# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

FRANCISCO JAY ALVAREZ,
Defendant and Appellant.

S089619

Kern County Superior Court
68352A

---

August 18, 2025

Justice Groban authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

Justice Liu filed a concurring opinion.

Justice Evans filed a concurring opinion.

Chief Justice Guerrero filed a concurring and dissenting opinion.

---

PEOPLE v. ALVAREZ

S089619

Opinion of the Court by Groban, J.

A jury convicted defendant Francisco Jay Alvarez of the first degree murders of Tyler Ransom (Tyler) and Dylan Vincent (Dylan) and of assaulting Dylan, a child under the age of 8, with force likely to produce great bodily injury, resulting in death. (Pen. Code,[1] §§ 187, subd. (a), 273ab.)  The jury found true a multiple murder special circumstance as to each count. (§ 190.2, subd. (a)(3).)  At the penalty stage, the jury returned a death verdict.

The defense filed a motion for a new trial based upon allegations of juror misconduct.  After a hearing, the trial court found juror misconduct and granted the motion for a new trial. On retrial, the jury again found Alvarez guilty on all three counts and found the multiple murder special circumstances true.  The jury again returned a death verdict and this time the court entered a judgment of death for the first degree murder convictions.  The trial court also sentenced Alvarez to 25 years to life for assault on a child causing death but stayed that term. This appeal is automatic.  (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)  Because this case raises a sufficiency of the evidence claim, we review the trial evidence in some detail.  For the reasons that follow, we strike a $200 parole revocation fine

---

[1]     All further undesignated statutory references are to this code.

1

imposed under section 1202.45 and in all other respects affirm Alvarez's judgment.

## I. FACTS

### A. Guilt Phase

In October 1994, Frank Alvarez and Shari Ransom (Shari) began a romantic relationship. Alvarez soon moved in with Shari and her infant son, Tyler, at her family home in Bakersfield. On November 15, 1994, Tyler suffered numerous and ultimately fatal physical injuries while Alvarez and Shari were at home with him. Tyler's right tibia and fibula were fractured. His ribcage had suffered approximately 40 fractures on three separate occasions. Alvarez was charged with murder, but the charges were initially dropped.

However, two years later, Alvarez began a romantic relationship with Diane Borgsdorf. On October 23, 1996, Borsdorf's four-year-old son Dylan died from injuries suffered while in Alvarez's care. Dylan had 70 to 75 bruises all over his body. Dylan bled to death internally after blunt-force trauma to his abdomen caused his internal organs to impinge upon his spine. Alvarez was subsequently convicted for both the murder of Tyler and the murder of Dylan.

*1. Prosecution Witnesses for Tyler Ransom's Murder*

### a. Shari Ransom's testimony

Tyler Ransom was the infant son of Shari and Brian Ransom (Brian). The three lived in a house owned by Shari's parents in Bakersfield. However, Brian and Shari separated and Brian moved out. Shari and Alvarez soon began a romantic relationship and Alvarez moved in to live with Shari, about two or three weeks before Tyler's death.

Shari testified that she did not see Alvarez acting "mean" toward Tyler. She saw him be "real good" and "gentle" around Tyler and call him a "good boy." However, Shari saw Alvarez turn Tyler's head sharply to one side once when he was putting Tyler down in his crib. Shari told Alvarez not to do it again explaining that it could hurt Tyler.

In November 1994, after Alvarez moved in, Shari began noticing bruises on Tyler's wrists, ears, buttocks, and back. There were fingernail marks inside both ears. Tyler seemed "more cranky," whined when picked up, and would not smile anymore. Shari testified in an earlier hearing that she possibly could have caused the bruises on Tyler's back because they matched her fingers. However, she did not actually believe that she had caused the bruises, and she had never put any finger mark bruises on Tyler before Alvarez moved in.[2]

On the morning of November 8, 1994, Alvarez woke Shari up saying that he had performed CPR on Tyler. Shari went and found Tyler lying on the floor in the den and he looked fine. Alvarez told Sharri that he had gone into Tyler's room and found Tyler had stopped breathing. Shari thought Alvarez was lying.

On November 12, 1994, Shari noticed that Tyler whimpered and acted sore when she picked him up, but thought it was congestion. Shari was worried and asked her father Albert T. to drive Tyler to the doctor. At the suggestion of her father, Shari's stepmother Elaine T. drove them to the hospital.

---

[2] Multiple witnesses, including Tyler's treating physicians as well as friends and family, corroborated that Tyler did not have injuries from physical abuse before October 1994.

Shari and Tyler were discharged from the hospital with medication for pneumonia.

On November 15, 1994, Shari got up in the morning and took care of Tyler. Alvarez left. When Shari changed Tyler's diapers, she did not see anything wrong with him. Tyler grimaced though when Shari picked him up from the chest area. Shari's sister-in-law came over for a short while.

Alvarez returned home in the afternoon. He went to the neighbor's house for about 30 to 40 minutes before returning again. Shari and Alvarez had an argument after Shari told Alvarez he needed to help pay the bills and Alvarez replied that he was not going to pay anything. Alvarez told Shari that she should give Brian Ransom an ultimatum to either pay child support or not see Tyler.

Shari's father called and they talked for about 30 minutes. While talking on the phone, Shari watched Alvarez go into the living room and pick Tyler up. Tyler had not been crying but started to when Alvarez picked him up. Alvarez carried Tyler out of sight toward the area of the bedroom, while Tyler cried.

Shari saw Alvarez walk back and forth to the bedroom two or three times. Tyler was crying the whole time. Tyler's cries grew louder and "more painful sounding" when Alvarez went back into the bedroom for the second or third time. Shari had not heard this type of cry before.

Shari told her father that Tyler had stopped crying and said that maybe Tyler had fallen to sleep. Within seconds, Alvarez called out her name. Shari responded, "What?" She did not hear anything for several seconds and then told her father to hold. Just as Shari got to the bedroom door, Alvarez started

yelling, "Call 9-1-1." Shari ran back to the phone and called 9-1-1.

Shari told the operator that something was wrong with her baby. The operator started asking her questions about the baby, and Shari told her to hold so that she could go back to the bedroom to see the baby. Shari saw Tyler unconscious on the bed with Alvarez trying to perform CPR on him. Alvarez pushed down on his chest "real hard" and hit him on the chest with his fist. Shari turned on the light and saw that Tyler's lips were "bluish-purple."

Shari returned to the phone and told the operator that Tyler looked "kind of blue." The operator told her to tell Alvarez how to perform CPR and said to push on the chest only with the fingers. Shari relayed the CPR instructions to Alvarez, but he did not follow them and continued to pound on Tyler's chest with his fist. Shari was shocked and told Alvarez to stop, but he did not. The operator told Shari to move Tyler to a hard surface and Alvarez moved Tyler to the dining room table. The operator said to wipe Tyler's mouth and to stick a finger in his mouth in case he was choking. Alvarez followed that instruction, but otherwise kept "doing the same thing he was doing before." Shari was yelling at him to stop and asked him to let her perform CPR, but he did not. Alvarez stopped when paramedics arrived.

Alvarez and Shari got into the truck to go to the hospital and Alvarez started driving off before the paramedics left. Shari asked Alvarez what he was doing because she wanted to wait for the ambulance. Shari told Alvarez that they had to go back to the house. After a couple seconds, Alvarez finally turned around and went back to wait for the ambulance.

When they got to the hospital, Shari spoke to police officers who told her that Tyler had a broken leg. Shari did not know at that point in time whether Alvarez had done anything to injure Tyler. She testified that she never shook Tyler violently, that she never harmed him in any way, and that she did not break his leg.

On the drive home from the hospital on the day after, Alvarez acted very nervous, asked Shari if she was wearing a wire, and felt her body to check for one. Alvarez told Shari "if Tyler didn't get better, that we needed to get the fuck out of Dodge." Alvarez told Shari that they had to have the same story. Alvarez asked Shari to lie to the police and say that "Tyler wasn't on the bed, he was on the floor, stuff like that." Alvarez told Shari to lie about the CPR to the police and tell them that he had not touched Tyler. Shari told Alvarez that she had told officers the truth.

### b. Albert and Elaine T.'s testimony

Brian Ransom had custody of Tyler on Halloween weekend, the first weekend after he moved out. Brian took Tyler to see Shari's father and stepmother, Albert and Elaine T. Elaine and Albert held and played with Tyler, and Tyler did not grimace. Tyler had a cold, but smiled and nothing was unusual about him.

Elaine testified that she saw Tyler again on November 5, 1994. Tyler appeared normal but had a cold. Because Tyler always seemed to have a cold, Elaine did not pay much attention to it. On November 12, 1994, Elaine saw Tyler after Shari asked her to drive Tyler to the doctor. Elaine immediately noticed something was wrong with Tyler. His nose had dried blood, and

he whimpered when touched. Elaine drove Tyler and Shari to the hospital.

Albert testified that he fixed Alvarez's truck on November 14, 1994. Albert saw Tyler in his crib in the front room. Tyler's breathing was labored, and he did not look right.

On November 15, 1994, Albert called Shari at about 3:30 p.m. Shari seemed calm and concerned about Tyler. Albert could hear Tyler crying loudly in the background and then it grew fainter and then it stopped. Three to four minutes after he last heard Tyler crying, Albert heard Alvarez yell, "Quick, call 9-1-1, Tyler quit breathing."

### c. First responder's testimony

On November 15, 1994, at 4:40 p.m., a paramedic and a fire department engineer responded to a call involving a respiratory arrest of a five-month-old baby. They arrived within two minutes and knocked on the front door, identifying themselves as the fire department. Shari answered the door.

The paramedic walked in and saw Tyler lying on his back on the dining room table. Alvarez was seated next to Tyler. Alvarez was not performing CPR and looked "somewhat calm." As the paramedic approached, Alvarez got up and walked into the kitchen area with Shari. Tyler was unconscious and nonresponsive. The paramedic assessed Tyler's airway as open and put an oral airway in to ventilate him. Tyler's coloring was beginning to turn blue from lack of oxygen.

The ambulance transported Tyler to Kern Medical Center. The paramedic noticed Tyler's right leg was snapped in two with the tibia and fibula broken. The paramedic did not see any bruising on Tyler's leg. The paramedic wrote notes regarding

the case within 30 minutes of returning from the call.  He thought Tyler's case as "odd" and "didn't seem quite right."  He wrote that Tyler's right leg had severe swelling and deformity.  The paramedic wrote in his notes that Shari and Alvarez showed no emotion.  He believed that he saw some tears on Shari's face, but never any on Alvarez's.

### d. Dr. Loren Leidheiser's testimony

Dr. Loren Leidheiser examined Tyler on November 12, 1994, when Tyler arrived at the emergency room with complaints of congestion and a cough, and again on November 15, 1994, when he arrived with his ultimately fatal injuries.  On November 12, 1994, Dr. Leidheiser documented ecchymosis, which was a purplish discoloration of the skin, on the top part of Tyler's ear and on his wrist.  The ecchymosis was consistent with a trauma bruise, but at the time Dr. Leidheiser was not able to diagnose the cause.

When Dr. Leidheiser looked at Tyler's chest X-ray on November 12, he was concerned with some shadows that were consistent with a lung infection.  He wrote on Tyler's chart that he thought it might be an early sign of pneumonia.  A radiologist who also looked at the X-ray agreed with Dr. Leidheiser's opinion that it was not full blown pneumonia.

However, at trial, Dr. Leidheiser testified that he overlooked that Tyler's X-ray also showed a small fracture to his rib.  He said that he overlooked it because he was looking for an infection based on the symptoms.  In retrospect, Dr. Leidheiser thought it was reasonable to conclude that Tyler was having respiratory problems due to some fractured ribs.  Dr. Leidheiser opined that the rib fracture he had missed in the X-ray and the

ecchymosis on the wrist and ear were consistent with child abuse bruise trauma.

Three days later, on November 15, 1994, Dr. Leidheiser was again working in the emergency room when Tyler again arrived in critical condition. Dr. Leidheiser intubated Tyler, put him on a ventilator, and administered medicine through an IV. Tyler did not have neurological reflexes. Tyler's eyes exhibited retinal hemorrhages, bleeding spots in the back of the eye. Such bleeding is directly related to the baby being shaken back and forth.

Dr. Leidheiser noted that Tyler's skin was discolored on his right temple and ear and on his wrist. Tyler's right leg had an abnormal deformity in the tibia. The right leg was unstable in a way that was "overwhelmingly suggestive of a fracture." Dr. Leidheiser thought the injury was fresh and was consistent with it having occurred immediately before Tyler arrived at the hospital. Based on Tyler's leg fractures, Dr. Leidheiser opined that it was a child abuse injury.

Dr. Leidheiser interviewed Alvarez and Shari, together and separately. During her interview, Shari did not talk much and focused on Tyler's condition. She seemed stunned and very upset. Alvarez, on the other hand, seemed anxious and inquisitive and did not appear overcome with grief. Alvarez said that he did not know what was wrong with Tyler and repeatedly kept asking if the doctors had figured it out yet.

### e. Dr. Aiylam and Dr. Bogost's testimony

On November 16, 1994, Dr. Parameswaran Aiylam and Dr. Gregg Bogost evaluated Tyler's condition. Tyler was on a respirator and nonresponsive to any painful stimuli. Dr. Aiylam

and Dr. Bogost both concluded that Tyler had suffered total and irreversible cessation of brain function.

Dr. Aiylam talked to Tyler's parents and told them nothing more could be done for Tyler and recommended that they turn off the respirator. Shari and Brian agreed. On November 16, 1994, Dr. Aiylam turned off Tyler's respirator at 3 p.m. and he was pronounced dead ten minutes later. Dr. Aiylam diagnosed Tyler's cause of death as brain edema. Dr. Aiylam's discharge diagnosis included child abuse, multiple rib fractures, right tibia and fibula fractures, liver hematoma, bilateral hemothorax subdural hemorrhages, and increased intracranial pressure.

Dr. Bogost opined Tyler suffered from diffuse axonal injury, which is an injury to the brain. Tyler was neurologically impaired from the moment the injury occurred. Dr. Bogost examined Tyler's leg X-rays which showed his right tibia and fibula each had a nondisplaced fracture. Tyler's fibula suffered a buckle fracture. Dr. Bogost opined, based on the X-rays, that Tyler's leg fractures occurred sometime between ten minutes and possibly two or three days before the X-ray. The fractures could have occurred from someone grabbing the knee and ankle and then twisting the leg, or from a fall or a drop from a significant height.

### f. Shari's police interviews

Two detectives interviewed Shari on November 15, 1994, and again, after Tyler died, on November 16, 1994. The interviews were tape-recorded and one of the detectives testified about them. The two detectives asked repetitive questions to see if Shari would change her story. Her responses were

consistent except on whether Alvarez told her he was taking Tyler to the back room or if she asked him to take him.

Shari said that the last time Brian had custody of Tyler was the weekend of November 4 to 6, 1994.  When Tyler came back, he had bruises on his wrist, fingers, and both ears.  Shari thought the bruises were about one day old.  She told detectives that Tyler had more bruises on his back that were not there when she got him back from Brian.  Shari did not think Brian caused the bruises.  She initially did not think Alvarez had hurt Tyler and thought that perhaps it was an accident.  Shari said Alvarez was a "nice guy" and treated Tyler "good" in her presence.

A detective pointed out that Tyler's bruising began when Alvarez moved in.  Shari said that Tyler bruised "really easily."  Shari thought the fingerprint bruises on Tyler's back were probably from her picking him up, and not Alvarez.

Shari asked if Tyler had injuries to his ribs and the detective told her Tyler had "lots of injuries."  Shari said Tyler had a sore chest and sore ribs since he got sick about week after Halloween.  Shari noticed Tyler was unusually cranky for the past week, but thought it was from teething.  The detective asked Shari how long Tyler had been cranky when Alvarez was around him, and she said, "[a]ll the time."  She clarified Tyler was not cranky around Alvarez at first, but just when he got sick.  Shari described how Alvarez performed CPR.  She said Alvarez pinched Tyler's nose and breathed into his mouth.  Shari said Alvarez was pushing hard on Tyler's chest and slapping it.  Shari told Alvarez to listen to her CPR instructions, but he would not listen and kept pushing on Tyler's chest.

Shari said she had not seen anything wrong with Tyler's leg. The first time Shari heard that there was something wrong with Tyler's leg was from a police officer at the hospital.

During the second interview, Shari said that she saw how swollen Tyler's leg was at the hospital and it was not like that when she changed his diaper. She said that on the day before, Brian was with Tyler in the intensive care unit and she could tell that Brian had not caused Tyler's fatal injuries, that she knew she did not do it, and that left only one person.

Shari told the detective about the prior incident in which Alvarez had told her that he had awakened in the night to find that Tyler was not breathing and had resuscitated him with CPR. She also told the detective about the conversation she had with Alvarez the night before when they got home from the hospital, and that Alvarez had asked her to lie to the police.

### g. Dr. Armand Dollinger's testimony

On November 18, 1994, Dr. Armand Dollinger performed an autopsy on Tyler. He found no evidence, other than the pneumonia directly related to the chest wall trauma, that Tyler suffered from any disease that attributed to his death. Tyler had swelling on his right leg around an apparent fracture. Dr. Dollinger thought it was "certainly possible" that Tyler's leg injury occurred immediately before coming to the hospital, approximately 22 hours before the autopsy. Tyler's right shin, tibia, and fibula also had bruising.

An internal examination of Tyler's chest revealed 19 fractures to his left side, and 21 fractures to his right side. Dr. Dollinger found the rib fractures occurred in three different time periods. Two rib fractures near the spine were fresh fractures with new hemorrhages. Other fractures were several days old,

showing yellow discoloration indicating that they were 72 hours or older.  Numerous fractures were also healing fractures with thickened callus formation, which demonstrates a variable age differential, but were possibly seven to ten days old.

Tyler's scalp had a contusion on the left side that Dr. Dollinger opined was caused by a hard object.  An internal head examination revealed a bruise on the scalp and multiple hemorrhages.  Tyler's brain was swollen and generally softened, commonly seen in brain death when the brain is severely damaged.  Tyler's left eyelid also had a small area of ecchymosis.  Tyler also had a retinal hemorrhage.

In 1994, Dr. Dollinger concluded Tyler's cause of death as traumatic encephalomalacia due to subdural hemorrhage due to blunt-force trauma consistent with shaking.  In 2000, Dr. Dollinger testified that in retrospect, instead of stating that the brain injury was due to a subdural hemorrhage, he would conclude that the brain injury and subdural hemorrhage were due to blunt-force trauma consistent with shaking.  Dr. Dollinger opined that Shaken Impact Syndrome, as opposed to Shaken Baby Syndrome, is more applicable to Tyler because he had a contusion on his scalp along with a hemorrhage.

### h. Dr. Frank Sheridan's testimony

Dr. Frank Sheridan was board certified in neuropathology and forensic pathology and had performed over 3,000 autopsies, but was not present at Tyler's autopsy.  Dr. Sheridan explained that Shaken Baby Syndrome is the collection of particular injuries in the head area that are indicative of the child having been shaken violently.  Dr. Sheridan opined that Tyler died as a result of shaking with an impact as well.  Dr. Sheridan pointed to impact injuries to Tyler's left side of his scalp as well as a

subdural hemorrhage, subarachnoid hemorrhage, swollen brain, hemorrhage around the optic nerves, and retinal hemorrhage. These injuries were all clearly fresh. Microscopic slides of Tyler's brain showed no old injuries. However, a skeletal slide, which appeared to be from a muscular area under the skin, indicated an injury at least a few days prior to death, along with a new injury. Some injuries to Tyler's ribs were more than a few days old also. One rib had previously been fractured and then fractured again later.

### i. Dr. Phillip Walker's testimony

Dr. Phillip Walker was a physical anthropologist. He specialized in researching traumatic injuries in cases of homicide, especially skeletal injuries associated with child abuse, and interpreting the physical evidence from the skeleton to reconstruct what happened in the past.

Dr. Walker was consulted in 1997 to study Tyler's bones to try to determine how long before death the rib and leg fractures occurred. Dr. Walker grouped Tyler's ribs into four categories: (1) recent fractures with minimal healing; (2) older fractures with gross healing; (3) ribs with new bone forming but without a fracture; and (4) two greenstick fractures, which do not go all the way through the bone, with signs of healing.[3] Dr. Walker opined that Tyler's rib fractures were typical of child abuse cases where someone grabs and compresses the child's chest and then shakes. Tyler's rib fractures were classic rib fractures from squeezing and/or shaking abusive injury. Dr.

---

[3]     Dr. Walker observed a few rib fractures in areas where Dr. Dollinger did not, and similarly Dr. Dollinger observed a few rib fractures in areas where Dr. Walker did not.

Walker opined that the recent rib fractures had occurred within a few days of death. Dr. Walker determined that Tyler's tibia fracture was an angular fracture that went through the bone and is commonly found in child abuse cases. The fibula had a greenstick fracture that did not go all the way through the bone. Dr. Walker found no evidence of healing in the tibia or fibula. He concluded that the tibia and fibula fractures occurred immediately before Tyler entered the hospital.

### j. Dr. Donald Cornforth's testimony

Dr. Donald Cornforth was a diagnostic radiologist who studied X-rays. Dr. Cornforth compared the X-rays from August 10 and September 28, 1994, and opined that the ribs, spine, and bone structures were all normal in both X-rays. Dr. Cornforth found no fractures or injuries on those X-rays. The diagnosis was a lower respiratory tract infection.

In the X-ray from November 12, 1994, Dr. Cornforth noticed a new rib fracture, but no healing callus from any earlier injury. If there had been a fracture on September 28, 1994, there would have been sufficient time on November 12 for an "excellent callus and [it] would make it very easy to see a rib fracture if it had happened in September." Dr. Cornforth opined that the X-ray from November 12 showed no prior, old rib injuries. The only rib fracture Dr. Cornforth noticed on the November 12, 1994 X-ray was displaced and not very obvious, but he testified that you can overlook or not see fractures if they occurred within the last day or two. In sum, in reviewing the X-rays from August 10, September 28, and November 12, 1994, Dr. Cornforth did not identify any rib fractures as occurring before the date that Alvarez moved in with Shari, but did identify one rib fracture from after that date on the November 12 X-ray.

### k. Dr. Kevin Rice's testimony

Dr. Kevin Rice was a board-certified radiologist. After reviewing Tyler's X-rays and medical chart, Dr. Rice concluded that this was a child abuse case. Dr. Rice had separate bone X-rays taken after Tyler died. The postmortem X-ray of Tyler's right leg showed a fracture in the tibia and another in the fibula. The fractures were consistent with child abuse. Typically, such fractures would be caused by a direct blow or less likely by twisting. The leg fractures were less than 10 to 14 days old. Tyler also had multiple rib fractures. The type of rib fractures that Tyler had is typically caused by an adult squeezing the baby's chest. Dr. Rice opined that the rib fractures were recent and less than eight weeks old.

Dr. Rice also examined a CT scan of Tyler's brain and abdomen. The CT scan revealed that Tyler had fluid around the lung and right ribs as well as an abnormality of the liver due to an injury. The liver injury could have occurred from blunt force trauma. The CT scan also showed Tyler had two subdural hematomas in the back part of his head.

### l. Dr. Ronald Cohen's testimony

In 1998, Dr. Ronald Cohen, a pediatric radiologist, reviewed Tyler's X-rays and medical records. Dr. Cohen opined that the X-ray from November 12, 1994, showed swelling or fluid along Tyler's right chest wall along with several rib fractures.

The November 15, 1994, X-ray showed evidence of healing or callus formation in some rib fractures on the lateral side. Callus formation is first seen at seven to ten days after an injury. The healing was more evident on November 15, 1994, than on November 12, 1994, consistent with an injury occurring approximately 10 to 14 days earlier. However, there was

indication of several rib fractures in different states of healing, indicating injuries from different occasions. In Dr. Cohen's opinion, Tyler's rib fractures were consistent with child abuse squeezing. Tyler's rib fractures do not occur with CPR, whether it is performed properly or improperly.

A November 16, 1994, X-ray indicated Tyler's right tibia and fibula were fractured in a way seen in child abuse cases and that can be caused by bending or twisting. The leg fractures had no sign of new bone or callus formation, which in Dr. Cohen's view would make them recent injuries, less than seven to 14 days and consistent with having occurred 22 hours before Tyler died. Tyler's right leg fractures would generally occur as an inflicted injuries and were unlikely to be caused by falling. Tyler could not have caused his leg fractures himself. Dr. Cohen opined that the leg fractures were due to a violent inflicted injury.

### m. Jeff M.'s testimony

Jeff M. had known Alvarez for approximately ten years and testified that on the night before Tyler's death, Alvarez told him that Tyler "just cries all the time. It just kind of gets to me after a while."

### n. Child protective services proceedings

A social worker for child protective services (CPS) testified that on April 5, 2000, about six years after Tyler's death, she responded to a call that Shari was using drugs in her home and neglecting her then four-year-old daughter, Taylor. The social worker told Shari the condition of the home was unacceptable and asked her to clean it up. The social worker asked Shari for a drug test and Shari took one the following day. The social worker returned to the house on April 7, 2000, and found the

house to be clean. The social worker had no concern about physical abuse by Shari. The social worker observed the relationship was a normal mother-daughter relationship and that they had a good bond.

On April 13, 2000, Shari's preliminary drug test came back positive for marijuana and amphetamines. The social worker returned with a police officer who arrested Shari for being under the influence (Health & Saf. Code, § 11550) and misdemeanor child endangerment (*id.*, § 273a, subd. (b)).[4] The house was dirty again. The social worker took Taylor into her custody on that day because of Shari's positive drug test, the condition of the home, and because she was concerned that within two weeks two different men were staying in the home. During this visit, Taylor picked up a small object resembling an ice pick and threatened to stab a CPS worker. Shari told the social worker that she was clean and had not used drugs.

Another CPS worker testified there were pending allegations against Shari for her drug use and filthy house on April 13, 2000, and for a failure to protect Taylor from potential sexual abuse by Shari's brother. Shari had been molested by her brother 16 years earlier and the same brother was living with her and Taylor. CPS, however, found insufficient evidence to show that Shari purposefully inflicted physical abuse on Taylor.

Shari testified that she had a pending dependency hearing and needed to show that she was a fit parent so she could be reunified with Taylor. She admitted to using

---

[4] When Shari's subsequent urine test came back negative, she was only charged with child endangerment based on the dirty house.

methamphetamine on one occasion and smoking marijuana for a couple weeks while pregnant and admitted that she had lied about using drugs.

### o. Dr. Dean Haddock's testimony

Dr. Dean Haddock was a licensed clinical psychologist. As explained further in part II.D below, Dr. Haddock testified in rebuttal that he administered the Child Abuse Potential Inventory test to Shari in 1998 and that his opinion was that Shari "was not at risk to physically abuse children in her care."

### 2. Defense Witnesses for Tyler Ransom's Murder

### a. Alvarez's testimony

Alvarez denied killing Tyler. He testified that on November 15, 1994, he left the house at 8:10 a.m. for a physical therapy appointment and returned around 1:30 p.m. Alvarez testified that he heard Tyler crying when he returned. Shari was changing Tyler's diaper on the couch. Alvarez kissed Tyler and Shari finished changing his diaper. After Alvarez changed his clothes, he and Shari went into the kitchen to discuss bills that Shari wanted Alvarez to pay. Alvarez claimed that he did not get upset, but rather Shari got upset and angry with Brian.

Alvarez testified that he went outside and spent an hour with a neighbor. Alvarez said he came back inside, and Tyler was crying in the crib in the living room while Shari was in the kitchen. Shari's father called. Alvarez carried Tyler into the master bedroom, as Shari had asked, while she talked on the phone. Tyler continued to cry after Alvarez carried him to the master bedroom. Alvarez claimed he did not notice any bruises or injuries on Tyler, but that he would not have because he was in a full jumpsuit. Alvarez placed Tyler in the middle of the bed

with pillows on both sides to protect him from falling. Alvarez testified that he was in the room with Tyler for a minute and a half at most and that he did not do anything to injure him. Alvarez denied shaking him and claimed that he did not drop him.

Alvarez testified that he returned to the kitchen table and sat next to Shari. He could still hear Tyler crying. Alvarez claimed that when Tyler stopped crying about two or three, or possibly as long as 10 to 15 minutes later, he went back to check on Tyler because he thought Tyler might have fallen off the bed. Alvarez testified he went into the bedroom, and saw that Tyler was not breathing and he immediately told Shari to call 9-1-1. Alvarez claimed that he picked Tyler up and carried him down the hall. When he was walking down the hallway, Shari was already on the phone with 9-1-1. Shari was relaying to him what the 9-1-1 operator was saying. He claimed he pressed "a little" on Tyler's chest and never hit Tyler's chest. Alvarez claimed Shari's testimony that he pushed on Tyler's chest after bringing him into the kitchen was inaccurate. Alvarez testified that he followed the 9-1-1 operator's instructions for CPR that Shari was relaying to him. Alvarez testified that when the paramedics arrived, he was standing over Tyler trying to get him to breathe.

Alvarez testified that when he and Shari got in the truck, he drove off because he wanted to beat all the red lights, and he knew where the emergency personnel were going. Late that night, Alvarez and Shari left the hospital together. Alvarez denied that he told Shari that they needed to "get out of here, let's get the — out of Dodge." Alvarez testified that he told officers he would not torture a baby because the baby was sick. Alvarez thought Brian Ransom might have been involved in Tyler's death because he was with Tyler the night before.

### b. Shari's family's testimony

Brian Ransom's sister testified that between January and April of 2000, she twice noticed injuries on Shari's daughter Taylor. Taylor had a faint, black bruise in the corner of one eye. Taylor initially said that nothing had happened, but then, after Brian's sister asked her what had happened to her eye, she said that her mother had gotten mad at her and hit her. Another time, Taylor had bruises on her stomach and on a leg. Taylor said she fell on her bedpost causing the bruise on her stomach. Brian's sister testified that she had no physical proof that Shari was abusing Taylor but had "notions of it."

Brian Ransom's fiancé testified that in January 2000, she saw a mark and bruise on the corner of Taylor's eye. She asked Taylor what had happened and Taylor in tears said, "I ran out in the rain and my mama hit me."

### c. Shari's neighbors

A neighbor lived across from Shari Ransom in 2000. The neighbor testified that Shari constantly berated her daughter. He saw Shari, her brother, and her brother's girlfriend holding Taylor down by the shoulders "probably" more than five times and believed that they took pleasure in it. While laughing, they would yell at her to make her scream for hours. The neighbor testified that Taylor cried all the time and Shari would call her stupid.

Another neighbor testified that she heard Shari be verbally abusive and scream at Taylor every day, calling her names like "stupid." The neighbor never saw Shari hit Taylor, but one time she saw Shari throw a shoe at her because she came out of her room.

An investigator testified that a third neighbor confirmed to him, after initially denying it, that he saw Shari hit Taylor with an open hand on the back, front, and side of the head, sometimes knocking the child off her feet. The neighbor also told the investigator that Shari was always yelling at the child and that he had seen Shari spank her after removing her clothing.

### 3. *Prosecution Witnesses for Dylan Vincent's Murder*

### a. Diane Borgsdorf's testimony

Dylan Ross Vincent was born on September 19, 1992, to Diane Borgsdorf. Dylan fell often, incurring numerous bruises. In July of 1996, Borgsdorf and Alvarez began a romantic relationship. Alvarez stayed over "all the time" at Borgsdorf's apartment. In August of 1996, Borgsdorf and Dylan moved into a new apartment with Alvarez. After they moved in together, Borgsdorf saw bruises on Dylan more frequently. On occasion, Alvarez told Borgsdorf to keep Dylan home from preschool. On one occasion, he told Borgsdorf to keep Dylan out of preschool because he did not want the teachers to see bruises on him after Dylan scraped his face. On another occasion, Borgsdorf saw red finger imprints on Dylan's neck from Alvarez holding his neck as he escorted him to his mother. Borgsdorf noticed that Dylan was afraid of Alvarez at times, mostly when she argued with Alvarez.

On October 22, 1996, Borgsdorf returned home from work and followed Dylan into his room to get him undressed. Alvarez became furious and "just started screaming and yelling and arguing with me." She told Alvarez to get out and get away from her. Afterwards, Alvarez calmed down and said they had to get

ready because Jeff M. and his girlfriend Teresa H. were coming over. Around 7:30 p.m., Jeff and Teresa came over for dinner.

Borgsdorf put Dylan to bed at 9 p.m. after changing him. She did not notice any bruises. Borgsdorf asked Alvarez if on the next day he would take Dylan with him to the store and buy Dylan new pants. Alvarez said he would take Dylan because he was meeting his dad anyway and that he would drop Dylan off at school at 1 p.m. Borgsdorf was running late for work and Dylan and Alvarez were both still in bed when she got up around 6:30 a.m. She arrived at work at 8 a.m.

During that day, Borgsdorf wrote a letter to her niece describing Dylan as a battered child and that he had "so many bruises." Borgsdorf testified she never received a message from Alvarez, telling her to come home at lunch and watch Dylan.[5] Borgsdorf called home at 12:50 p.m. to see if Alvarez had dropped Dylan off at school, but no one answered. She clocked back into work at 12:56 p.m. At roughly 2 p.m., Borgsdorf received a panicked call from Alvarez, telling her it was emergency and to get home. Borgsdorf's coworker drove her home, taking approximately 15 to 20 minutes.

When Borgsdorf arrived home, Alvarez was in the living room and told her to call 9-1-1. When Borgsdorf went to the phone, the 9-1-1 operator was already on speakerphone. As Borgsdorf began talking to the 9-1-1 operator, Alvarez was calling out what was wrong and that Dylan "wasn't breathing, was breathing." Borgsdorf explained this to the operator. Alvarez was panicked and running back and forth. The operator

---

[5] Conversely, Alvarez testified that he left such a message for Borgsdorf.

told Borgsdorf to bring Dylan near the telephone and put him on the floor. Borgsdorf asked Alvarez to bring Dylan into the living room, but he refused. When Borgsdorf began to hear the sirens, Alvarez said Dylan was "breathing, but barely breathing."

A police officer arrived shortly thereafter and Borgsdorf followed him into Dylan's room. Alvarez did not let Borgsdorf go into the bedroom before the officer arrived. Borgsdorf noticed Dylan was covered in bruises, which she had not seen the night before when she got him ready for bed. Borgsdorf asked Alvarez how Dylan got so many bruises. Alvarez pulled her out of the room and told her that she had to say she put them there or he would go back to jail. He then told her that "he was playing with him all day, he had been throwing him in the air or something, and that Dylan had bumped into him." Borgsdorf had never seen Alvarez play with Dylan that way before. At some point, Alvarez was rambling on about how Dylan bruised easily.[6]

### b. First responder's testimony

On October 23, 1996, at about 2:10 p.m., a police officer was dispatched to Borgsdorf's home and arrived one to two minutes later. When he got there, he walked into the bedroom where he saw Alvarez, Borgsdorf, and Dylan lying on the bed. Dylan was naked, his skin was "slightly bluish," he "had bruises from his neck to his hips," he had a large bruise on his forehead, and he was not moving. The officer touched Dylan and felt that he was cool to the touch and that he was not breathing. The

---

[6] As part of a plea agreement, Borgsdorf pled guilty to five counts of child endangerment for failing to protect Dylan and was sentenced to 14 years in prison. She was promised nothing in return for testifying.

officer asked if anyone attempted CPR. Alvarez said that he did not know how. The officer checked Dylan for a pulse, found none, and started CPR. While performing CPR, the officer noticed a small amount of blood dripping from Dylan's penis. Alvarez was saying that, "Dylan bruises easily."

The officer noticed that Alvarez appeared "nervous, was pacing back and forth, speaking in an accelerated manner." Alvarez was again saying that "Dylan bruises easily," and "walks into walls and falls down a lot." The officer asked Alvarez what happened. Alvarez said that "he and Dylan had been playing earlier in the day and that if Dylan would have received any injuries, that he would have noticed it." He said that later on Dylan had called out to him "Daddy, I need to go to the bathroom." He said he then walked into the bedroom and found Dylan barely breathing.

A police sergeant arrived at the apartment at approximately 2:27 p.m. just as an ambulance carrying Dylan was leaving. The sergeant saw Alvarez in front of the residence and heard him stating out loud that Dylan had been sick for a long time, that he bruises easily and everybody knows that, and that he often gets dizzy and falls into the wall. Alvarez also said that Borgsdorf sometimes "tells me not to play with him too hard. I don't mean to bruise him. Maybe I'm too rough sometimes, but I don't mean to be." Alvarez said that Dylan had been sick all day. Alvarez said he heard Dylan call for him saying that he had to go to the bathroom. Alvarez said he went to assist Dylan because Dylan had been dizzy and could not stand on his own. Alvarez said he helped Dylan into the bathroom, but then Alvarez felt something fall on his own foot and saw blood dripping from Dylan's penis. Alvarez claimed he said, "Oh, my God," and then Dylan fell unconscious. Alvarez

25

said he called Borgsdorf at work and then called emergency help. The sergeant noted he did not see any blood on the sandals Alvarez was wearing. Borgsdorf went back into the apartment to use the restroom. The sergeant followed her inside and told her to come out immediately. When he looked in the bathroom after she left, he noticed a bloody towel on the countertop that he did not remember from the first time he looked into the bathroom.[7]

### c. Dr. Peter Ellis's testimony

On October 23, 1996, at about 2:30 p.m., Dr. Peter Ellis treated Dylan in the emergency room at Mercy Hospital. Dylan was in full arrest, had no vital signs, and showed no evidence of life. Dr. Ellis "did just about everything humanly possible to restart his heart." Dr. Ellis pronounced Dylan dead at 3:17 p.m. However, Dr. Ellis believed that Dylan was "essentially dead on presentation." Dylan was in a moribund condition, and it was possible that he was "down" for several hours. Dr. Ellis' stated that Dylan may have been injured and hurt for a long period of time. Dr. Ellis believed that Dylan had sustained a significant injury to his abdomen causing distention. The trauma to Dylan's abdominal cavity possibly may have caused him to have full arrest. Dylan had "many, many bruises over his body," including on his head, trunk, abdomen, buttocks, and back, and his mouth appeared to have some bleeding as well. Dylan had

---

[7]     A criminalist confirmed that blood from the towel matched Dylan and did not match Alvarez or Borgsdorf. Blood found on bedroom linens also matched Dylan and did not match Alvarez or Borgsdorf. Blood found on the bedroom wall and on a towel in Alvarez's truck was inconclusive as to whose it was.

a mark on his midback that appeared to have been inflicted by an implement.

### d. Borgsdorf's police interviews

After Dylan had died, on October 23, 1996, at approximately 5:30 p.m., two detectives interviewed Borgsdorf in a tape recorded interview at the police department building. Borgsdorf told detectives that she never saw Alvarez hit her son, but that Alvarez would hold him around the neck, causing marks. Alvarez would also regularly go into Dylan's room while Borgsdorf was sleeping and occasionally she would wake up to Dylan screaming or crying and find Alvarez in Dylan's room. When the detectives asked if Alvarez "was takin' out . . . the argument with you on your son," Borgsdorf responded "[m]aybe."

Borgsdorf informed the detectives that Alvarez had told her that he had been in jail twice. He told her he was arrested for murdering a child. The detective asked, "He told you that he had been arrested for murdering a child in the past and you trusted him with your child?" Borgsdorf replied, "[t]hey had proven that he didn't do it." Borgsdorf said she was scared to confront Alvarez because of his temper. When confronted that she knew Alvarez was abusing Dylan, Borgsdorf responded that she did not know what to do and she was too scared, especially since her fight with her brother. Borgsdorf said, "I don't have a doubt in my mind that [Alvarez] physically killed my son today, killed my son."

Borgsdorf said on the night before she had told Alvarez to get out of her life. Alvarez pushed Borgsdorf down on Dylan's bed. She got up and pushed him back, Alvarez pushed her down again, calling her stupid. Borgsdorf had nowhere to go and so

she told Alvarez she was "stuck there." Alvarez admitted being jealous with Dylan because Borgsdorf gave him less attention that Dylan got. The next morning, when Borgsdorf changed her mind about Alvarez taking Dylan to go shopping that day, Alvarez stopped her from taking Dylan to school. Alvarez instead insisted that Borgsdorf not wake Dylan up as she was leaving. He said he wanted to let Dylan sleep and that he would wake him up later.

On October 24, 1996, another officer spoke to Borgsdorf to obtain medical release forms for Dylan's medical records. After Borgsdorf asked him, the officer confirmed that Dylan was "really dead." Borgsdorf started crying and became very upset. In reference to Alvarez, Borgsdorf said, " 'I want that mother fucker dead.' " Borgsdorf told the officer that Alvarez had raped her. She said that she was afraid of him and that he made her feel like she was nothing.

### e. Dr. Dollinger's testimony

As described above, Dr. Dollinger conducted an autopsy on Tyler Ransom. On October 24, 1996, Dr. Dollinger conducted an autopsy on Dylan as well. Dylan bled to death due to transection of the small intestine, the pancreas, and vascular structures due to blunt-force trauma. Considerable force is necessary to cause such injuries. Dr. Dollinger opined Dylan could have died within a matter of minutes or could have survived up to three to four hours, but no more than that. Dr. Dollinger believed the blood coming from Dylan's penis could have been due to a retroperitoneal hemorrhage or possibly an injury to the kidneys that was not grossly evident.

Dr. Dollinger counted approximately 70 to 75 bruises on Dylan's body. Dr. Dollinger estimated that Dylan likely

sustained about 30 blows. Dr. Dollinger opined the bruises were recent and occurred within two hours of his death.

### f. Dr. Sheridan's testimony

In addition to reviewing Tyler's medical records, Dr. Sheridan reviewed Dylan's medical records in March 1998. Dr. Sheridan opined that Dylan's major lethal injury probably occurred two to three hours, at most, before the 9-1-1 call at 2:15 p.m. He determined that the injuries could not have occurred more than a couple hours before the 9-1-1 call.

Dr. Sheridan noted that the front of Dylan's abdomen had several bruises that were consistent with more than one hand punch. Dylan also had a severe, fatal injury to his abdomen. His pancreas was essentially cut in two. His small intestine was also torn, resulting in a major internal hemorrhage. Dr. Sheridan testified that he was "sure" the impact object was a fist. It took "considerable force" to inflict these abdomen injuries.

Dr. Sheridan pointed out injuries to Dylan's face that were consistent with an attempted smothering. Dr. Sheridan also found that Dylan suffered numerous injuries to his head, including a large, rectangular patterned bruise on his forehead, which indicated an impact injury. Dr. Sheridan noted that Dylan had numerous blunt force injuries and bruises to the back of his torso, chest, abdomen, and particularly to his buttocks. Dr. Sheridan concluded there were several discrete, nonoverlapping injuries requiring separate impacts.

### g. Monica Alvarez's testimony

Monica Alvarez (Monica) is Alvarez's sister. Monica first met Dylan a little over a month before Dylan's death.

Throughout the time she knew him, he had bruises or injuries. Monica recalled seeing injuries or bruises on Dylan three times. One time Dylan had a scabbed nose and lip. Around September 30, 1996, Monica saw a bruise on Dylan's forehead, and his ankle was swollen and bruised. When Monica asked Dylan how he got the injuries, he would "generally just repeat whatever you ask him, like bruise or fell." Monica then asked Dylan how many times Alvarez had hit him, and Dylan responded, "four times." Dylan had "slow speech for a four-year-old" and did not speak clearly, but Monica was able to understand him. Borgsdorf told Monica that Dylan was being kept out of preschool because of his bruises and injuries. Alvarez told Monica that Dylan was being kept at home because "they didn't want to cause any suspicion at the preschool."

On October 23, 1996, the day Dylan died, at approximately 12:20 p.m., Alvarez called Monica trying to get a hold of their father Ben Alvarez (Ben). Alvarez said he had been at the mall waiting for Ben for approximately 30 minutes. At Ben's request, Monica said that Ben had already left for the mall, even though he was still at her house. However, during their phone conversation, Alvarez heard Ben in the background. Alvarez told Monica that he had something he needed to take care of and that he would meet Ben at the mall.

### h. Ben Alvarez's testimony

Ben is Alvarez's father. Ben testified that Dylan seemed like a typical little boy, but was clumsy, tripped all over sometimes, and was a little slow in his speech and difficult to understand. One time, Ben noticed bruises on Dylan's lip and the side of his mouth, but not his cheeks. When Ben asked Alvarez about the lip injury, Alvarez told him that Dylan tripped

and hit a rug and that he was clumsy, accident-prone, and bumps into things. When Ben asked Dylan how he got hurt, Dylan "said 'daddy,' and once he said — he mumbled different things. He was sort of incoherent. I couldn't understand him. He sort of flip-flopped, you know, from time to time as to what happened to him, kind of like he wanted to please who it was that was asking the questions half the time." When Ben asked Dylan who put that "big lip" on him, he told him it was Alvarez.

On October 23, 1996, Ben and Alvarez planned to meet at the mall around 10:30 or 11:00 a.m. Ben arrived late at the mall around 1 p.m. and Alvarez and Dylan were not there. Ben stayed at the mall for between 25 and 35 minutes and did not see Alvarez or Dylan.

### i. Jeff M. and Theresa H.'s testimony

On October 22, 1996, the evening before Dylan died, long time social acquaintance Jeff M. and his girlfriend Theresa H. visited Borgsdorf and Alvarez for dinner. Theresa thought Dylan acted "very scared" when Alvarez was in the room with him. After Alvarez had left the room, Dylan showed Theresa his neck and said he had an "owie" on his neck and then showed them a bruise on the back of his elbow and on his leg. Jeff and Theresa did not see anything on Dylan's neck but saw bruises on the other locations. After Alvarez returned, he put his hands over the side of Dylan's neck. Alvarez told Jeff that Dylan was "always running around and falling and hitting himself." After dinner, Dylan gave Jeff, Theresa, and his mom a hug and kiss on the cheek. Alvarez made Dylan give him a kiss too, but Theresa thought Dylan "acted very scared" and "was pulling back like he didn't want to."

### j. Borgsdorf's family's testimony

Borgsdorf's brother and her brother's wife testified that Dylan had lived at their house before Borgsdorf moved in with Alvarez and they never observed any abnormal bruises on Dylan while living with him. Both believed that Dylan walked normally and was not unusually accident-prone or clumsy.

### k. Preschool teacher's testimony

Dylan's preschool teachers testified that Dylan's attendance was sporadic. The teachers would not characterize Dylan as accident-prone. One of the teachers never noticed any bruises on Dylan's body. Another teacher observed occasional bruises and bumps on Dylan's forehead. During the week before Dylan's death, that same teacher noticed Dylan had a fading, yellowish bruise on his chin. Alvarez told her that Dylan fell getting out of the truck.

On October 18, 1996, Dylan twice went to the restroom at preschool and each time when he came back, he pulled down his pants and told a teacher that his penis hurt. The teacher did not notice any bruises and pulled Dylan's pants back up. The teachers discussed the possibility that Dylan might have a bladder infection.

### 4. *Defense Witnesses for Dylan Vincent's Murder*

### a. Alvarez's testimony

Alvarez denied killing Dylan. Alvarez testified Dylan was uncoordinated and that he would just fall to ground when he turned his head. Alvarez said that Dylan would not catch himself when he fell and would instead hit his forehead or chin.

Alvarez testified that on October 23, 1996, he stayed home with Dylan after Dylan woke up with a fever. Alvarez called

Borgsdorf's office at 10 a.m. and left a message for her to come home during the lunch hour. While Dylan was napping, Alvarez left the apartment at 11:30 a.m. to go to the mall to meet his father.

Alvarez testified he arrived at the mall around noon. At 12:29 p.m., Alvarez called his sister and learned that his father had not yet left for the mall. Alvarez told his sister that he would wait at the mall, but if he was not there when his father arrived, to tell his father to wait for him to return. Alvarez assumed Borgsdorf would be at the home and thought she would be mad if he did not get back and pick her up before 1:00 p.m. to take her back to work. Alvarez testified he waited until 1:30 p.m. before leaving the mall and that he arrived home close to 2 p.m.

Alvarez testified that when he arrived home, he went into Dylan's room and saw a large bruise on Dylan's forehead. Alvarez testified he pulled down Dylan's blanket and saw more bruises. Alvarez testified he repeatedly said, "What happened? Where's mommy?" but Dylan did not answer. Alvarez testified he immediately called Borgsdorf at work and told her it was an emergency and to come home.

Alvarez testified he went back into Dylan's room and Dylan said, "I need to go to the rest room, daddy, I need to go to the restroom." Alvarez walked him to the bathroom. Alvarez saw blood in Dylan's urine when Dylan was urinating into the toilet. Alvarez said that Dylan fainted but Alvarez caught him. Dylan then urinated blood on a towel on the bathroom floor. Alvarez testified he carried Dylan back to his bed, called 9-1-1, put the phone on intercom, and went back into Dylan's room. Alvarez testified Borgsdorf arrived, walked into Dylan's room,

and asked what happened. Alvarez denied that he prevented Borgsdorf from entering Dylan's bedroom.

Alvarez testified that he was in a panic and "uncontrollable words" came out of his mouth when he said he was home all day in the 9-1-1 recording.[8] Alvarez testified it was more important to him to protect himself from getting into trouble than to tell the authorities what had happened. Alvarez claimed he never told Borgsdorf to take the blame and that he said to her "you better tell what happened — tell where these bruises came from or I'm going back to jail." Alvarez suspected that Borgsdorf had been home during lunch and that he did not know that she was not there.

Alvarez testified he believed Brian Ransom was responsible for Dylan's death and that he was unaware that Brian was working on the day Dylan died. Alvarez alleged that Brian had threatened him many times based upon Tyler's death.

Alvarez admitted that on a few occasions he held himself out as a correctional officer, wearing a uniform that he had received from a friend.

### b. Dr. Vincent Maddela's testimony

On October 21, 1996, Dylan visited his pediatrician, Dr. Vincent Maddela. Dr. Maddela noted Dylan had a low grade fever and an upper respiratory infection. Dr. Maddela

---

[8] In the recorded 9-1-1 call, Alvarez explains, "He's been in bed. I've been tending to him all day long. And then all of a sudden he just, like — I gave him something to drink and then after I gave him something to drink I went back out and he says daddy, daddy. And I go walkin' back in there and he says, uh — he didn't say nothin'. He didn't really say nothin'. He just stood there."

confirmed with Borgsdorf that Dylan was favoring his left side when he walked and referred him to another physician to have his vision checked. Borgsdorf did not tell Dr. Maddela that Dylan had injured his foot in a car door and Dr. Maddela agreed that, if a person's foot was injured and it was painful, it is possible that would cause them to favor one foot when walking. Dr. Maddela testified he did not notice any unusual bruising and did not suspect child abuse.

### 5. *Impeachment Evidence*

## a. Michelle E.

On January 31, 1996, Michelle E. met Alvarez while she was at the mall with her son. At the time, Michelle was 19 years old, and her son was approximately one and a half years old. On February 2, 1996, Alvarez went to Michelle's home and then she and her son went to Alvarez's house. After her son fell asleep, she and Alvarez had consensual intercourse. When Alvarez took her home, he acted "really different," "had a weird outlook," and "didn't seem right." Afterwards, Michelle felt bad because she was married, and she knew she did "something wrong."

On February 3, 1996, Alvarez called her, and she told him she did not want to have a relationship with him. Alvarez refused and was "fairly forceful" about having a relationship. Alvarez called the house numerous times and said that he was going to raise a big scene outside in the front yard. Alvarez then showed up at her house. Alvarez told her that if she did not have a relationship with him and go with him then, he would kill her or her son. Alvarez said he would break her and her husband up. Michelle was afraid Alvarez was going to kill her, her son, or her husband. Alvarez proceeded to rape her in her house.

Her son was running around the room while Alvarez raped her. Alvarez said she is not her husband's anymore, that she is his.

While crying, Michelle got into Alvarez's truck and he then drove to his house. Alvarez locked her and her son in in his bedroom. Alvarez had her call the police and ask whether it was okay for her to take her son without her husband's permission. Alvarez sat on the bed watching television while she and her son sat on the floor crying. Alvarez became upset at her son crying and twisted his earlobe until he started screaming. After her son fell asleep on the floor, Alvarez raped her again.

On February 4, 1996, Michelle spoke to the Bakersfield Police Department and reported that Alvarez had kidnapped her and then raped her at his residence. At that time, she did not tell officers that she knew Alvarez because she was ashamed and afraid what her husband would think.

On February 5, 1996, nurse examiner Donna Hogan performed a sexual assault exam on Michelle. Hogan testified that Michelle told her that Alvarez had raped her. During the exam, Hogan documented injuries and abrasions to Michelle's vagina, consistent with nonconsensual sexual intercourse.

Alvarez testified that his relationship with Michelle was consensual.

### b. Melinda A.

On January 23, 1996, Melinda A. met Alvarez while she was walking on campus at Bakersfield College. Melinda was a student there and had a two-and-a-half-year-old daughter. Alvarez called out to her, told her she was a nice looking lady, and said he would like to have dinner with her. Melinda declined his dinner invitation, but Alvarez kept asking if she

wanted to go out that night. She told Alvarez she had to leave. Alvarez replied, "Go pick up [your] daughter" and then followed her to her vehicle. Melinda had not told him that she had a daughter and Alvarez pointed out what car was hers before she reached it in the parking lot. She gave Alvarez her phone number so that she could leave. Alvarez tried to kiss her, and she turned away.

Alvarez called her later that day telling her that they were going to dinner that night. She kept telling him "No." Later that day, as Melinda was driving to the post office, she noticed a truck following her and flashing its headlights. As Melinda was walking back to her truck from the post office, she saw Alvarez walking toward her car and the same truck that had been following her was parked behind it. After she again declined to go to dinner, Alvarez grabbed her and pinned her against her truck. Alvarez kissed her, licked her face, and pressed his body against hers. She told Alvarez she wanted to leave but he would not let her, kept telling her that they were going to dinner, and began grabbing her breasts. She tried to grab his hands away and said, "no."

Melinda asked Alvarez what it meant to him when a woman told him, "No." Alvarez got "very angry" and his grip grew stronger. Alvarez pinched her nipples with both hands. Melinda managed to get free and jumped in her vehicle, locked the door, and drove off.

Alvarez testified that Melinda came over to his house later in the day after they met at Bakersfield College. He claimed they kissed on his bed and he "could have went a little too far" with his hands, but he did not attack her in any way. He denied ever seeing her at the post office.

## B. Penalty Phase

### 1. Prosecution Evidence

Tyler's paternal grandmother testified about her close, loving relationship with Tyler. The grandmother explained that when Tyler died, "the hurt, the loss, it was unbelievable." The hardest part was realizing she would not have Tyler anymore, and she would not be able to see his first anything, first tooth, first Christmas light, first bicycle, first kiss, or first car.

Borgsdorf's sister-in-law testified about the importance of Dylan to their family. It was awful for Dylan's three cousins after Dylan died. One cousin had nightmares for almost two years and had to attend counseling. The hardest part for the sister-in-law was looking back and thinking that she could have prevented Dylan's murder.

### 2. Defense Evidence

Ricardo is Alvarez's older brother. His testimony from a prior proceeding was read to the jury. That testimony detailed his father Ben's extensive abuse of Alvarez and his brothers while growing up. Ben would beat all four of his boys every day of the week. Ben would beat them with his fists, belts, or tools. Ben beat Alvarez the most. Alvarez would also burn himself with cigarettes and poke his fingers with needles. One time, Alvarez saved Ricardo's daughter when she was drowning in a swimming pool. Ricardo testified that he loved Alvarez.

Bernardo is Alvarez's oldest brother. He also testified to his father's extensive abuse. Their father punished the boys by beating them with his hands, belts, sticks, and pool cues. Their father began hitting Alvarez when he was around two or three

years old, and he hit Alvarez the most. Bernardo testified that he cared deeply for Alvarez.

Christina L. is Alvarez's youngest sister. She testified that her mother physically abused her by pinching, slapping, pushing, and grabbing. She did not see her brothers be physically abused, but "heard stories." She recalled that one time she heard Alvarez broke some ribs when he was badly beaten.

Diana K. is Alvarez's mother. Ben physically abused Diana and twice broke her arm. Alvarez was around three or four years old when Ben started to physically abuse him. Ben beat Alvarez about once a month.

When in kindergarten, the school discovered that Alvarez is aphasic, which is a form of autism. When Alvarez was in fifth grade, Diana ran away with her three daughters, leaving Alvarez behind. Diana testified that while she loved her son dearly, she saw many of the Ben's negative qualities in him. She also testified that Alvarez loved little children, but did not know how to treat them.

Dr. James Sanderson is a clinical psychologist and clinical neuropsychologist. Dr. Sanderson met with Alvarez over the course of two days to conduct a comprehensive neuropsychological evaluation. Alvarez told Dr. Sanderson that from age 20 to 25 he was a "big-time alcoholic" and had used marijuana and methamphetamine. Alvarez reported though that he had been alcohol and drug free for five years. In 1984, Alvarez's intelligence test score showed borderline intellectual functioning, the fifth percentile. In 1997, Alvarez's intelligence test score was low-average.

Based upon his examination, Dr. Sanderson concluded Alvarez suffered from organic brain impairment. Dr. Sanderson performed multiple tests on Alvarez and all but one showed that Alvarez's organic brain damage scores were all within the brain-damaged range. This, along with his IQ scores, suggested Alvarez had failures in brain development or had experienced deterioration of adaptive abilities dependent upon brain function. Dr. Sanderson testified that Alvarez is able to control his behavior, but his impairments can make it more difficult. Dr. Sanderson testified that many times abusers of children have abuse in their early history.

## II. DISCUSSION

### A. Denial of Motion for Change of Venue

Alvarez now argues that the trial court prejudicially erred in denying a motion for a change of venue. We conclude he has forfeited this claim.

On April 13, 1995, the prosecution initially dismissed charges against Alvarez related to only Tyler's murder after witnesses failed to appear. On November 7, 1996, after Dylan's death, Alvarez was indicted with the charges related to both the murder of Tyler and Dylan. Alvarez's first trial began on February 24, 1998, and the jury returned guilty verdicts, true findings on the special circumstance allegations, and a death verdict. On November 18, 1998, the trial court granted a defense motion for a new trial due to juror misconduct after a juror's wife called into a radio talk show during the trial. Retrial commenced on April 4, 2000, and the jury again returned guilty verdicts, true findings on the special circumstance allegations, and a death verdict. This time the court entered a judgment of death.

Before the retrial, Alvarez brought a motion for a change of venue. In connection with this, the defense submitted an exhibit that included over 100 pages of media articles that had appeared between 1994 and 1998, and which had been presented during a hearing on a change of venue motion at the first trial and the hearing on the new trial motion. The defense submitted a second exhibit of more recent articles that appeared between August and October 1999. The defense submitted as a third exhibit a local newspaper, which included an article entitled "Accused Testifies in Tears." The defense further submitted a video exhibit that compiled the electronic media on the Alvarez matter for November through December 1998 as well as another exhibit listing all of the news broadcasts contained in the videos. Finally, the defense submitted a second video exhibit that compiled all electronic media from February 23, 1998, to October 27, 1998. The court also had in its possession video exhibits from prior proceedings on the Alvarez matter that showed newscasts from earlier in time. In argument, defense counsel noted that 152 news broadcasts referred to the present case in less than two months, from November 4 through December 31, 1998. In terms of the nature of the broadcasts, defense counsel emphasized that they often describe Alvarez as a "two-time child killer or kid killer," that they talk about the high costs of the case, and that many indicate that he had previously received a death sentence, even though that is not technically accurate. In terms of its inflammatory nature, defense counsel argued that the media sensationalized the case in such a way as to have a substantial impact on Alvarez. In opposition to the motion, the prosecutor noted that much of the coverage dated back to early 1997, at a minimum, and that "the past 19 months, since the original jury

verdict during the first trial, there hasn't been a great deal of publicity."

The trial court denied the motion, finding that Alvarez had not established by the evidence that the substantial media coverage was reasonably likely to result in him being denied a fair trial in Kern County. The court recognized "this is a high-profile case, and there's little or no question in that regard that this matter has received a substantial amount of media coverage from television news, radio station news, the newspaper. The coverages in evidence that's been presented here to substantiate that is quite clear." However, the court ultimately found that change of venue was not justified, reasoning:

> "I have not been convinced by the defense that there would be any reason to grant the motion for a change of venue.

> "There are no studies having been submitted. There's no indication of the impact of this media blitz, if you will, media coverage of these various matters that would cause the Court to conclude that the defendant, in spite or in the face of this media coverage, that the defendant would be denied a right to have a fair trial before a jury in this community.

> "And, therefore, the Court's going to make a finding to that effect. *Understanding that the order that's made is to be made not imposing prejudice on the defense to the point that it precludes them from making a further request if there are other matters that should surface during the voir dire process.*" (Italics added.)

The Attorney General argues that Alvarez forfeited this claim when he failed to renew his change of venue motion after

voir dire. We agree. Here, the trial court denied the motion before the retrial with the "[u]nderstanding that the order that's made is to be made not imposing prejudice on the defense to the point that it precludes them from making a further request if there are other matters that should surface during the voir dire process." The trial court further explained that the motion for change of venue "could be reopened by either party if it feels it's appropriate based upon new evidence that might be brought up during the voir dire process."

We have held that "where leave is granted to counsel to renew his application if the facts disclosed on the impanelment should further warrant it, and . . . where counsel fails thereafter to renew his motion, he cannot claim that error was committed by the court in failing to order a change of venue. [T]he failure to renew [the] motion, where it was denied temporarily only, [i]s an abandonment and waiver of the whole question, and fatal to any claim based upon the original application." (*People v. Staples* (1906) 149 Cal. 405, 412; accord, *People v. Oyler* (2025) 17 Cal.5th 756, 806 (*Oyler*); *People v. Johnson* (2015) 60 Cal.4th 966, 982; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1076 (*McCurdy*); *People v. Hensley* (2014) 59 Cal.4th 788, 796.)

Alvarez responds that renewal of the motion was unnecessary here because the trial court agreed to revisit the issue only if new evidence surfaced during voir dire but there was nothing new or unexpected about voir dire. Furthermore, Alvarez notes that this court has reached the merits of venue motions not renewed after voir dire when the claim of error was based on the evidence at the hearing and not on what develops later during voir dire. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 946 [defendant's claim had "been waived to the extent it is based upon occurrences at voir dire"].) For several reasons, we

reject Alvarez's argument. First, Alvarez's reading of the court's remarks, even if correct, does not distinguish this case from others in which we have found forfeiture. (*Oyler, supra*, 17 Cal.5th at p. 806 [trial court "specified that it was denying defendant's motion without prejudice to renewing it if voir dire showed that the court could not empanel an impartial jury"]; *People v. Johnson, supra*, 60 Cal.4th at p. 982 [trial court stated that " 'denial is without prejudice to renew the motion during the jury selection, should actual experience in trying to select a jury so justify' "].) Second, Alvarez's contention that nothing new surfaced during voir dire is belied by the fact that his briefing in this court, although detailing the evidence before the trial court before it denied his motion, also contains substantial discussion of what transpired *after* the ruling and *during* voir dire. Specifically, based upon the record of the voir dire proceedings, Alvarez calculates and emphasizes the percentage of jurors who admitted disqualifying bias because of their knowledge of the case. In this court, Alvarez relies on this evidence to supply what the trial court believed was lacking when it denied the motion: something to demonstrate "the impact of th[e] media blitz" on the jury pool. Because the trial court's denial was without prejudice to renewal and because Alvarez did not renew his motion during or after voir dire, we find that the claim is forfeited. (See *McCurdy, supra*, 59 Cal.4th at p. 1076 ["Even assuming futility could excuse defendant's failure to renew his motion, the court's isolated remark does not establish irreversible hostility to changing venue"].) To be clear, we are not applying the partial waiver approach from *Jenkins* here, but, in any event, even if Alvarez's claim had "been waived to the extent it is based upon occurrences at voir dire" (*Jenkins*,

44

at p. 946), the result would be the same given Alvarez's reliance on evidence from voir dire.

## B. Denial of Motion to Sever

Alvarez next claims the trial court abused its discretion in denying a motion to sever the two murder counts and that such denial resulted in the deprivation of his state and federal constitutional rights of due process, fundamental fairness, and reliable fact-finding underlying a capital verdict. We disagree.

Before the first trial, Alvarez filed a motion to sever the two murder counts (counts one and two), the assault on a child with force likely to produce great bodily injury resulting in death count (count three), and a count alleging that Alvarez failed to register as a sex offender (count four). The court severed the failure to register count after the prosecutor conceded to do so.[9] The trial court otherwise denied Alvarez's severance motion, reasoning that "Counts 1 and 2 are of the same class of crime or offense as one another" and that "Counts 2 and 3 are connected together in their commission." Furthermore, the court found that "defendant has failed to establish that there would be an abuse of discretion if the Court did not sever" and "the defendant failed to make a clear showing that prejudice would occur if the charges were tried together."

During the second trial, Alvarez again filed a motion to sever. The trial court took judicial notice of the first trial. On February 28, 2000, the trial court again denied the motion to sever, stating:

---

[9] The prosecution ultimately dismissed the failure to register count in the interest of justice (§ 1385).

"The Court has carefully reviewed the arguments of counsel, plus the motions that have been submitted. And it appears to the Court that it is appropriate to deny the motion to sever. The consolidation of these is in order, and the Court is — with what the previous law is that relates to matters of this nature, and the Court's going to deny the motion to sever."

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." Because the two murder charges are of the same class and the charge for assault on a child causing great bodily injury resulting in death is connected in commission, the statutory requirements for joinder are satisfied. "Defendant, therefore, can predicate error in denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion." (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 (*Kraft*).)

" ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." ' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 (*Bradford*).) "In determining whether a court abused its discretion in declining to sever properly joined charges, we first consider 'the cross-admissibility of the evidence in hypothetical separate trials.'

([*People v. Soper* (2009) 45 Cal.4th 759,] 774.)  If the evidence is cross-admissible, then this 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' (*Id.* at pp. 774–775.)  If not, then we also consider '(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.' (*Id.* at p. 775.)" (*People v. Gomez* (2018) 6 Cal.5th 243, 275–276 (*Gomez*); see also *People v. Hin* (2025) 17 Cal.5th 401, 439; *People v. Lamb* (2024) 16 Cal.5th 400, 416–417.)  Under Evidence Code section 1101, subdivision (b), "evidence that a person committed a crime, civil wrong, or other act" can be cross-admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Alvarez argues that the murder of Tyler and Dylan were so dissimilar that they would not be cross-admissible.  Alvarez notes that the prosecution initially dismissed the charges related to Tyler's murder before Dylan's murder occurred.  Alvarez also claims that the evidence for Tyler's murder was weaker than the evidence of Dylan's murder.  As a result, he argues that combining the two inflammatory murders bolstered the case for each other.  He further argues that combining the

two cases into a single proceeding qualified this as a capital case under the multiple-murder special circumstance. (See § 190.2, subd. (a)(3) ["The defendant, *in this proceeding*, has been convicted of more than one offense of murder in the first or second degree" (italics added)].) Alvarez is correct that the present matter is "one in which the joinder itself gave rise to the special circumstance allegation (multiple murder, § 190.2, subd. (a)(3)), requiring that a higher degree of scrutiny be given the issue of joinder." (*Bradford*, *supra*, 15 Cal.4th at p. 1318.) However, any inference of prejudice here was dispelled by the cross-admissibility of the two homicides. (See *Gomez*, *supra*, 6 Cal.5th at p. 275.)

Alvarez notes that the trial court did not explain the rationale for denying the motion to sever before the retrial and that consequently the court did not specifically rule on cross-admissibility. However, when the trial court denied the motion to sever, it did refer back to "what the previous law is that relates to matters of this nature." In denying severance before the first trial, the court had explained, that "statutory requirements for joinder are met. Counts 1 and 2 are of the same class of crime or offense as one another." The court further explained at the first trial, "the defendant failed to make a clear showing that prejudice would occur if the charges were tried together." Before the court's ruling on the motion to sever at the retrial, both parties also argued and briefed the issue of cross-admissibility as well. By referring back to its previous ruling before the second trial, the court's ruling before the retrial makes clear that the court found that Alvarez had failed to make a clear showing of prejudice if the charges were tried together.

Indeed, any inference of prejudice was dispelled because, as the Attorney General contends, evidence of the two murders

48

was cross-admissible. (*Gomez*, *supra*, 6 Cal.5th at p. 275.) Here, the two offenses had numerous distinct similarities: (1) both victims were the children of Alvarez's girlfriend at the time they died; (2) Alvarez resided with each victim immediately before they died; (3) before Alvarez moved in, the two victims did not have abnormal physical injuries; (4) after Alvarez moved in, both began to show signs of physical abuse; (5) Alvarez was the person that "found" both in critical condition; (6) Alvarez was the last person known to be with both children before they went into the critical condition that resulted in their deaths; (7) Alvarez was not noticeably sad after either death; (8) Alvarez had an argument with both victim's mothers within a day before the children died; (9) Alvarez had previously been found alone in each child's bedroom at night; (10) both children died from assaultive trauma; (11) both children sustained similar bruising and injury to the ears; and (12) in both cases Alvarez oversaw the child in a separate room while the mother talked to the 9-1-1 operator. Alvarez responds that the two murders are dissimilar and that the similarities the Attorney General relies upon are superficial or mistaken. He notes that Tyler was an infant who was apparently shaken excessively while his mother was home, while Dylan was a four year old who had been beaten while only Alvarez was home. He also notes that the offenses were committed nearly two years apart, and there was evidence that Tyler's mother was abusive to another child. Alvarez claims there are no common marks on the two victims supporting that the same person committed both crimes and that the claimed similarities shed no light on the mental state of the perpetrator. We find that the Attorney General has the better argument. (See *Kraft*, *supra*, 23 Cal.4th at p. 1032 ["That

all of the charged murders were not committed in exactly the same way. . . does not preclude cross-admissibility"].)

First, the 12 similarities discussed above clearly make the two murders cross-admissible for showing an absence of mistake or accident. "[W]hen a defendant admits committing an act but denies the necessary intent for the charged crime because of mistake or accident, other-crimes evidence is admissible to show absence of accident." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 204.) Nevertheless, "we have never limited evidence of absence of accident to such instances. Rather, a defendant's plea of not guilty puts in issue all the elements of the charged offense." (*Ibid.*) Here, the evidence supported that Alvarez was the last person known to be with both children before they went into the critical condition that resulted in their deaths and therefore the two murders are cross-admissible to show absence of mistake or accident.

Furthermore, the 12 similarities discussed above also make the murders cross-admissible for showing intent. "[I]n order to be relevant, the 'least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] "[T]he recurrence of a similar result . . . tends (increasingly with each instance) to [negate] accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . ." [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Molano* (2019) 7 Cal.5th 620, 665 (*Molano*).) Here, the two murders are sufficiently similar to

support the inference that the Alvarez " ' " 'probably harbor[ed] the same intent in each instance.' " ' " (*Ibid.*)

Alvarez further argues that the prosecutor improperly argued that the jurors could use a conclusion of guilt as to one homicide as circumstantial evidence that Alvarez was also guilty of the other homicide. Alvarez relies upon the prosecutor's argument directing the jury to "put two and two together and you see the similarities and consider the evidence together on both, which you're entitled to do, as well, it is clear that he is the man who killed both of these boys." To begin with, the jury was properly instructed with CALJIC No. 17.02, which provided in part: "Each count charges a distinct crime. You must decide each count separately." Alvarez argues that this instruction did not tell the jurors anything about what evidence they could or could not consider in regard to each count. Alvarez though presumes that the two homicides were not cross-admissible under Evidence Code section 1101. As discussed above, the evidence from the two homicides was cross-admissible. " '[U]nder Evidence Code section 1101 the jury properly could consider other-crimes evidence in connection with each count, and also could consider evidence relevant to one of the charged counts as it considered the other charged count.' " (*People v. Geier* (2007) 41 Cal.4th 555, 579, quoting *People v. Catlin* (2001) 26 Cal.4th 81, 153.) We find that the trial court did not abuse its discretion in denying the motion to sever.

## C. Denial of Request to Discharge Juror for Disobeying Court Orders

Alvarez claims the trial court erred when it declined to discharge Juror No. 9 for identifying himself as a juror on the

Alvarez case and describing the case as "crazy" or "stupid" to a nonjuror while inebriated in a bar. We need not decide whether juror misconduct occurred here because there was no substantial likelihood of juror bias from this brief, nonsubstantive conversation.

Throughout the trial, the court repeatedly instructed the jurors not to speak with any juror or nonjuror about the case. Before the court adjourned for Easter recess, the court again admonished the jury: "You are going to be gone for some time now — 10, 11 days. Please don't discuss this case amongst yourselves or with anyone else or make any independent investigations or look at papers or articles, or anything of that nature."

The day the court resumed session after the 11-day Easter recess, the prosecution informed the court of a potential juror incident. The prosecutor's babysitter had talked to a man at Jelly's Bar who, as the prosecutor reported, "said, well, I'm a juror on the Frank Alvarez case. And he said, yes, I'm Juror No. 9 on that crazy or stupid — she can't remember the word — Frank Alvarez case." The court then questioned Juror No. 9 about the alleged conversation. The juror recalled going to Jelly's Bar in the last 11 days. The juror did not initially recall discussing the case with anyone, but then remembered "I may have. Not — well, I don't recall any specifics. I had a few cocktails that evening, but I don't remember discussing the case with anyone. Maybe the fact that I was on the jury." After the court then asked if he recalled saying "something about being on the jury in the Alvarez case," the juror replied, "I don't specifically recall saying that. Like I said, I had a couple cocktails that evening, and I probably forgot that I even talked to [anyone]. Typically, I don't — if it ever comes up in any

conversation, it's just that I'm on the jury." When the court asked if he knew the young woman the court was referring to, the juror replied, "I vaguely recall hearing her say something like that, that she was a baby-sitter, but that's about it." When defense counsel asked if he had expressed any opinion about the case or made derogatory comments about the case at the bar to the young woman, the juror replied, "no." The juror also denied making any comments about the case other than that he was a juror.

Defense counsel moved for Juror No. 9 to be discharged because, based upon the prosecutor's description of the babysitter's comments, the juror had "expressed an opinion about this case being stupid or crazy" and was now "either not being honest or I think he was so inebriated that he didn't know what he was saying." Defense counsel did not think that the juror could be fair and impartial. The prosecutor responded that the juror was being honest and he "indicated, right off, that he did have this conversation and that he told the Court it was about being on the jury." In any event, the prosecutor also argued that "crazy" or "stupid" is a "very innocuous statement" and is not in any way inflammatory. The prosecutor thought the juror could be fair and impartial. The trial court agreed with the prosecution and "disagreed with defense counsel's jumping to the fray here and making some comment that the juror is lying about what he had to say on the stand." The trial court thought the juror "was very forthright in his comments," but thought that it was appropriate to speak to the prosecutor's babysitter.

The court later met with the prosecutor's babysitter who had spoken with Juror No. 9 at the bar during the court's Easter recess. The babysitter said she had a margarita at dinner before

arriving at the bar and was relatively sober when she saw Juror No. 9. She said Juror No. 9 appeared somewhat intoxicated and that you would not want him driving home. She told the court that she and Juror No. 9 were making "small talk" at Jelly's Bar because they had mutual friends and they discovered they both had a mutual connection with a Kern County deputy district attorney who was not involved in this case.[10] The babysitter testified that Juror No. 9 "proceeded to tell me that he was on the Alvarez case, and he said the — I don't recall if he said the crazy Alvarez case or the stupid Alvarez case, and they were out there playing a lot of loud music and I said excuse me, and then he repeated again I'm on this crazy or stupid Alvarez case, and I said is that the case that Cathy Purcell is doing, and he said yes, because I was not sure if that's what he said, so I made him repeat it more than once, and I said you know what, I'm a very good friend of Cathy Purcell, I do not think you should tell me anything else about this, I don't want to talk to you about this, and then he proceeded to kind of go on and say yeah, I'm juror number nine. He said that several times."[11] The babysitter then walked away from the juror because she "was afraid he would say something else." She estimated she spoke with Juror No. 9 for "three to five minutes" before she walked away. She reiterated that the Juror No. 9 said more than once either "that

---

[10] During voir dire, Juror No. 9 informed the court his wife used to date a Kern County deputy district attorney. The prosecutor's babysitter informed the court that she currently was dating this same deputy district attorney.

[11] Cathy Purcell employed the babysitter and was the prosecutor in Alvarez's case that brought this situation to the court's attention.

stupid Alvarez case" or "that crazy Alvarez case," but she did not recall which. When the defense asked if Juror No. 9 said it a "derogatory tone," the babysitter testified "no, he just kind of matter-of-factly said I'm doing the stupid, crazy, Alvarez case." She confirmed that Juror No. 9 did not say anything else about the case.

After the prosecutor's babysitter was excused, the defense requested "juror number nine be excused for expressing an opinion." The court then denied the defense's request, explaining:

> "I don't think there's anything about this conversation that the juror had with this young lady that would indicate that — well, obviously she didn't suggest to him any thoughts as to how he should act as a juror in this case or what the facts are according to her or anything of that nature. In fact, she acted very responsibly in moving away from the situation.

> "It didn't appear from what she indicated was the conversation that there's anything about referring to this as a stupid or the crazy Alvarez case. It's just merely a matter of speaking that relates to the case itself, in general, but nothing obviously having to do with any interpretation of what the evidence is. So the motion is denied in that regard."

Alvarez now argues the trial court erroneously refused to discharge Juror No. 9 after the juror committed misconduct by disobeying court orders not to speak to anyone about the case. "A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Miles* (2020) 9 Cal.5th 513, 601 (*Miles*).) Juror misconduct occurs when an

"overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors." (*In re Hamilton* (1999) 20 Cal.4th 273, 294 (*Hamilton*).) " 'It is misconduct for a juror during the course of trial to discuss the case with a nonjuror.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1309 (*Lewis*).)

As general rule, "[a] finding of 'juror misconduct "raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." ' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1171 (*Johnsen*).) However, this Court has also held that " '[w]hen the alleged [juror] misconduct involves an unauthorized communication with or by a juror, the presumption [of prejudice] does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant.' " (*Hamilton, supra,* 20 Cal.4th at pp. 305–306.) "The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) "Our review 'accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by

substantial evidence,' and we independently examine the mixed question of '[w]hether prejudice arose from [the] juror misconduct.' " (*Johnsen, supra,* 10 Cal.5th at p. 1171.)

Here, Alvarez argues it is serious juror misconduct for a juror to speak to a nonjuror about the case, "regardless of whether the juror receives new information or is otherwise influenced." Alvarez contends that, although the defense was unable to prove that any actual harm occurred, the evidence established that this juror could not be trusted to obey court orders and therefore he may have repeated his misconduct without getting caught.

Alvarez cites to *People v. Cissna* (2010) 182 Cal.App.4th 1105, in which the Court of Appeal found that a juror's failure to "comply with repeated admonitions [of the court] not to discuss the case casts serious doubts on [the juror's] willingness to follow the court's other instructions." (*Id.* at p. 1118.) However, "[t]he question of what constitutes juror bias varies according to the circumstances of the case." (*Id.* at p. 1116.) While *Cissna* and this case both involve a juror speaking to a nonjuror, the cases are materially different. In *Cissna,* the Court of Appeal granted a new trial after the juror spoke to a nonjuror almost daily about substantive matters of the trial and deliberation which made the nonjuror "in effect, a [thirteenth] juror." (*Id.* at p. 1120.) "Defendant was entitled to have his case evaluated by 12 *jurors,* not by 12 jurors and one extra, 'invisible,' unsworn juror whom Juror D. consulted on a daily basis." (*Ibid.*) The Court of Appeal determined the defendant was unjustly prejudiced by the juror and ordered a new trial. (*Id.* at p. 1111.)

Juror Number 9's communication with the babysitter was, at a minimum, ill-advised. However, we do not decide whether juror misconduct occurred here because we find no substantial

likelihood of juror bias. (*Miles*, *supra*, 9 Cal.5th at p. 602.) "Juror misconduct raises a 'presumption of prejudice,' but that presumption is rebutted when the reviewing court determines, based on the record as a whole, that ' " 'there is no substantial likelihood that the complaining party suffered actual harm.' " ' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 26–27 (*Miranda-Guerrero*).) Here, Juror No. 9 and the babysitter spoke on one occasion for approximately three to five minutes, unlike in *Cissna* when the juror and nonjuror spoke daily for long periods of time. In their conversation, Juror No. 9 briefly mentioned his involvement as a juror in a case, without receiving any substantive information from the babysitter nor expressing any bias against Alvarez.

Alvarez responds that the trial court was required to discharge Juror No. 9 because his conversation with the prosecutor's babysitter at a bar revealed that he might engage in similar misconduct later in the trial. However, the record does not support Alvarez's purely speculative claim. The trial court determined that the juror was trustworthy, "was very forthright in his comments" to the court, and that the reference to "stupid" or "crazy" was "just merely a matter of speaking that relates to the case itself, in general, but nothing obviously having to do with any interpretation of what the evidence is." The record supports the trial court's determination. (See *Johnsen*, *supra*, 10 Cal.5th at p. 1171 ["Our review 'accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence' "].)

While trial courts must be vigilant to protect defendants from juror prejudice, we have typically found that a presumption of prejudice was rebutted when a juror spoke with a nonjuror about nonsubstantive aspects of the case. For

example, in *Lewis, supra,* 46 Cal.4th 1255, this court found a juror's discussion with her husband about "the manner in which the jury picked the foreperson and the foreperson's refusal to reveal the results of the first jury poll . . . [was] nothing substantive. She also confirmed that the incident and the trial court's inquiry would not affect her ability to be fair and impartial." (*Id.* at p. 1309.) In *People v. Stewart* (2004) 33 Cal.4th 425, this court found a juror's misconduct in a capital case was not prejudicial when the juror told defendant's former girlfriend, " ' "We're not supposed to have any contact but I just wanted to tell you that you're a very beautiful woman," ' " because the comment did "not appear to have involved anything of substance concerning the merits of the case." (*Id.* at pp. 509–510.)

This court has repeatedly held that " '[i]f the system is to function at all, [courts] must tolerate a certain amount of imperfection short of actual [juror] bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' " (*Miles, supra,* 9 Cal.5th at pp. 601–602.) Here, the conversation between Juror No. 9 and the prosecutor's babysitter did not reveal nor introduce substantive information about the case. Rather, Juror No. 9 and the babysitter briefly discussed nonsubstantive matters. In sum, " ' " 'there is no substantial likelihood that the complaining party suffered actual harm.' " ' " (*Miranda-Guerrero, supra,* 14 Cal.5th at pp. 26–27.) The record supports the trial court's denial of the motion to discharge Juror No. 9. (See *Johnsen, supra,* 10 Cal.5th at p. 1171.)

## D. Admission of Psychologist Dr. Dean Haddock's Rebuttal Expert Testimony

Alvarez claims that the trial court erred by allowing the psychologist Dr. Dean Haddock to testify in rebuttal about Shari's Child Abuse Potential Inventory (CAPI-6) test result. Alvarez argues that the testimony was not properly scrutinized for the scientific requirement for admissibility under *People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*) in a hearing[12] and was not relevant, thereby prejudicially violating his state and federal rights to a fair trial. We reject Alvarez's claim.

In April 2000, the trial court conducted an Evidence Code section 402 hearing on the defense's motion to admit evidence from a CPS investigation conducted that same month. The CPS investigation documented Shari's physical abuse of her daughter Taylor and in-utero abuse of her unborn child. The prosecution noted that if evidence Shari abused Taylor was admitted, "the People intend to offer rebuttal testimony in the form of testimony from expert mental health professional[], . . . Dr. Dean Haddock, that after testing and examination Shari is not at risk for physically abusing her child." The trial court granted the defense's motion to admit evidence from the CPS investigation. The court, however, ruled that CPS documents,

---

[12]     Alvarez's briefs and objection in the trial court included "reference to *Frye v. U.S.* (D.C. Cir. 1923) 293 Fed. 1013, which we relied upon for the rule announced in the *Kelly* decision. Because the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, ruled that the Federal Rules of Evidence (28 U.S.C.) superseded *Frye*, we refer here solely to *Kelly*." (*People v. Cowan* (2010) 50 Cal.4th 401, 469, fn. 22.)

files, or records themselves were inadmissible and only the observations of the witnesses would be presented to the jury.

At trial the defense first elicited evidence during cross-examination of prosecution witnesses that Shari had abused her daughter Taylor, who was born a year after Tyler's death in 1995. The defense then presented multiple defense witnesses who confirmed that Shari abused Taylor. A neighbor testified for the defense that Shari constantly berated her daughter. He saw Shari, her brother, and her brother's girlfriend holding Taylor down by the shoulders "probably" more than five times and believed that they took pleasure in it. While laughing, they would yell at her to make her scream for hours. The neighbor testified that Taylor cried all the time and Shari would call her stupid.

Another neighbor testified for the defense that she heard Shari be verbally abusive and scream at Taylor every day, calling her names like "stupid." The neighbor never saw Shari hit Taylor, but one time she saw Shari throw a shoe at her because she came out of her room.

An investigator testified for the defense that a third neighbor confirmed to him, after initially denying it, that he saw Shari hit Taylor with an open hand on the back, front, and side of the head, sometimes knocking the child off her feet. That neighbor also told the investigator that Shari was always yelling at the child and that he had seen Shari spank her after removing her clothing.

Brian Ransom's sister and his fiancé both testified for the defense that they had seen a bruise on the corner of Taylor's eye in 2000. The fiancé testified that she asked Taylor what had happened and Taylor in tears said, "I ran out in the rain and my

mama hit me." The sister testified that Taylor initially said that nothing had happened, but then, after the sister asked her what had happened to her eye, she said that her mother had gotten mad at her and hit her. Another time, the sister saw bruises on Taylor's stomach and on a leg. Taylor said she fell on her bedpost causing the bruise on her stomach.

In rebuttal, the prosecution then offered the testimony of psychologist Dr. Dean Haddock. He was a licensed clinical psychologist and director of a psychological clinic in Bakersfield. He had a master's degree and doctorate in clinical psychology, as well as a doctorate in philosophy. He had received certifications from peers acknowledging him as being in the top one percent of his field and was on the referral list for several superior courts throughout California. He had a special expertise with a test called the Child Abuse Potential Inventory and his dissertation research helped established the reliability of it. The *Journal of Clinical Psychology* published Dr. Haddock's dissertation in 1983. The test is now in its sixth stage and called "CAPI-6" for short.

Dr. Haddock testified that CAPI-6 "is used primarily worldwide by Children's Protective Services to identify persons who are at risk to physically abuse children in their care. [¶] Most of the Human Services, at least across the United States and Canada, are either aware or use it regularly to screen persons who are involved in foster care or in reunification plans, when children are being returned to their parents' care."

CAPI-6 asks 160 questions that the examinee either agrees or disagrees with, describing themselves. It is then scored according to a validity scale and a physical abuse scale. The validity scale identifies persons trying to mislead the

evaluator, which would invalidate the test. The physical abuse scale makes a predication as to whether a person would be at risk to abuse children in their care.

In October 1998, Dr. Haddock performed the CAPI-6 test on Shari Ransom. Dr. Haddock affirmed that CAPI-6 was just one of the general tests in a battery of tests that he gives. When the prosecution asked Dr. Haddock to describe the results of that test, the defense objected based upon the *Kelly* standard. The trial court overruled the objection. Dr. Haddock then testified that in October 1998 he found that Shari "was not at risk to physically abuse children in her care."

On cross-examination, Dr. Haddock explained that his opinion was based upon the results of CAPI-6 test as well as a clinical interview, a medical checklist, a social history questionnaire, a clinical assessment with a mental status examination, a structured parenting questionnaire, a house/tree/person projective drawing test, a kinetic family projective drawing test, a Milan clinical multitaxial inventory-2 test, a neurological screening test, a Ravens progressive matrices nonverbal IQ test, a thematic apperception test, and a "three wishes" test.[13] Dr. Haddock added that the empirical

---

[13] The Milan clinical multitaxial inventory-2 is an empirically scored test that provides information about major mental disorders or personality disorders. The medical checklist and social history questionnaire asked questions about medical history, education, family life, employment, home life, legal issues, and general social background. The clinical assessment with mental status examination assesses intelligence and memory and provides insight into whether a person has any major mental disorders. The neurological screening test assesses whether there are any head injuries or

tests, like CAPI-6 and the Milan clinical multiaxial inventory-2, were more valid and reliable than the subjective tests (i.e., the house/tree/person projective drawing test, the kinetic family projective drawing test, the thematic apperception test, and the "three wishes" test). Dr. Haddock also consulted the juvenile court records in Shari's files. When defense counsel asked if his predictions had ever been wrong, Dr. Haddock replied, "Not that I'm aware of."

Shortly after, when defense counsel asked if Shari's use of controlled substances prior to 1998 was a factor on which he based his opinion, Dr. Haddock replied affirmatively. Defense counsel then requested "to go into what his knowledge was" and requested a sidebar for clarification. The prosecutor requested the jury be admonished that any statements that come in regarding Shari's prior drug usage should be considered only as part of the basis for the doctor's opinion and not for the truth of the matter asserted. At the sidebar, defense counsel again requested clarification, explaining "What I'm trying to find out what he was told, what he knows, what the basis of his opinion was[,] not to find out whether it was a valid opinion or not." The prosecutor argued that Dr. Haddock's statements of Shari's drug abuse was hearsay. The court was concerned because the "side

---

neurological difficulties that might instead present as a mental disorder. The Ravens progressive matrices nonverbal IQ test is an empirical test that tests for intelligence. The house/tree/person projective drawing test and the kinetic family projective drawing test are subjective tests and are interpreted by the person who is doing the assessment to determine the subject's drives and personality style. The thematic apperception test is also subjective and asks the subject to tell a story about a picture. The "three wishes" test is subjective as well and provides an idea about the subject's future.

trips" in the case are "very time-consuming processes . . . [and] distractive to the jurors." The court clarified that "you have a right to look into these items that he has reference[d] and I'm going to allow you, for a limited purpose, to do so, but we don't need to get into a long, detailed review that is so time-consuming that it's distract[ing] to the jurors . . ." Defense counsel then continued to argue that, "I don't personally see what the relevance is and his opinion as to whether he thought Shari Ransom was potentially abusive in 1998 [when the CAPI-6 test was performed] has to do with whether or not, for example, she abused Taylor in 2000 [when CPS investigated her] or, for that matter, whether she was abusive towards Tyler Ransom back in 1994 [when Tyler died], but they put him on as a witness, so now I've got to be able to question him regarding his opinion." The court granted the prosecutor's request for an admonition that any statements that come in regarding Shari's prior drug usage should be considered only as part of the basis for the doctor's opinion and not for the truth of the matter asserted and "hope[d] everybody understands now my ruling, and, that is, for a limited purpose you may pursue this matter." Dr. Haddock was then questioned about the scope of his test's findings from 1998. He stated that his opinion regarding Shari's potential for abuse, was time-limited to when he performed the test in 1998. Dr. Haddock clarified that he did not render an opinion regarding Shari's potential for abuse in 1994 or in 2000.

1. *Applicability of* People v. Kelly *(1976) 17 Cal.3d 24*

On appeal, Alvarez claims that the psychologist's testimony should not have been permitted without first determining whether CAPI-6 met the *Kelly* standard for new scientific evidence. Alvarez further argues that Dr. Haddock's

testimony cannot be relied upon to provide a general consensus in the scientific community because he had a vested interest in developing and promoting the CAPI-6 examination due to his dissertation research on the test. We find that the *Kelly* standard does not apply and therefore the trial court was not required to hold a hearing to determine the admissibility of scientific evidence under *Kelly* and the trial court was also not required to determine whether CAPI-6 is generally accepted as reliable in the scientific community. Accordingly, the trial court did not err in overruling defense counsel's objection under *Kelly*.

"Under the *Kelly* rule, ' "when faced with a novel method of [scientific] proof, [we] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community" before the scientific evidence may be admitted at trial.' (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, quoting *Kelly, supra*, 17 Cal.3d at p. 30.) *Kelly* 'renders inadmissible evidence derived from a "new scientific technique" unless the proponent shows that (1) "the technique is generally accepted as reliable in the relevant scientific community"; (2) "the witness testifying about the technique and its application is a properly qualified expert on the subject"; and (3) "the person performing the test in the particular case used correct scientific procedures." ' (*People v. Jackson* (2016) 1 Cal.5th 269, 315–316.) The party offering the evidence has the burden of proving its admissibility by a preponderance of the evidence." (*People v. Nieves* (2021) 11 Cal.5th 404, 444 (*Nieves*).)

"The purpose of these threshold requirements — commonly referred to as the *Kelly* test — is to protect against the risk of credulous juries attributing to evidence cloaked in

scientific terminology an aura of infallibility." (*People v. Peterson* (2020) 10 Cal.5th 409, 444 (*Peterson*).) Considering that, *Kelly* applies to unproven techniques, procedures, or methodologies that seem "in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156 (*Stoll*).) Without this safeguard, "[l]ay minds might easily, but erroneously, assume that such procedures are objective and infallible." (*Ibid.*) "However, absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly/Frye*." (*Id.* at p. 1157.) "In most other instances, the jurors are permitted to rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them." (*People v. Venegas* (1998) 18 Cal.4th 47, 80.)

In *Stoll*, this court held that we have not "applied the *Kelly/Frye* rule to expert . . . testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness . . . ." (*Stoll*, *supra*, 49 Cal.3d at p. 1157.) Similarly, in *People v. Therrian* (2003) 113 Cal.App.4th 609 (*Therrian*), the Court of Appeal held that two experts' opinions on defendant's likelihood of reoffending was independent of a new psychological test (the Static-99 test) that both experts utilized and therefore a *Kelly* hearing was not required. (*Id.* at pp. 615–616.) At trial, "both experts testified that use of the Static-99 test was not definitive and that other factors were considered in reaching an opinion." (*Id.* at p. 615.) The Court of Appeal thus found "[t]he concern addressed by *Kelly* is not present" and was "satisfied that no reasonable juror would mistake either expert's use of the Static-99 test as a source of

infallible truth on the issue of defendant's risk of reoffending."
(*Id*. at pp. 615–616.)

*Stoll* and *Therrian* are somewhat different from the
situation here because in those two cases the experts testified to
the actuarial nature of their tools — that they were conducting
an algorithm-based risk assessment to predict unknown
variables based on some known risk factors. *Therrian* is further
distinguishable because in that case the psychological
evaluation was used to establish the defendant's character or
propensity for its own sake (and not to show defendant
committed an act). *Stoll* is also different because there it was
the defendant that wanted to offer expert character-evidence
testimony.

However, here too, just like *Stoll* and *Therrian*, the
concerns addressed by the *Kelly* standards — to protect against
the risk of credulous juries attributing to evidence cloaked in
scientific terminology an aura of infallibility — are not present.
Instead, Dr. Haddock interpreted CAPI-6's findings and myriad
other data, such as a clinical interview, a medical checklist, a
social history questionnaire, a clinical assessment with a mental
status examination, and a structured parenting questionnaire,
to form his opinion. In this way, the CAPI-6 test was used as "a
springboard for a far more normative and subjective diagnostic
process." (*Stoll*, *supra*, 49 Cal.3d at p. 1159.) As in *Therrian*,
where the psychologist formed her opinion on factors beyond the
scope of the Static-99 test, Dr. Haddock formed his opinion on
empirical and subjective sources that assessed factors beyond
the scope of CAPI-6. (*Therrian*, *supra*, 113 Cal.App.4th at
p. 612.) The tests, as described above, assessed Shari's
intelligence, memory, emotional stability, drives, personality
styles, potential mental disorders, and potential neurological

difficulties. Dr. Haddock did apply the CAPI-6 test. However, on direct examination, Dr. Haddock affirmed that CAPI-6 was just one of the general tests in a battery of tests that he gives. On cross-examination, when defense counsel asked, "Was your opinion based solely on how she did in the test[,]" Dr. Haddock replied, "No. . . . It was based on a clinical interview . . . and a battery of psychological tests." Thus, Dr. Haddock used his personal expertise and the results of other tests to reach his opinion that Shari was not at risk to physically abuse children in her care. Dr. Haddock was clear that his expert opinion was not based on the CAPI-6 test alone, but instead factored in at least eight other tests, several questionnaires, a clinical interview, and documentation of Shari's personal, social, legal, and medical history. It is unlikely that the jury would have assumed that the CAPI-6 test was definitive. As noted in *Stoll*, a psychological evaluation is "a learned professional art, rather than the purported exact 'science' with which *Kelly*[] is concerned." (*Stoll*, *supra*, 49 Cal.3d at p. 1159.) Dr. Haddock's expert opinion was neither a new scientific technique nor based primarily on a new scientific technique.[14]

Furthermore, the purpose of the *Kelly* test "is to protect against the risk of credulous juries attributing to evidence

[14]    The Court of Appeal cases Alvarez cites for support are distinguishable along similar lines. Unlike *People v. John W.* (1986) 185 Cal.App.3d 801, where a psychologist's testimony "was inadmissible as the direct product of a legally unreliable scientific technique" (*id*. at p. 809), Dr. Haddock relied on more than one factor to reach his conclusion. Similarly, unlike *In re Amber B.* (1987) 191 Cal.App.3d 682, where the *Kelly* rule applied to " 'a new scientific process operating on purely psychological evidence' " (*id*. at p. 691), Dr. Haddock relied upon a multitude of factors.

cloaked in scientific terminology an aura of infallibility." (*Peterson, supra,* 10 Cal.5th at p. 444.) Defense counsel now argues that Dr. Haddock's opinion "clearly had an 'aura of infallibility.' " In supplemental briefing, Alvarez further argues that Dr. Haddock's rebuttal testimony bore an " 'aura of certainty' " similar to that found in *People v. Leahy* (1994) 8 Cal.4th 587, 607. In *Leahy*, this court concluded that the Horizontal Gaze Nystagmus (HGN) test — given to drivers suspected of being under the influence of alcohol — involves a " 'new scientific technique' " that must meet *Kelly*'s general acceptance test because "the 'aura of certainty' emanating from the officers' description of HGN tests was unmistakable." (*Ibid.*) However, Alvarez relies primarily on Dr. Haddock's testimony that he was personally unaware of any time which his predictions had been inaccurate, but this statement is not a claim of infallibility. Dr. Haddock's statements undoubtedly were made with some degree of confidence. But, unlike the testimony in *Leahy*, where the witness explained that he went back and cross checked the results of the HGN test with a subsequent blood test which verified that he has "always been right" (*id.* at p. 607), Dr. Haddock here gave the more qualified response that he was not "aware" of subsequently being proved wrong. Furthermore, Dr. Haddock qualified his opinion by emphasizing its imprecision. When giving his opinion in front of the jurors, Dr. Haddock stated, "at statistically significant relevance, my best prediction is [Shari Ransom] is not likely to abuse children in their care." This phrasing emphasizes probability, the expert's fallibility, and a finding that, itself, is premised on likelihood — not certainty. When defense counsel asked whether Dr. Haddock's opinion that a person does not have a potential abuse meant that a person "will not, under any

circumstance, go out and abuse another individual[,]" Dr. Haddock replied, "No." And finally, Dr. Haddock stated that his opinion regarding Shari's potential for abuse was limited to 1998 when he rendered the opinion. Dr. Haddock was clear that he did not render an opinion regarding Shari's potential for abuse in 1994 or 2000. Given the doctor's explanations and phrasing, we believe a reasonable juror would have appropriately evaluated the testimony's weight. Additionally, because the expert testimony transparently draws on a variety of factors and sources, we do not believe it had an aura of infallibility. Here, a *Kelly* hearing regarding the admissibility of Dr. Haddock's expert testimony was not warranted. (See *Peterson, supra,* 10 Cal.5th at p. 446 [dog trailing evidence was not subject to *Kelly* and therefore a *Kelly* hearing was not necessary before the evidence was admitted, provided that the requisite foundational requirements are satisfied].) Consequently, the trial court did not err in overruling defense counsel's objection under *Kelly* without a hearing.

### 2. *Relevance of Testimony on CAPI-6 Examination*

Alvarez also argues that Dr. Haddock's testimony was not relevant to Tyler's death in 1994 because Dr. Haddock's opinion that Shari was not at risk to physically abuse children in her care was time limited to 1998. The Attorney General responds that Dr. Haddock's testimony was relevant to rebut the defense's presentation of evidence on the 2000 CPS investigation that documented Shari's physical abuse of her daughter Taylor and in-utero abuse of her unborn child. We conclude that the testimony was relevant rebuttal evidence and

71

that there was no abuse of discretion in permitting Dr. Haddock's rebuttal testimony.[15]

"Rebuttal evidence is relevant and admissible if it tends to disprove a fact of consequence on which the defendant has introduced evidence." (*People v. Valdez* (2012) 55 Cal.4th 82, 169.) "[E]vidence presented or argued as rebuttal must relate directly to a particular incident or character trait [the] defendant offers in [their] own behalf." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24.) The trial court, notably, "has broad discretion to determine the relevance of evidence." (*People v. Gurule* (2002) 28 Cal.4th 557, 614 (*Gurule*).) "The admission of evidence in rebuttal is a matter left to the sound discretion of the trial court. [Citation.] The court's decision in this regard will not be disturbed on appeal in the absence of

---

[15] The Attorney General also argues that Alvarez failed to make a timely objection on relevance grounds to Dr. Haddock's testimony regarding Shari's CAPI-6 examination. Here, when addressing the prosecution's objection to cross-examination, defense counsel argued, "I don't personally see what the relevance is and his opinion as to whether he thought Shari Ransom was potentially abusive in 1998 was potentially abusive in 1998 has to do with whether or not, for example, she abused Taylor in 2000 or, for that matter, whether she was abusive towards Tyler Ransom back in 1994 . . ." Though there is an open question as to whether defense counsel's statement that "I don't personally see what the relevance is" constitutes a proper objection, we will assume arguendo that an objection was preserved and proceed to the merits. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 354 ["Although no 'particular form of objection' is required, the objection must 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling' "].)

'palpable abuse.' " (*People v. Hart* (1999) 20 Cal.4th 546, 653 (*Hart*).)

The trial court here did not abuse its discretion in admitting Dr. Haddock's testimony. His opinion that Shari was not at risk to physically abuse children in 1998 allowed the prosecution to counter the defense's evidence of Shari's physical abuse in 2000. Though Dr. Haddock's opinion was time limited to two years prior to the defense's evidence of Shari's physical abuse, the testimony related directly to a character trait that the defense sought to establish: that Shari was potentially abusive. Because the trial court admitted Shari's 2000 CPS investigation, it is reasonable to also admit evidence from 1998 addressing Shari's risk of abuse then. This rebuttal evidence was relevant and matches the breadth and scope of Alvarez's direct evidence, both of which relate to Shari's propensity for abuse during the time period *after* the death of both victims. The trial court "has broad discretion to determine the relevance of evidence." (*Gurule, supra,* 28 Cal.4th at p. 614.) "The admission of evidence in rebuttal is a matter left to the sound discretion of the trial court. [Citation.] The court's decision in this regard will not be disturbed on appeal in the absence of 'palpable abuse.' " (*Hart, supra,* 20 Cal.4th at p. 653.) Here, there was no palpable abuse of discretion.

## E. Trial Court's Response to Testimony on Inadmissible Evidence

Alvarez contends that he was improperly sanctioned by the court without meaningful access to counsel or an opportunity to be heard in violation of his state and federal statutory and constitutional rights after he referred in

testimony to evidence that had been ruled inadmissible. We disagree.

Before the retrial, the prosecution filed a motion in limine to exclude evidence that Brian Ransom, the father of Tyler Ransom, had two convictions for child molestation. On September 8, 1999, with Alvarez present, the trial court heard argument on the motion. The trial court granted the motion, finding that the evidence would be an improper attempt to attack the credibility of Shari Ransom that would be "more prejudicial than probative."

During the retrial, Alvarez testified as follows upon questioning from his own counsel:

"Q. When you moved over to Ashe Road, did you ever see Brian Ransom over near your house on Ashe Road?

"A. Yes.

"Q. Had you ever given him that address?

"A. No.

"Q. Had you ever given Brian Ransom your phone number?

"A. No.

"Q. Had you basically stopped seeing Brian Ransom?

"A. After I found out he had been convicted of child molestation, yes, I did.

"Q. When you —

"[Prosecutor]: Objection, your Honor. May we have a sidebar?

"THE COURT: Sure."

During the subsequent sidebar conference occurring in chambers, the prosecutor objected that Alvarez "just bombed in the fact that Brian Ransom was convicted of child molestation" without provocation from counsel, "in total disregard of the Court's ruling" in order "to smear Mr. Ransom, because he knew it wasn't coming in any other way." The prosecutor requested to cross-examine Alvarez "about the fact that he was there, a ruling was made by this Court that was not admissible, he knew that was the ruling, and that he was deliberately violating the Court's order in order to get evidence in front of the jury to smear Brian Ransom because it's helpful to his defense." The court acknowledged, "Mr. Alvarez, who has been present during all of these proceedings, certainly is and certainly should have been aware on his own, plus, I'm sure his counsel has admonished him, to not violate any of the rules that the Court has imposed as it related to the in limine pretrial motions regarding various aspects of this matter. He's pretty ring wise and I'm sure that he's — he must be aware of the fact that he is violating the Court's order." In order to cross-examine him on the topic, the prosecutor offered to grant Alvarez immunity from prosecution for contempt. The prosecutor argued the requested cross-examination would show Alvarez's "motive and bias and his lying on the witness stand. [¶] It's highly relevant to his credibility, that he will basically stop at nothing, including violating a court order, to do whatever he has to do get himself off from this charge." The defense expressed concern that the cross-examination would go into attorney-client privilege

matters.  The prosecutor responded that he had no objection to Alvarez being permitted time for his counsel to advise him about any attorney-client privilege issues.

The prosecution requested that the trial court admonish Alvarez immediately outside the presence of jury so that he would not "do the same thing again."  The defense did not object to such an admonition and the court agreed with the prosecution's request.  Outside the presence of the jury, the trial court then admonished Alvarez as follows:

> "This Court made an order which has been violated by the witness in his comments regarding Brian Ransom's history or record.
>
> "And Mr. Alvarez, you were present — and I don't want any comments from you in this regard.
>
> "You were present during the pretrial proceedings at all times.  You were certainly present when motions were discussed and when this Court made rulings on motions, and by making a reference to the child molest charges against Brian Ransom, you have violated the Court's order, and all I can do today is to admonish you as it relates to advising you not to make any further reference whatsoever to that subject, or any of the other subjects that were contained in our pretrial motions, in which this Court, when you were present, and you were made aware of by being present during those proceedings of this Court's orders as it related to those motions, and there's not to be any further comments in violation of any of those pretrial orders that this Court made during that in limine motion.

"The People have comment?

"[Prosecutor]: Sounds pretty clear to me, your Honor.

"THE COURT: How about the defense, comments?

"[Defense counsel]: No, your Honor."

On the following morning with Alvarez present, the prosecution asked to cross-examine Alvarez on his violation of the court order, contending it was relevant to his character for truth and honesty under Evidence Code section 780, and also to his credibility and character.

The trial court reiterated that "As I indicated yesterday and I told the defendant this, and his counsel as well, that he has violated a Court order, knowingly violated a court order, as far as I'm concerned. And I don't want this matter to become an absolute sideshow." The trial court warned that it would consider removing Alvarez from the courtroom if there was any further conduct of that nature.

Defense counsel argued that Alvarez's violation of the court order was unintentional. Defense counsel objected to the prosecutor cross-examining Alvarez based on concerns the prosecution might ask about privileged attorney-client matters.

The trial court noted the prosecutor had agreed to waive any charges related to the contempt of court for the conduct, and the court was inclined to accept that proposal. The trial court granted the prosecution's request to cross-examine Alvarez. The prosecutor cross-examined Alvarez as follows:

"Q. You couldn't, and then you felt it important to tell us about the fact that Mr. Ransom has a child molestation conviction, didn't you?

"A. That was one of her questions.  I gave an answer.  I misunderstood the question.

"Q. You misunderstood her question to call for information about a child molest conviction that Brian Ransom had, right?

"A. I thought she was referring and asking me a question why I had separated from Brian Ransom, in other words, stopped seeing him, stopped working out with him, stopped associating with him, and that was after he wrote to me and said what you just — I'm not allowed to say that anymore.  I don't know —

"Q. Well, let's go over that.  You're not allowed — you were not allowed to mention his child molestation conviction ever in this trial, were you?

"A. It slipped.  It was an accident.

"Q. You slipped.  Because there was a specific order of the Court, made at a pretrial motion in this case, that that was ruled by the Court basically not to be admissible as evidence in this trial.  Isn't that correct?

"A. That is correct.

"Q. And you were there when that ruling was made, right?

"A. Yes, I was."

When the prosecutor asked Alvarez if he deliberately violated the court ruling, Alvarez responded:

"A. Not deliberately.  It was an accident.

"Q. It was an accident.

"A. Yes, it was.

"Q. You were asked a question about when you were separated, and it was an accident that you mentioned something you'd been told you couldn't bring up?

"A. I had misunderstood the question and I thought the question was being asked of me why I left Brian and terminated the relationship between me and him, and that was — that was why. It was the truth. I even said it in my statements."

After asking about Alvarez's interactions with Brian Ransom, the prosecutor again returned to questioning about Alvarez violating the court order:

"In this trial, even though you were told you couldn't, you deliberately violated a court order to bring in his child molestation conviction because you wanted to dirty him up in front of this jury. Isn't that right, sir?

"A. That was an accident.

"Q. You'll stop at nothing to get yourself off from these charges, will you?

"A. No, sir. I —"

At this point, the defense counsel objected as argumentative. After the court overruled the objection, the prosecutor again asked Alvarez why he brought up Brian Ransom's child molestation conviction. Alvarez responded:

"It was an accident. I misunderstood, [prosecutor]. I misunderstood the question and I thought the question was stating why, in fact, did I leave and terminate my relationship with Brian Ransom, and I said because of what you just said. I can't say it anymore."

The prosecutor then had Alvarez confirm the testimony from the day before, before again asking:

"Q. What about that question don't you understand — or didn't you understand yesterday when you felt it necessary to tell us about that?

"A. I misunderstood the question and on accident I gave that answer and I'm sorry.

"Q. Tell me what you misunderstood about the question that you thought called for his child molestation conviction.

"A. I just misunderstood the question.

"Q. Tell me what you misunderstood about the question that called for it. You didn't answer me, sir.

"A. Well

"Q. Tell me what you misunderstood in that question."

Defense counsel again objected as argumentative and as asked and answered. The court again overruled the objection. Alvarez then again answered that he misunderstood the question.

" 'Under the Sixth Amendment's confrontation clause, a defendant has the right to be personally present at any

proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." [Citations.] The Fourteenth Amendment guarantees the right to be present as a matter of due process at any "stage . . . that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." ' " (*People v. Ng* (2022) 13 Cal.5th 448, 564–565 (*Ng*).) "Our state Constitution similarly provides a ' "right to be personally present at critical proceedings." ' " (*People v. Perez* (2018) 4 Cal.5th 421, 438.) "We have previously held, however, that neither the state nor federal Constitution, nor any statutory requirement, provides a defendant with the right to be present at hearings or discussions outside the jury's presence 'on questions of law or other matters as to which his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him.' " (*Ng*, at p. 565.) " 'An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law.' [Citation.] Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice." (*People v. Perry* (2006) 38 Cal.4th 302, 311–312.)

Alvarez claims the in chambers sidebar conference immediately after he violated the trial court's in limine order deprived him of his state and federal statutory and constitutional rights to be present at all trial proceedings. His rights to be personally present, however, were not violated because the in chambers sidebar conference did not bear a " ' "reasonable and substantial relation to his full opportunity to

defend against the charges." ' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1234.) The in chambers sidebar conference was held in response to Alvarez violating a court order and during that time the court did not decide any matter that came before the jury. The decision to permit the prosecutor to cross-examine Alvarez regarding his violation of the court order occurred the next day in Alvarez's presence, after Alvarez had consulted his counsel and after both counsel had made their arguments to the court.

Alvarez further argues that his state and federal due process rights were violated under *People v. Ramirez* (1979) 25 Cal.3d 260 when the trial court determined that he intentionally violated the court order and decided to admonish him but made this determination outside of Alvarez's presence and without giving him an opportunity to consult with counsel or respond. The admonishment, however, was in direct response to Alvarez violating a court order and was given outside the jury's presence. The trial court has inherent power to establish order in its courtroom and "we will generally defer to the trial court in determining when a defendant has been disruptive or when further disruption may be reasonably anticipated." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1211.) Furthermore, since the admonishment occurred outside the jury's presence, it did not influence the jury's determination and was not " ' "critical to [the] outcome." ' " (*Ng, supra,* 13 Cal.5th at p. 565.) While the court stated outside the jury's presence that Alvarez violated the court order, Alvarez was given an opportunity to consult with a lawyer, and his counsel was afforded the opportunity to fully argue the legal issues to the judge before the trial court ruled that it would allow the prosecution to cross-examine Alvarez.

Alvarez responds that the appropriate remedy was instead to strike his testimony and to admonish the jury to disregard it, rather than to permit cross-examination as a sanction for his violation of the court order. However, the cross-examination was not imposed as a sanction for Alvarez's violation, but because his violation of the court orders bore on his credibility as a witness. Furthermore, although striking the testimony and admonishing the jury may have been alternative remedies worthy of consideration, any claim to this alternate remedy is forfeited because defense counsel did not object on these grounds to the prosecution's request to cross-examine Alvarez. Rather, defense counsel only objected to the prosecutor cross-examining Alvarez based on concerns the prosecution might ask about privileged attorney-client matters. (See *Ng, supra*, 13 Cal.5th at p. 551 [" 'A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal' "].) Though the prosecutor stated that he was not seeking that the jury be admonished as a remedy, Alvarez did not present to the court admonishment in lieu of cross-examination as a remedy, and so the court never considered this alternative on the record before ruling.

Alvarez next claims that the prosecutor improperly badgered and belittled him during the cross-examination in violation of Alvarez's state and federal constitutional rights. Alvarez similarly claims that the court erred in overruling objections to the prosecutor's argumentative and prolonged questioning. Specifically, during cross-examination Alvarez's counsel objected as argumentative to the prosecutor asking, "You'll stop at nothing to get yourself off from these charges, will you?" The court then overruled this objection. Then after asking

Alvarez to explain what he did not understand about the question that led him to testify about Ransom's child molestation conviction, Alvarez replied that he "misunderstood the question and on accident I gave that answer and I'm sorry." The prosecutor continued on this same line of questioning as follows:

> "[Prosecutor] Q. Tell me what you misunderstood about the question that you thought called for his child molestation conviction.
>
> "[Alvarez] A. I just misunderstood the question.
>
> "Q. Tell me what you misunderstood about the question that called for it. You didn't answer me, sir.
>
> "A. Well
>
> "Q. Tell me what you misunderstood in that question.
>
> "[Defense counsel]: Your Honor, I'm going to object. Argumentative and asked and answered."

The court again overruled the objection. " 'A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 333.) The prosecutor's argumentative and prolonged questioning was not a model of prosecutorial conduct. Indeed, the prosecutor at one point withdrew a comment, explaining that "it was inappropriate and I apologize." However, even assuming the court erred in overruling defense counsel's objections, any error was harmless. This is not a case where, for example, the prosecutor elicited inadmissible evidence during the questioning. (See *Molano, supra,* 7 Cal.5th

at p. 674 ["A prosecutor commits misconduct by ' " ' "intentionally elicit[ing] inadmissible testimony" ' " ' "].) Instead, the scope of prosecutor's questions was consistent with the court's order and Alvarez simply repeated the same general answer about misunderstanding the question. The prosecutor's questioning on the violation of the court order was also relatively short compared to the length of the trial. Finally, the in chambers sidebar conference, the court's admonition of Alvarez, the subsequent hearing, and the prosecutor's cross-examination of Alvarez, did not individually or cumulatively amount to a violation of Alvarez's state or federal constitutional rights.

## F. Admission of Impeachment Evidence of Sexual Assaults and Impersonating Law Enforcement

Alvarez argues the trial court abused its discretion under Evidence Code section 352 in allowing the prosecution to impeach him with testimony about his misdemeanor sexual assault conviction of Melinda A., uncharged rape and false imprisonment of Michelle E., and prior incidents of impersonating correctional or law enforcement officers. He further argues that the trial court prejudicially erred in failing to accept his offer to stipulate that he had been convicted of a misdemeanor involving moral turpitude. We disagree.

On May 10, 2000, after the defense asked what impeachment evidence the prosecution would use if Alvarez testified, the prosecutor represented that he would seek to introduce evidence of Alvarez's sexual assaults of Michelle E., Melinda A., and Borgsdorf in order to impeach Alvarez's credibility. The prosecutor argued that this evidence was relevant to evaluating Alvarez's credibility and its introduction

would not result in an undue consumption of time because Alvarez's credibility versus Shari Ransom's credibility was a central issue in Tyler's death.  The prosecutor also stated that he would seek to introduce evidence of incidents from 1992 where Alvarez misrepresented himself as a correctional or law enforcement officer.

The defense countered that this evidence was more prejudicial than probative under Evidence Code section 352, arguing that the prejudicial impact was great.  The defense noted that the only conviction involved was a misdemeanor plea for the allegations relating to Melinda A. and that Melinda A. had fainted in the courtroom the last time she testified.  Defense counsel also argued that the alleged incidents for impersonating an officer were remote in time, given that they had occurred eight years earlier in 1992. The defense also noted that the evidence of Shari's abuse of her daughter Taylor and her unborn child was admitted under an exception to the general prohibition on character evidence pursuant to Evidence Code section 1101, but the proposed evidence of Alvarez committing sexual assaults and impersonating law enforcement was offered solely for impeachment under *People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*).[16]

If the court determined that the allegations relating to Melinda A. were admissible, the defense offered in the alternative to stipulate to the fact that Alvarez could be

---

[16]  In *Wheeler*, the court held that evidence of past misdemeanor conduct bearing on a witness's veracity was admissible in a criminal proceeding subject to the trial court's discretion.  (*Wheeler, supra,* 4 Cal.4th at p. 295.)

impeached by a misdemeanor conviction involving moral turpitude in order for the jury to evaluate his credibility, rather than calling Melinda A. as a witness to testify to the facts of those allegations. The defense's proffered stipulation involved treating the misdemeanor like a felony so that the underlying facts of the offense would not be admitted.[17] The defense argued that the stipulation would allow the jury to consider Alvarez's misdemeanor involving moral turpitude in evaluating his credibility without considering the conduct for any other purpose. The prosecutor replied that the People would not accept the stipulation to a misdemeanor involving moral turpitude without the underlying facts of the sexual assault being presented to the jury.

The court found the People were entitled to reject the defense's offer to stipulate. After weighing the prejudicial value versus probative value of the evidence under Evidence Code section 352, the court also ruled that, if Alvarez testified, the prosecutor would be entitled to present the impeachment evidence relating to the sexual assaults of Michelle E., Melinda A., and Borgsdorf, the misdemeanor conviction from the Melinda A. sexual assault, and the 1992 impersonating law enforcement incidents.

---

[17] Previously, the right to cross-examine or impeach the credibility of a witness concerning a felony conviction did not extend to the facts underlying the offense. However, we have since found that the "Truth-in-Evidence" amendment to the California Constitution abrogated that rule. (See *People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*) ["We disapprove of *People v. Casares* (2016) 62 Cal.4th 808, 830 (*Casares*) ['Under California law, the right to cross-examine or impeach the credibility of a witness concerning a felony conviction does not extend to the facts underlying the offense.']"].)

Alvarez subsequently decided to testify. In response to the court ruling, Alvarez testified on direct examination regarding the incidents involving Melinda A. and Michelle E. and acknowledged wearing a correctional officer uniform in 1992. Prior to the prosecutor cross-examining him about Michelle E. and Melinda A., the court informed the jury that the testimony was being introduced for a limited purpose:

> "THE COURT: You will receive from me a jury instruction that will address this issue as well. But in order that you clearly understand, this line of questioning is being presented and proposed by the district attorney for the limited purpose of and only this limited purpose, and that is the credibility issue. So please keep that in mind and carefully analyze the jury instruction when I read it to you.

> "And as I will tell you at the time when I do read you jury instructions in this case, you have a right to ask that those jury instructions be delivered back to you in the jury room for your review.

> "And this is a critical element here. It's a limited purpose for which this information is being presented."

The prosecutor then proceeded to cross-examine Alvarez about his conduct with Michelle E. and Melinda A. and about Alvarez impersonating a correctional officer in 1992. The prosecutor also presented the testimony of Melinda A., Michelle E., and a sexual assault nurse examiner Donna Hogan. As discussed in part I.A.5 above in more detail, Michelle E. testified that Alvarez threatened to kill her or her son. She testified that Alvarez then proceeded to rape her in her house with her son

present. She also testified to Alvarez taking her back to his house where he locked her and her son in his bedroom. She testified to Alvarez raping her again there. Hogan testified to performing a sexual assault exam on Michelle E., in which Hogan found injuries consistent with nonconsensual sexual intercourse and in which Michelle E. told her that Alvarez had raped her. On direct and cross-examination, Alvarez testified that his relationship with Michelle E. was consensual.

Melinda A. testified to Alvarez following her and sexually assaulting her in a post office parking lot before she managed to get free and drive off. On direct and cross-examination, Alvarez testified that Melinda A. came over to his house and claimed they kissed on his bed, but that he did not attack her and did not see her at the post office. Alvarez acknowledged that he impersonated a correctional officer in 1992.

Before jury deliberations, the trial court instructed the jury pursuant to CALJIC No. 2.09 as follows:

> "Certain evidence was admitted for a limited purpose. At the time this evidence was admitted, you were instructed that it would not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider this evidence for any purpose except the limited purpose for which it was admitted."

The trial court also instructed, pursuant to CALJIC No. 2.23.1, that:

> "Evidence has been introduced through the testimony of Michelle E[.], Melinda A[.], and Donna Hogan for the purpose of showing that a witness, Frank Alvarez, engaged in past criminal conduct. This evidence may be

considered by you only for the purpose of determining the believability of that witness.

"The fact that a witness engaged in past criminal conduct, if it is established, does not necessarily destroy or impair a witness' believability. It is one of the circumstances that you may take into consideration in weighing the testimony of that witness."

Alvarez now argues that the impeachment evidence caused an undue consumption of time, undue prejudice, confused the issues, and misled the jury. "[A]ny criminal act or other misconduct involving moral turpitude suggests a willingness to lie and is not necessarily irrelevant or inadmissible for impeachment purposes." (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24; see *Wheeler, supra*, 4 Cal.4th at pp. 295–296; Cal. Const., art. I, § 28, subd. (f)(2) [truth-in-evidence provision]; Evid. Code, § 788 [authorizing prior felony convictions for impeachment].) "In general, a misdemeanor — or any other conduct not amounting to a felony — is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler*, at pp. 296–297.) "The trial court's determination that the evidence was proper impeachment is reviewed for abuse of discretion." (*Ramirez, supra*, 13 Cal.5th at p. 1134; see *Wheeler*, at pp. 295–297.) " '[T]he court's ruling will not be disturbed unless made "in an arbitrary, capricious,

or patently absurd manner that resulted in a manifest miscarriage of justice.” ’ ” (*People v. Johnson* (2022) 12 Cal.5th 544, 611 (*Johnson*).)

Alvarez claims that testimony about his prior instances of misconduct resulted in an undue consumption of time as demonstrated by the 272 pages of the reporter’s transcript that were needed to record it. However, Melinda A. and Michelle E. spent less than one day total testifying over the course of two different days in a lengthy capital trial that occurred over the span of roughly two months. By way of comparison, the defense spent over a day of trial impeaching Shari with evidence of misconduct. The prosecution’s impeachment evidence against Alvarez did not result in an undue consumption of time.

Alvarez further claims undue prejudice because the Melinda A. and Michelle E. incidents bore similarities to the present allegations. Alvarez notes that, like the two mothers in the present case, Melinda A. and Michelle E. were young females with a child that Alvarez had approached. Furthermore, the Melinda A. and Michelle E. incidents and the present offenses all involve an assault on another person. “ ‘Although the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive.’ ” (*People v. Edwards* (2013) 57 Cal.4th 658, 722.) In fact, even where the uncharged and charged offenses are similar, it is not necessarily an abuse of discretion to admit evidence of the uncharged offenses for impeachment purposes. (See *People v. Clark* (2011) 52 Cal.4th 856, 932 [rejecting defendant’s claim that trial court “abused its discretion in permitting the prosecutor to impeach him with prior convictions that were identical to the charged offenses”].) Here, there are

several distinct differences as well. The Melinda A. and Michelle E. incidents involved sexual assaults, while the charged crimes were for murder. Furthermore, the victim in the Melinda A. and Michelle E. incidents was the adult parent, while the victim in the charged offenses was the young child.

Furthermore, the impeachment evidence was relevant to assessing Alvarez's credibility. The trial court instructed the jury before Alvarez was cross-examined about the incidents and again prior to deliberations that the evidence may be considered only for the limited purpose of assessing Alvarez's credibility or believability. As noted above, Michelle E. testified that Alvarez threatened to kill her or her son and that Alvarez raped her on two occasions with her son present. Melinda A. testified to Alvarez following her and sexually assaulting her in a parking lot at the post office. Conversely, Alvarez testified that his relationship with Michelle E. was consensual and that he did not attack Melinda A. nor see her at the post office. "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Clark, supra*, 52 Cal.4th at p. 932.) The trial court did not abuse its discretion in admitting the impeachment evidence in this case.

Alvarez responds that the terms "credibility" and "believability" in the jury instructions may have misled the jury and suggested that there was no limitation on the use the evidence because the court did not instruct, like it did regarding Shari's impeachment evidence (i.e., the child protective service proceedings in 2000), that the evidence is *not* to be considered for the purpose of demonstrating "bad moral character." By

failing to request a more specific limiting instruction, Alvarez forfeited this argument to the extent that he argues that one was necessary to avoid potential ambiguity. (See *People v. Klvana* (1992) 11 Cal.App.4th 1679, 1708, fn. 20 [if defendant "desired a more specific limiting instruction, it was incumbent upon him to submit one for the trial court's consideration"].) Nevertheless, the court was clear that the evidence was being presented "for the limited purpose of and only this limited purpose" of Alvarez's "credibility" and further emphasized that "this is a critical element here. It's a limited purpose for which this information is being presented." The instructions did not convey that the jury could consider the evidence for other purposes. "[J]urors are presumed to understand and accept the court's instructions." (*People v. Erskine* (2019) 7 Cal.5th 279, 301 (*Erskine*).)

Alvarez also argues that admission of Melinda A. and Michelle E.'s testimony risked confusing the issues and misleading the jury because it created a mini trial that included contradictions in Melinda A.'s testimony. In making this argument, Alvarez does not explain the contradictions in Melinda A.'s testimony that he is specifically referring to.[18] In

---

[18] However, on cross-examination, Melinda admitted to lying to police about Alvarez scaring her when she first met him. She admitted to initially telling police that the voice on a message she left on Alvarez's message machine was not hers even though it was. She also did not initially tell law enforcement about the first time Alvarez had raped her at her house. She also admitted that she initially lied about not knowing Alvarez and about saying he forced entry into her house. She did not initially tell police that she had a consensual affair with Alvarez.

any event, the jury could consider any contradictions in the testimony in evaluating Alvarez's credibility.

Furthermore, Melinda A. and Michelle E.'s testimony was relevant impeachment evidence. The incidents were both recent, occurring on January 23, 1996, and February 2, 1996, respectively, with Alvarez being taken into custody for the current offenses in October 1996. (See *Wheeler*, *supra*, 4 Cal.4th at p. 297 ["*relatively recent conviction* for . . . an offense necessarily involving both moral turpitude and dishonesty, was highly relevant to [a witness's] credibility" (italics added)].) The existence of the misdemeanor conviction and the additional unadjudicated crimes also cast doubt on Alvarez's veracity because " 'it is undeniable that a witness' moral depravity of any kind has "some tendency in reason" [citation] to shake one's confidence in his honesty.' " (*Id.* at p. 295.) "We have also recognized that the commission of numerous crimes involving moral turpitude 'may be more probative of credibility than a single crime.' " (*Dalton, supra*, 7 Cal.5th at p. 215.) The trial court did not abuse its discretion in admitting the impeachment evidence. (See *Johnson, supra*, 12 Cal.5th at p. 611 [" '[T]he court's ruling will not be disturbed unless made "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice" ' "].)

Alvarez contends that the trial court had the power to require the prosecutor to accept the offer to stipulate to a misdemeanor involving moral turpitude and that it abused its discretion in failing to do so. "The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) Here, the prosecutor argued that the

underlying conduct was probative and therefore the probative value of Melinda A.'s testimony exceeded the scope of the proposed stipulation to just the fact of a conviction involving moral turpitude. Alvarez responds that impeachment by a prior felony conviction must be limited to the fact of conviction without any surrounding details under Evidence Code section 788.[19] However, as noted above, we have found that the "Truth-in-Evidence" amendment to the California Constitution abrogated the prior rule that the right to cross-examine or impeach the credibility of a witness concerning a felony conviction did not extend to the facts underlying the offense. (See *Dalton, supra,* 7 Cal.5th at p. 214.) Furthermore, "[t]he circumstance that the defense might have preferred that the prosecution establish a particular fact by stipulation, rather than by live testimony, does not alter the probative value of such testimony or render it unduly prejudicial. The prosecution was not required to accept such a stipulation or other 'sanitized' method of presenting its case." (*People v. Carter* (2005) 36 Cal.4th 1114, 1169–1170 (*Carter*).) "The trial court's determination that the evidence was proper impeachment is reviewed for abuse of discretion." (*Ramirez, supra,* 13 Cal.5th at p. 1134.) The trial court here did not abuse its discretion in permitting the prosecution to reject the defense's offer to stipulate.

Finally, Alvarez argues that the admission of Melinda A. and Michelle E.'s testimony deprived him of his constitutional rights to a fair jury trial in accordance with due process of law

---

[19] With certain exceptions, Evidence Code section 788 permits evidence that the witness has been convicted of a felony for the purpose of attacking the witness's credibility.

and to reliable fact-finding. Alvarez did not object on federal constitutional grounds below and to the extent, if any, that defendant may be understood to argue the federal constitutional principles required exclusion of the evidence for reasons different from his trial objection, that claim is forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 436.) In any event, for the same reason we find no statutory violation, Alvarez's constitutional claims fail.

### G. Admission of Hearsay Statements under *Crawford v. Washington* (2004) 541 U.S. 36 and Evidence Code sections 1360 and 352

Alvarez claims that the trial court prejudicially erred in admitting hearsay statements Dylan made to Ben and Monica Alvarez and that inculpated Alvarez as the cause for some of Dylan's prior injuries. Alvarez claims this evidence violated *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and Evidence Code sections 1360 and 352. We disagree.

Before both the first and second trial, the prosecution filed a motion pursuant to Evidence Code section 1360 to admit hearsay statements Dylan made to Ben and Monica Alvarez. Both times, the defense filed an opposition, the court heard oral argument, and the court granted the prosecutor's motion. Before the first trial, the court also considered the pretrial testimony of Ben and Monica as well as a Bakersfield police officer, who had spoken to Ben about Dylan's statements to him. In granting the motion before the first trial, the court determined that:

> "The statements are reliable according to this evidence we've had here. Certainly there was — there's no question that Dylan had some sort of speech problem

notwithstanding both witnesses indicated an ability to understand what he was saying even though having to interpret somewhat themselves through the process.

"And, therefore, the court's going to make the finding that these statements are, in fact, reliable and will grant the motion."

In granting the motion before the second trial, the court noted that "we have been through this previously" and "I have reviewed the documents that have been presented, I've reviewed the points and authorities that have been submitted by the People and in the opposition by the defense as it's been submitted in Ms. Walters' presentation." The court then concluded:

"The Court is going to grant the motion to the People to allow the information be provided to the Court as it relates to that statement pursuant to provisions of Section 1360 of the Evidence Code.

"I looked at that carefully, as well. And it appears that subject to further evidence being brought by the defense, to the extent they wish to, this matter will be acceptable and will be allowed to be presented, to be evidence to the jury by the People, subject to that obvious observation that the defense will be able to cross-examine and present whatever evidence in opposition that they wish to in this regard."

Subsequently, at the second trial, Monica testified that she asked Dylan how he suffered the bruises and injuries, and that Dylan generally would repeat whatever she asked him, "like bruise or fell." Monica asked Dylan how many times

Alvarez had hit him and Dylan responded, "Four times." Dylan had slow speech for a four year old, but Monica was able to understand him.

Ben testified he asked Dylan what happened to his lip after noticing bruising on it and Dylan "would kind of be shy, you know, 'cause he didn't really want to say anything. Then he'd say — once he said 'daddy,' and once he said — he mumbled different things. He was sort of incoherent. I couldn't understand him. He sort of flip-flopped, you know, from time to time as to what happened to him, kind of like he wanted to please who it was that was asking the questions half the time." When questioned further, Ben clarified that Dylan told him that Alvarez had caused his big lip. Ben asked Alvarez if he caused the injury and Alvarez said Dylan was clumsy and would lose his balance and bump into things.

"The Sixth Amendment bars the admission of testimonial hearsay from a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a previous opportunity for cross-examination." (*Ramirez, supra,* 13 Cal.5th at p. 1147, citing *Crawford, supra,* 541 U.S. at pp. 51, 53–54.) The Sixth Amendment is concerned only with those hearsay statements that qualify as "testimonial." (*Whorton v. Bockting* (2007) 549 U.S. 406, 419–420; *Davis v. Washington* (2006) 547 U.S. 813, 824.) "The high court has yet to state definitively just *what* facts conclusively demonstrate that particular hearsay qualifies as testimonial. [Citation.] However, it has never held a hearsay statement to be testimonial unless it was sufficiently formal and made by or to a government agent during the course of a criminal investigation, for the primary purpose of preserving evidence for trial." (*Ramirez, supra,* 13 Cal.5th at p. 1147; see also *Ohio v.*

*Clark* (2015) 576 U.S. 237, 246 ["Because at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns, we decline to adopt a categorical rule excluding them from the Sixth Amendment's reach. Nevertheless, such statements are much less likely to be testimonial than statements to law enforcement officers"].) "Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules." (*Giles v. California* (2008) 554 U.S. 353, 376 (*Giles*).)

Evidence Code "[s]ection 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse." (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367 (*Roberto V.*).) Evidence Code "[s]ection 1360 safeguards the reliability of a child's hearsay statements by requiring that: (1) the court find, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances surrounding the statement(s) provide sufficient indicia of reliability; (2) the child either testifies at the proceedings, or, if the child is unavailable to testify, other evidence corroborates the out-of-court statements; and (3) the proponent of the statement gives notice to the adverse party sufficiently in advance of the proceeding to provide him or her with a fair opportunity to defend against the statement." (*Ibid.*; Evid. Code, § 1360, subds. (a)–(b).) Normally, "[w]e review a trial court's admission of evidence under [Evidence Code] section 1360 for abuse of discretion." (*Roberto V.*, at p. 1367; *People v. Mitchell* (2020) 46 Cal.App.5th 919, 927.)

Under Evidence Code section 352, " ' "evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 162–163.) We review for abuse of discretion a trial court's rulings on the admission or exclusion of evidence under Evidence Code section 352. (*Johnson*, *supra*, 12 Cal.5th at p. 611.) " '[T]he court's ruling will not be disturbed unless made "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ibid.*)

Alvarez argues that Dylan's statements constituted testimonial hearsay in violation of the Sixth Amendment and *Crawford*. Alvarez claims that *Crawford* applies because Ben and Monica were authority figures who conducted suggestive interrogations of Dylan and that they were therefore conducting the same kind of interrogation that a government agent would. However, the Sixth Amendment was not violated here because Dylan's statements to Ben and Monica were not actually testimonial under *Crawford*. (See *People v. Cage* (2007) 40 Cal.4th 965, 987 ["the focus of both *Crawford* and *Davis* [*v. Washington* (2006) 547 U.S. 813] is on formal and solemn accusatory statements made to *law enforcement agents* in the context of *criminal investigations or inquiries*"].) Rather, Dylan's statements to his mother's boyfriend's family members were casual remarks to acquaintances and not formal accusations made to government agents. (See *People v.*

*Gutierrez* (2009) 45 Cal.4th 789, 813 ["The statement of a three-year-old declarant made to his aunt is more like 'a casual remark to an acquaintance' and is therefore not a testimonial statement under *Crawford*"]; *Giles, supra,* 554 U.S. at p. 376 ["Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules"].)   Alvarez relies upon *People v. Sisavath* (2004) 118 Cal.App.4th 1396 because in that case a child's statements were found to be testimonial even though the interview was not conducted by a police officer or other government employee. (*Id.* at pp. 1402–1403.) However, *Sisavath* is readily distinguishable because there the "interview took place after a prosecution was initiated, was attended by the prosecutor and the prosecutor's investigator, and was conducted by a person trained in forensic interviewing." (*Id.* at p. 1403.) Here, in contrast, no such circumstances were present and Dylan's statements to Ben and Monica were not testimonial.[20]

Alvarez further argues the trial court should have excluded Dylan's statements under Evidence Code section 1360 because the content and circumstances of the statements did not provide sufficient indicia of reliability. Alvarez contends the statements were unreliable because Dylan's statements were

---

[20]    Alvarez argues in the alternative that, if Dylan's statements are not considered testimonial, then they are less reliable and their admission over objection violated the federal Eighth Amendment requirement of heightened reliability in death penalty cases. The Eighth Amendment, however, does not require that statements be considered testimonial in order to be admissible.

not spontaneous nor consistently repeated. However, the trial court did not abuse its discretion in finding sufficient indicia of reliability. When Monica asked Dylan how many times Alvarez had hit him, Dylan responded "four times." Though Dylan had slow speech for a four year old, Monica testified that she was able to understand him. Indeed, a "child may well be able to relate uncomplicated, simple facts." (*Roberto V.*, *supra,* 93 Cal.App.4th at p. 1369.) In her pretrial testimony, Monica also stated that she took notes of the incident in her diary afterwards. Since Dylan's statements were prompted by questioning concerning visible injuries, the statements were likely made near in time to the infliction of the injuries. Though Ben Alvarez acknowledged that Dylan was not consistent about the cause of his injury and that Dylan "flip-flopped . . . from time to time as to what happened to him, kind of like he wanted to please who it was that was asking the questions half the time," Ben's testimony that Dylan had told him that Alvarez had assaulted him was corroborated by Monica's testimony. Furthermore, at the pretrial hearing, a Bakersfield police officer, who in October 1996 had spoken to Ben about Dylan's statements, corroborated the testimony as well. While the statements are at the outer perimeter of admissibility, the trial court did not abuse its discretion in allowing the statements to be admitted under Evidence Code section 1360. (See *Roberto V.*, at p. 1367 ["[w]e review a trial court's admission of evidence under [Evidence Code] section 1360 for abuse of discretion"].)

Alvarez also contends the trial court erred in failing to perform an Evidence Code section 352 analysis. "Although the record must 'affirmatively show that the trial court weighed prejudice against probative value' [citations], the necessary showing can be inferred from the record despite the absence of

an express statement by the trial court." (*People v. Prince* (2007) 40 Cal.4th 1179, 1237 (*Prince*).) Before granting the People's motion, the court stated here that it had reviewed the defense's opposition, which expressly invoked Evidence Code section 352. Implicit in the trial court's statement is that the court considered Alvarez's objection under Evidence Code section 352 contained in that brief. Furthermore, the court's assessment of the statements' reliability, while in the context of the parties' section 1360 arguments, clearly constituted an implicit section 352 balancing. Indeed, before the first trial, the court stated, "[t]he statements are reliable according to this evidence we've had here. Certainly there was — there's no question that Dylan had some sort of speech problem notwithstanding both witnesses indicated an ability to understand what he was saying even though having to interpret somewhat themselves through the process."

"Although 'the better practice' would have been for the trial court, prior to issuing its ruling, to have set forth on the record its balancing of the probative value of the evidence against its prejudicial effect [citation], its ruling did not have to be that explicit. . . In view of the court's indication it had reviewed such submissions, the weighing process contemplated by Evidence Code section 352 may be inferred." (*Carter, supra*, 36 Cal.4th at p. 1152.) Alvarez responds that, unlike in *Carter*, in which "the parties submitted the issue to the court on the strength of their thoroughly prepared written arguments" (*ibid*.), the briefing here did not focus on the weighing of Evidence Code section 352, but rather the issue was only raised as a brief objection in his opposition and was never discussed at oral argument. However, though the court did not expressly invoke Evidence Code section 352, the court did expressly state

that it considered the defense's opposition, which did raise Evidence Code section 352, and also acknowledged that this was not the first time addressing the admissibility of Dylan's statements, noting, "we have been through this previously," in the first trial. At the first trial, the court explicitly determined that the statements were reliable. Under the totality of circumstances, we infer that the court here implicitly considered Evidence Code section 352 and determined that the probative value outweighed any undue prejudice.

Alvarez further contends that a proper exercise of discretion under Evidence Code section 352 would have precluded the admission of Dylan's statements to Monica and Ben. Alvarez claims that the statements had little probative value, noting that Dylan was four years old and had speech impediments, but had great danger for prejudice because it was the only direct evidence that Alvarez was responsible for any injury that Dylan had suffered. However, Alvarez's theory of prejudice goes to the power to persuade, not on their tendency to inflame the jurors' emotions. (See *People v. Scott* (2011) 52 Cal.4th 452, 490 ["Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant"].) The prosecutor here argued to the court that the statements were circumstantial evidence of the charged offenses because they permitted the jury to draw the inference that Alvarez inflicted the fatal beating because he struck Dylan on an earlier occasion. Furthermore, other witnesses corroborated that Alvarez had been responsible for prior injuries that Dylan had suffered. Borgsdorf told the police in a tape-recorded interview that she had observed Alvarez "a couple of times" in Dylan's room "with

his hands around his neck." Theresa Hall testified that she noticed Dylan "acted very scared" when Alvarez was in the room and that Dylan pointed out his bruises to her when Alvarez left the room. Alvarez himself admitted that he "didn't mean to bruise [Dylan]" when he plays with him too hard. The defense questioned each of these witnesses, including Ben and Monica. On cross-examination, Ben acknowledged that Dylan "was just a little slow, a little slow on his speech" and "was very difficult to understand." On cross-examination, Monica testified to seeing bruises on Dylan and acknowledged that sometimes Dylan would play with her son Tyler and Dylan would say "Tyler is hitting me with a toy, that kind of thing." The jury was entitled to weigh the evidence and draw its own conclusions from this. (See *Dalton, supra,* 7 Cal.5th at p. 230 [" 'the reliability of a witness's testimony is a matter for the jury to decide and therefore concerns the weight of the evidence, and not its admissibility' "].) We examine the court's action for abuse of discretion (*Johnson, supra,* 12 Cal.5th at p. 610) and conclude that the court did not abuse its discretion under Evidence Code section 352 in denying Alvarez's requests to exclude Dylan's statements.[21] (See *Johnson,* at p. 611 [" '[T]he court's ruling will

---

[21] Alvarez also contends that the deprivation of the Evidence Code section 352 weighing process as well as any error in that weighing process violated his federal constitutional due process rights under the Fifth and Fourteenth Amendments, right to a reliable verdict under the Eighth Amendment, and right to be free from conviction except on proof beyond a reasonable doubt under the Fifth, Sixth, and Fourteenth Amendments. Since we conclude that the court in fact determined that the probative value outweighed any undue prejudice under Evidence Code section 352 and that it did not abuse its discretion therein, we do not address these constitutional claims.

not be disturbed unless made "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice" ' "].)

## H. Instruction on Mental State Required for First Degree Torture-Murder

Alvarez argues that the jury instruction for first degree torture-murder was inadequate because it failed to state that the phrase "sadistic purpose" must be limited to circumstances in which sexual pleasure is derived from the infliction of pain. However, the phrase "sadistic purpose" does not require a sexual pleasure element and does not require a legal definition. Rather, "[t]he jurors' common understanding of the term was all that was required." (*People v. Raley* (1992) 2 Cal.4th 870, 901 (*Raley*).)

The prosecutor argued that there were two ways the jury could find the required mental state for first degree murder: deliberate and premeditated murder or murder by torture. In regard to murder by torture, the prosecutor requested that the jury be instructed pursuant to CALJIC No. 8.24. The defense proposed a modification to CALJIC No. 8.24 in order to elaborate upon the definition of willful, deliberate, and premeditated intent by "express[ing] the intent in a different way, that it is the intent to inflict extreme and prolonged pain as opposed to the intent to kill." The trial court denied Alvarez's proposal, finding that the proposed modifications were already covered in part by CALJIC 8.24 and in part by the definition of willful, deliberate, and premeditated in CALJIC 8.20 and therefore the proposed modifications would be superfluous and confusing. The trial court ultimately instructed the jury on murder by torture under CALJIC No. 8.24 as follows:

"Murder which is perpetrated by torture is murder of the first degree. The essential element of murder by torture — the essential elements of murder by torture are as follows: One, one person murdered another person; two, the perpetrator committed the murder with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose; and three, the acts or actions taken by the perpetrator to inflict extreme and prolonged pain were the cause of the victim's death.

"The crime of murder by torture does not require any proof that the perpetrator intended to kill his victim or any proof that the victim was aware of pain or suffering.

"The word willful, as used in this instruction, means intentional.

"The word deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.

"The word premeditation means considered beforehand."

During closing arguments, the prosecutor argued that Alvarez committed murder by torture of Tyler as follows:

"And again, for what reason do you do that, squeeze a child so hard you break their ribs? For what reason do you snap or twist that leg? For what reason do you shake them so hard that it's like they've been hit by a car?

"That is torture murder. It was done with the intent to inflict extreme and prolonged pain on that child for persuasion or some sadistic purpose, or in anger because he was crying, which would be a sadistic purpose.

"That was — and it's premeditated, it's calculated, because, again, we've got multiple incidents of this.

[¶] . . . [¶]

"And it was done with the purpose to inflict extreme and prolonged pain for a sadistic purpose, because the child's crying bothered him."

Alvarez now contends the phrase "sadistic purpose" should have been defined to make clear that a sadistic purpose requires proof of sexual pleasure and there was no evidence of such an element in the present case. Alvarez also claims that the lack of a definition of a sexual pleasure element of "sadistic purpose" violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Alvarez's claim is without merit. The standard jury instructions defining first degree-murder special circumstance (CALJIC No. 8.24), as well as the torture-murder special circumstance (CALJIC No. 8.81.18), have "been approved as a '*precise* and correct statement of the law.'" (*Raley*, *supra*, 2 Cal.4th at p. 900.) Those instructions do not define " 'sadistic purpose' " as requiring proof of sexual pleasure and "[w]e have used the expression 'sadistic purpose' ourselves without requiring further definition." (*Ibid.*) We have also said that "there is no *legal* definition of the term." (*Id.* at p. 901.)

In *Raley*, this Court held "[t]he term 'sadistic purpose' is not one that calls only for the sort of 'sheer speculation,' that would be unconstitutional under *Godfrey v. Georgia* [(1980) 446 U.S. 420, 429], nor is it 'difficult to assign any specific content to the pejoratives contained in [the instruction].' " (*Raley*, *supra*, 2 Cal.4th at p. 901.) Instead, the Court in *Raley* found that sadism "is a term in common usage, having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure. This is the definition of the term offered by the district attorney in closing argument, and we are satisfied it is the definition that would be arrived at by a reasonable jury." (*Ibid*.) Alvarez now argues that *Raley* does not control because it only resolved an Eighth Amendment penalty phase claim[22] and any sexual pleasure element would have been satisfied by Raley's conviction for an attempted forcible oral copulation and so the court did not need to consider whether the term "sadistic purpose" could apply to circumstances that did not involve sexual pleasure. Alvarez notes that *Raley* quoted dictionary definitions of sadism that incorporated a sexual element.[23]

---

[22]    In *Raley*, the court actually rejected defendant's arguments that the "standard jury instructions defining first degree murder by torture and the torture-murder special circumstance violated the Eighth and Fourteenth Amendments of the United States Constitution and article I, sections 7 and 17 of the California Constitution because they used the term 'sadistic purpose.' " (*Raley*, *supra*, 2 Cal.4th at p. 897.)

[23]    Specifically, the court said in *Raley* that "[a] law dictionary defines sadism in this manner: 'Active algolagnia or the gratification of sexual desire by inflicting pain.' (Bouvier's Law

Alvarez then argues that a definition of "sadistic purpose" that does not include a sexual pleasure element would be redundant of an intent "to inflict extreme and prolonged pain" (CALJIC No. 8.24) and the alternative purposes of "revenge, extortion, [or] persuasion" in the jury instruction (*ibid.*). In other words, Alvarez argues, if the phrase "for any sadistic purpose" that the jury was instructed upon does not include a sexual pleasure element, the phrase would be rendered superfluous, since it would already be encompassed in the need to intend to inflict extreme and prolonged pain that the jury was also instructed on. In order to give meaning to the phrase "for any sadistic purpose," Alvarez claims the meaning of sadistic must either be limited to sexual gratification, or it must encompass some other technical legal meaning that is not contained in the dictionary definitions. However, since the common understanding of a "sadistic purpose" includes the purpose of experiencing pleasure, the term does include an additional meaning and is not redundant with an intent "to inflict extreme and prolonged pain" (CALJIC No. 8.24) even if it does not include a sexual pleasure element. (See *Raley*, at p. 901.) Accordingly, the phrase "sadistic purpose" does not require a sexual pleasure element. Furthermore, the court in *Raley* specifically rejected the argument that the term "sadistic purpose" requires a legal

---

Dict. (1934) p. 1080.) Another law dictionary defines sadism as 'That state of sexual perversion in man in which the sexual inclination manifests itself by the desire to beat, to maltreat, humiliate and even to kill the person for whom the passion is conceived.' (Black's Law Dict. (3d ed. 1933) p. 1754.) More recently Black's (6th ed. 1990, p. 1336) simplified the definition to 'A form of satisfaction, commonly sexual, derived from inflicting harm on another.' " (*Raley, supra,* 2 Cal.4th at p. 901, fn. 4.)

definition because "[t]he jurors' common understanding of the term was all that was required. 'There is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence.' " (*Ibid.*; accord, *People v. D'Arcy* (2010) 48 Cal.4th 257, 293 (*D'Arcy*); *People v. Smith* (2015) 61 Cal.4th 18, 53 ["[a]lthough sadism is commonly associated with sexual pleasure, courts have recognized that it does not necessarily have a sexual motivation"].) Alvarez has not presented reason to depart from this court's conclusion that CALJIC No. 8.24 is a correct statement of law. (*Raley, supra*, 2 Cal.4th at p. 899; see also *People v. Healy* (1993) 14 Cal.App.4th 1137, 1142 ["although sadistic pleasure is commonly sexual, a sexual element is not required"].)

Alvarez further claims that the prosecutor misled the jury by arguing that a sadistic purpose was shown by the fact that Alvarez was angry at Tyler for crying. Alvarez claims that being angry or annoyed is insufficient to establish a sadistic purpose. However, the fact that Alvarez was angry at Tyler for crying could serve as evidence supporting a sadistic purpose. Regardless, the prosecutor did not rely on this evidence alone. The prosecutor also argued "what reason do you do that, squeeze a child so hard you break their ribs? For what reason do you snap or twist that leg? For what reason do you shake them so hard that it's like they've been hit by a car?" The prosecutor further argued that the abuse "was done with the purpose to inflict extreme and prolonged pain for a sadistic purpose, because the child's crying bothered him." Here, "[t]he jury could infer a sadistic intent to give pain to punish [a baby] for crying." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1240 (*Pensinger*).)

In sum, the jury was properly instructed on murder by torture under CALJIC No. 8.24. Contrary to Alvarez's assertion, the phrase "sadistic purpose" does not require a sexual pleasure element. The phrase "sadistic purpose" does not have a legal definition and "[t]he jurors' common understanding of the term was all that was required." (*Raley, supra,* 2 Cal.4th at p. 901.) "[J]urors are presumed to understand and accept the court's instructions." (*Erskine, supra,* 7 Cal.5th at p. 301.) There is no reasonable likelihood that the jury misunderstood CALJIC No. 8.24 or the law regarding torture murder.

## I. Substantial Evidence for First Degree Murder Conviction

Alvarez argues that the evidence is insufficient to support his convictions for the first degree murders of Tyler and Dylan as either deliberate and premeditated or as murder by torture. We disagree.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739 (*Smith II*).) " ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]

Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' " (*Id.* at p. 739.)

### *1. Deliberate and Premeditated Murder*

Alvarez argues that the evidence was insufficient to support that the two murders were premeditated and deliberate. We disagree.

"First degree murder 'has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.' (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) These elements require 'more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death.' (*Ibid.*) ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' " (*Gomez, supra*, 6 Cal.5th at p. 282.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), we observed that premeditation and deliberation may be proved by evidence of planning activity, motive, and manner of killing, or any other evidence supporting " ' "an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 242 (*Streeter*).) We have elaborated that "[t]he *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way. [Citation.] Nor did *Anderson* change the traditional

standards of appellate review that we have set forth above. The *Anderson* guidelines are descriptive, not normative. [Citation.] The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Alvarez argues there was no meaningful evidence of planning or motive for either victim, but rather the evidence indicates the injuries were the result of misguided efforts to discipline the children or at most an unplanned explosion of violence. The record, however, belies Alvarez's claim as there was sufficient evidence of premeditation and deliberation for both victims.

As for Tyler's murder, the prosecution presented evidence supporting each of the *Anderson* factors of planning activity, motive, and manner of killing. First, a reasonable jury could deduce from the evidence that Alvarez engaged in planning activity with regard to Tyler's murder. The prosecution presented evidence suggesting that Alvarez began abusing Tyler while alone with him when he moved in with Shari two weeks before Tyler's death. In November 1994, after Alvarez moved in, Shari began noticing bruises on Tyler's wrists, ears, buttocks, and back. Shari additionally testified that, on the day Tyler sustained the fatal injuries, she watched Alvarez pick Tyler up while she talked on the phone. Tyler had not been crying but started to when Alvarez picked him up. Alvarez then carried Tyler out of sight toward the area of the bedroom, while Tyler cried. After Alvarez carried Tyler back and forth, Tyler's cries grew louder and "more painful sounding" when Alvarez went back into the bedroom for the second or third time. Then Tyler

stopped crying right before Alvarez called out to Shari to call 9-1-1. A rational trier of fact could conclude that Alvarez engaged in planning activity in moving Tyler to an isolated room where Shari could not see. (See *Pensinger*, *supra*, 52 Cal.3d at p. 1238, fn. 4 ["We do not require that the planning relate only to the act of killing"].)

Second, the prosecution's evidence also supported that Alvarez had motive to kill Tyler. "One of the aspects of 'motive' evidence is the prior relationship of the defendant to the victim." (*People v. Wright* (1985) 39 Cal.3d 576, 593, fn. 6 (*Wright*).) Here, Alvarez undoubtedly had a prior relationship with Shari and Tyler. Shari testified that, immediately before the fatal incident, she argued with Alvarez about him needing to help pay the bills. Shari told Alvarez he needed to help pay the bills and Alvarez replied that he was not going to pay anything. Alvarez told Shari that she should give Brian Ransom an ultimatum to either pay child support or not see Tyler. In addition, Alvarez's long time social acquaintance testified that on the night before Tyler's death, Alvarez told him that Tyler "just cries all the time. It just kind of gets to me after a while." A rational trier of fact could conclude that Alvarez had either a motive based upon his disputes with Tyler's parents over bills or a motive in his displeasure with Tyler for crying. "Although either motiv[e] was totally unreasonable, this is true of any senseless killing, but the incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it." (*Pensinger*, *supra*, 52 Cal.3d at p. 1238.)

Third, as for the manner of killing, substantial evidence supported that Alvarez abused a five-month-old baby over the course of approximately two weeks and that Tyler then died after suffering numerous physical injuries while in Alvarez's

care. Multiple doctors confirmed that Tyler's right tibia and fibula were freshly fractured and that his ribcage had suffered approximately 40 fractures from three separate occasions. Multiple doctors also opined that this was a child abuse case. Though "the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation" (*Anderson, supra*, 70 Cal.2d at p. 24), "the vicious form and the long duration of the assault" can support the inference that the defendant acted with a willful, deliberate and premeditated purpose (*People v. Isby* (1947) 30 Cal.2d 879, 888 (*Isby*)). Just like in *Pensinger,* the fact that there was substantial evidence that the defendant moved a five-month-old baby, who could not walk or presumably crawl, to the place of her death, supported an inference that there was no struggle and that the killing was preconceived. (*Pensinger*, *supra*, 52 Cal.3d at p. 1238.) A rational trier of fact could conclude that the manner of killing supports that the murder was deliberate and premeditated. Accordingly, based upon the three *Anderson* factors, a rational trier of fact could find Alvarez committed the deliberate and premeditated murder of Tyler.

There was also substantial evidence of premeditation and deliberation for Dylan's murder. The prosecution presented evidence supporting each of the *Anderson* factors of planning activity, motive, and manner of killing. First, substantial evidence supported that Alvarez engaged in planning activity with regard to Dylan's murder. In her police interview, Borgsdorf stated that, immediately after their argument on the night before Dylan's murder, Alvarez admitted to being jealous of Dylan because Borgsdorf gave him just a little bit of the attention that Dylan got. On the next morning, Borgsdorf changed her mind about Alvarez taking Dylan to go shopping

that day, but then Alvarez stopped her from taking Dylan to school. Instead, Alvarez insisted that Borgsdorf not wake Dylan up as she was leaving. He said he wanted to let Dylan sleep and that he would wake him up later. Furthermore, Borgsdorf testified that, on the night before, Alvarez had told her he would drop Dylan off at school at 1 p.m. Borgsdorf testified she never received a message from Alvarez, telling her to come home at lunch and watch Dylan. Instead, at roughly 2 p.m., Borgsdorf received the call from Alvarez, telling her it was emergency and to get home. Monica further testified that when Ben was delayed in getting to the mall, Alvarez told her that he could no longer meet Ben because "he had something he needed to take care of." A rational trier of fact could conclude that Alvarez engaged in planning activity by isolating Dylan from Borgsdorf and others on that day.

Second, substantial evidence also supported that Alvarez had motive. Like with Shari and Tyler, Alvarez undoubtedly had a prior relationship with Borgsdorf and Dylan. (See *Wright*, *supra*, 39 Cal.3d at p. 593, fn. 6.) As discussed above, in her police interview, Borgsdorf stated that Alvarez admitted being jealous of Dylan on the night before Dylan's murder. Borgsdorf testified that, during their argument, Alvarez became furious and "just started screaming and yelling and arguing with me." In her police interview, Borgsdorf thought Alvarez may have been taking out his arguments with her on her son. Borgsdorf also explained that Alvarez would regularly go into Dylan's room while Borgsdorf was sleeping and occasionally she would wake up to Dylan screaming or crying and find Alvarez in Dylan's room. (See, e.g., *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [retaliatory motive supported finding of intent to commit premeditated and deliberate murder]; *People*

*v. Cage* (2015) 62 Cal.4th 256, 274 [prior incidents of abuse were important evidence of defendant's motive].) A rational trier of fact could conclude that Alvarez had motive here.

Finally, as for the manner of killing, substantial evidence supported that, similar to Tyler's case, Alvarez began abusing Dylan after moving in with his mother and that Dylan then died after suffering numerous physical injuries while in Alvarez's care. As noted above, "the vicious form and the long duration of the assault" can support the inference that the defendant acted with a willful, deliberate and premeditated purpose (*Isby*, *supra*, 30 Cal.2d at p. 888). Here, several doctors testified to Dylan's extensive and freshly inflicted injuries, the violent causes of the injuries, and the considerable force required to inflict such injuries. Dr. Ellis testified that Dylan had "many, many bruises over his body," including on his head, trunk, abdomen, buttocks, and back, and his mouth appeared to have some bleeding as well. Dylan had a mark on his midback that appeared to have been inflicted by an implement. Dr. Ellis opined that Dylan bled to death due to transection of the small intestine, the pancreas, and vascular structures due to blunt-force trauma. Dr. Ellis believed that considerable force was necessary to cause such injuries.

Dr. Dollinger counted approximately 70 to 75 bruises on Dylan's body. Dr. Dollinger estimated that Dylan likely sustained about 30 blows. Dr. Dollinger opined the bruises were recent and occurred within two hours of his death. There was a pattern of bruises on the right forehead that indicated either an impact against an object or an object striking that area.

Dr. Sheridan testified that the front of Dylan's abdomen had several bruises that were consistent with more than one

hand punch. Dylan also had a severe, fatal injury to his abdomen, his pancreas was essentially cut in two, and his small intestine was also torn, resulting in a major internal hemorrhage. Dr. Sheridan testified that he was "sure" the impact object was a fist. It took "considerable force" to inflict these abdomen injuries. Dr. Sheridan pointed out injuries to Dylan's face that were consistent with an attempted smothering. Dr. Sheridan also found that Dylan suffered numerous injuries to his head, including a large, rectangular patterned bruise, which indicated an impact injury. Dr. Sheridan noted that Dylan had numerous blunt force injuries and bruises to the back of his torso, chest, abdomen, and particularly to his buttocks. Dr. Sheridan concluded there were several discrete, nonoverlapping injuries requiring separate impacts. Dr. Sheridan determined that the injuries could not have occurred more than a couple hours before the 9-1-1 call. This evidence of Dylan's extensive injuries "suggests defendant had ample opportunity to consider the deadly consequences of his actions." (*People v. Stitely* (2005) 35 Cal.4th 514, 544.) Based upon a combination of various factors — the multiple means of attack, the prolonged and unprovoked nature of the attacks, and evidence supporting planning and motive — a rational trier of fact could conclude that the manner of killing supports that the murder was premeditated and deliberate. In sum, viewing all of the evidence in the light most favorable to the judgment, we conclude a reasonable trier of fact could find that Alvarez committed the deliberate and premeditated murder of both Tyler and Dylan.

### *2. Murder by Torture*

Alvarez also argues that for both murders the evidence was insufficient to support the alternate theory of first degree murder as murder perpetrated by torture.

First degree murder includes a murder perpetuated by means of torture. (§ 189.) " 'The elements of torture murder are: (1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' " (*D'Arcy*, *supra*, 48 Cal.4th at p. 293.) "Murder by torture does not require that a defendant have an intent to kill or that the victim be aware of the pain. [Citation.] The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. [Citation.] We also have ' "cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an 'explosion of violence,' as with the intent to inflict cruel suffering." ' " (*Streeter*, *supra*, 54 Cal.4th at p. 245.)

Alvarez now argues that the record does not contain substantial evidence that he intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose in murdering Tyler and Dylan. The record, however, contains substantial evidence from which a rational jury could infer that Alvarez acted with intent to cause extreme pain for a sadistic purpose in committing acts that caused Tyler and Dylan's deaths. (See *Smith II, supra*, 37 Cal.4th at p. 739 [" ' "if the verdict is supported by substantial evidence, we must accord due deference to the trier

of fact and not substitute our evaluation of a witness's credibility for that of the fact finder" ' "].)

Here, the evidence supported a reasonable inference that Alvarez murdered Tyler by means of torture. As noted above, the prosecution's evidence supported that Alvarez abused Tyler, a five-month-old baby, over the course of approximately two weeks and that Tyler then died after suffering numerous physical injuries while in Alvarez's care. "In this regard, 'evidence that the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite " 'sadistic intent to cause the victim to suffer pain in addition to the pain of death.' " ' (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1188.) Such wounds support a finding of intent because they 'evidence[ ] deliberate and gratuitous violence beyond that which was necessary to kill the victim.' " (*People v. Powell* (2018) 5 Cal.5th 921, 945.) Here, after Alvarez moved in, Shari began noticing bruises on Tyler's wrists, ears, buttocks, and back. Multiple doctors opined that Tyler's right tibia and fibula were freshly fractured when he died and that he had suffered approximately 40 fractures to his ribcage inflicted on three different occasions. On the day he suffered his fatal injuries, Tyler had not been crying but started to when Alvarez picked him up. Alvarez then carried Tyler out of sight toward the area of the bedroom, while Tyler cried. Tyler's cries grew louder and "more painful sounding" when Alvarez went back into the bedroom, away from Shari, for the second or third time. Shari had not heard this type of cry before. Tyler then stopped crying immediately before Alvarez started calling out for her. First responders believed that Alvarez showed no emotion and never saw any tears on him. Alvarez's long time social acquaintance testified that Alvarez had told him that Tyler "just cries all the

time. It just kind of gets to me after a while." As a matter of law, repeated and intense abuse of this type with an intent to inflict extreme and prolonged pain can constitute torture. (See *Powell*, at p. 948 ["defendant's infliction of gratuitous injuries in addition to the fatal beating provided substantial evidence of an intent to inflict pain and suffering for their own sake"].) Based on the evidence, a jury could reasonably deduce that Alvarez abused Tyler while he cried and "that he was aware of [Tyler's] pain but continued to inflict it intentionally over a considerable period. The jury could infer a sadistic intent to give pain to punish [him] for crying." (*Pensinger*, *supra*, 52 Cal.3d at p. 1240.)

The evidence also supported a reasonable inference that Alvarez murdered Dylan by means of torture. As noted above, the prosecution's evidence supported that Alvarez began abusing Dylan after moving in with his mother and that Dylan then died after suffering numerous physical injuries while in Alvarez's care. Several doctors testified to Dylan's extensive and freshly inflicted injuries, the violent causes of the injuries, and the considerable force required to inflict such injuries. As also noted above, in her police interview, Borgsdorf stated that, during their argument on the night before Dylan's murder, Alvarez admitted to being jealous with Dylan because Borgsdorf gave him just a little bit of the attention that Dylan got. In that same interview, Borgsdorf explained that Alvarez would regularly go into Dylan's room while Borgsdorf was sleeping and occasionally she would wake up to Dylan screaming or crying and find Alvarez in Dylan's room. Borgsdorf thought Alvarez may have been taking out his arguments with her on her son. Then, on the day of Dylan's murder and after their fight the night before, Alvarez stopped Borgsdorf from taking Dylan to

school and insisted that Borgsdorf not wake Dylan up as she was leaving. The jury could reasonably infer from this evidence that Alvarez had "a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (*People v. Steger* (1976) 16 Cal.3d 539, 546 (*Steger*).)

Alvarez analogizes to *Steger*, *supra*, 16 Cal.3d at pages 548–549 and *People v. Walkey* (1986) 177 Cal.App.3d 268, 276 (*Walkey*) to argue that the fatal injuries were inflicted in a misguided attempt at discipline, but were not willful, deliberate, or premeditated.

In *Steger*, this Court held "that murder by means of torture under section 189, is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (*Steger*, *supra*, 16 Cal.3d at p. 546; accord, *People v. Brown* (2023) 14 Cal.5th 453, 456.) In *Steger*, the defendant continuously beat her three-year-old stepdaughter, who ultimately died from a fatal head injury. (*Steger*, at p. 542.) The defendant admitted to beating the victim because she was frustrated with her behavior and wanted to effect discipline. (*Ibid*.) We then found that the evidence was insufficient to justify a jury instruction on murder by means of torture. (*Id*. at p. 549.) We reasoned that "[v]iewed in the light most favorable to the People, the evidence shows that defendant severely beat her stepchild. But there is not one shred of evidence to support a finding that she did so with cold-blooded intent to inflict extreme and prolonged pain. Rather, the evidence introduced by the People paints defendant as a tormented woman, continually frustrated by her inability to control her stepchild's behavior. The beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a

criminal sense wilful, deliberate, or premeditated." (*Id.* at p. 548.)

Similarly, in *Walkey*, the Court of Appeal found that the evidence was insufficient to warrant a jury instruction on murder by means of torture. (*Walkey*, *supra*, 177 Cal.App.3d at p. 274.) In that case, the defendant beat his two-year-old son on numerous occasions, which ultimately resulted in the child's death. (*Id.* at pp. 274–276.) The court, however, concluded that the defendant's "intent may have been to punish [the victim] after becoming frustrated or angry because [the victim] misbehaved or had difficulty being toilet trained." (*Id.* at p. 276.) The court reasoned that "the prosecution failed to prove Walkey murdered Nathanel with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain. Although the medical experts testified Nathanel's injuries would have caused him pain, the amount of pain inflicted on the victim is not determinative of the crime of torture murder. [Citations.] Although evidence was presented Nathanel's injuries had been inflicted over a period of several months, this does not lead to the conclusion Nathanel was tortured. Rather, the fact Nathanel was beaten on numerous occasions shows only 'that several distinct "explosions of violence" took place, as an attempt to discipline a child by corporal punishment . . . .' " (*Id.* at p. 275.)

However, unlike the individual murders at issue in *Steger* and *Walkey,* there were *multiple* incidents in this case involving the murder of very young children. Tyler was also a five-month-old baby who was not at all susceptible to a misguided attempt at discipline and, as discussed in part II.B above, the two murders were cross-admissible. Furthermore, "a misguided attempt at discipline can involve an intent to cause cruel pain

and suffering." (*People v. Mincey* (1992) 2 Cal.4th 408, 434.) Here the evidence supported that Alvarez "was aware of [the victims'] pain but continued to inflict it intentionally over a considerable period" and displayed "calculation and lack of emotional upheaval." (*Pensinger*, *supra*, 52 Cal.3d at p. 1240.) In both cases, Alvarez was the boyfriend of victim's mother but was not in any type of parent-child relationship with the child. In both cases, there was evidence that Alvarez had previously been found in the victim's room at night and in one case there was evidence that he would regularly go into the young victim's room at night while the mother was sleeping, and that the victim would then wake his mother up with his screams or cries. In Tyler's case, Alvarez's long time social acquaintance testified that Alvarez had told him that Tyler "just cries all the time. It just kind of gets to me after a while." On the day Tyler sustained his fatal injuries, Alvarez carried Tyler toward the area of the bedroom, while Tyler cried. Tyler's cries grew louder and "more painful sounding" when Alvarez went back into the bedroom, away from Shari, for the second or third time. Shari then heard a creak in the floor and Tyler stopped crying immediately before Alvarez started calling out for her. First responders believed that Alvarez showed no emotion and never saw any tears on him. As previously noted, in Dylan's case, Borgsdorf stated in her police interview, that, during their argument on the night before Dylan's murder, Alvarez admitted to being jealous of Dylan because Borgsdorf gave him just a little bit of the attention that Dylan got. Borgsdorf thought Alvarez may have been taking out his arguments with her on her son. A rational jury could conclude that Alvarez had a sadistic purpose based

upon the evidence.[24] (See *People v. Lopez* (2018) 5 Cal.5th 339, 356 ["The prosecutor presented sufficient evidence for a reasonable jury to conclude, based on [the victim's] injuries and the nature of the abuse she suffered, that [the defendant] intended to inflict extreme and prolonged pain"].)

In sum, viewing all of the evidence in the light most favorable to the judgment, we conclude a reasonable trier of fact could find that Alvarez murdered both Tyler and Dylan by means of torture. "Appellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced of the defendant's guilt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.)

## J. Cumulative Error

Alvarez claims that the cumulative effect of the errors in the guilt phase requires reversal under both the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 for federal constitutional violations and the standard in *People v. Watson* (1956) 46 Cal.2d 818. Alvarez also claims that all errors must be assessed to determine whether their cumulative impact was

---

[24] Alvarez also repeats his arguments from part II.H above, that a sadistic purpose requires sexual gratification. For the same reasons that we rejected that argument in part II.H above, we reject that argument here.

prejudicial to the penalty verdict.[25]  We assumed error in part II.E in regard to the prosecutor badgering Alvarez about his violation of the court order.  However, we found that any error there was harmless.  For similar reasons, we conclude that the cumulative effect of the actual or assumed errors do not warrant reversal of Alvarez's judgment.  (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 934; *People v. Jennings* (2010) 50 Cal.4th 616, 691.)

### K. Challenges to the Death Penalty Statute

Alvarez raises a number of challenges to the constitutionality of California's death penalty statute similar to those that we have repeatedly rejected.  He provides no persuasive reason to revisit the following precedent:

Alvarez contends that the jury instructions violated the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution by failing to require juror unanimity on aggravating factors or requiring the jury to unanimously find that death was the appropriate punishment beyond a reasonable doubt.  However, the death penalty statute is not unconstitutional for failing to require "findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that

---

[25]  Alvarez requests that for assessing prejudice at the penalty phase that "this Court should reconsider whether the *Hamilton*/*Hines* principle should be revived."  (See *People v. Hamilton* (1963) 60 Cal.2d 105, 136–137; *People v. Hines* (1964) 61 Cal.2d 164, 169.)  However, the rule of penalty phase prejudice applicable to pre-1972 death penalty statutes no longer applies.  (See *People v. Lucky* (1988) 45 Cal.3d 259, 294, fn. 23.)  We decline to revisit established law.

death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235; see *People v. McDaniel* (2021) 12 Cal.5th 97, 148, 155.) Other than the penalty verdict itself, the jury need not achieve unanimity. (*People v. Sánchez* (2016) 63 Cal.4th 411, 487 (*Sánchez*).) " 'Nothing in the federal Constitution requires the penalty phase jury to . . . agree unanimously that a particular aggravating circumstance exists.' " (*People v. Williams* (2013) 58 Cal.4th 197, 295 (*Williams*).) " 'The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) [citation], [and] jury unanimity regarding such conduct is not required.' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 455 (*Rhoades*).) The high court's recent decisions interpreting the Sixth Amendment's jury trial guarantee do not alter our conclusions. (See *People v. Bracamontes* (2022) 12 Cal.5th 977, 1004 (*Bracamontes*).)

Alvarez claims that the failure to require that the jury make written findings about the aggravating factors they relied upon and to provide a procedure enabling meaningful appellate review violated his Fifth, Eighth, and Fourteenth Amendment rights. However, " '[n]othing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation.' " (*Williams, supra,* 58 Cal.4th at p. 295; see *Rhoades, supra,* 8 Cal.5th at p. 455.) Nor does the failure of the court's instructions to require specific written findings violate the constitutional right to "meaningful appellate review." (*People v. Parson* (2008) 44 Cal.4th 332, 370.)

Alvarez argues that California's death penalty statute is overbroad and does not perform the constitutionally required narrowing function. "The death penalty statute is not

impermissibly overbroad. It adequately narrows the class of defendants eligible for a death sentence." (*Bracamontes*, *supra*, 12 Cal.5th at p. 1005.) Alvarez also claims that the section 190.3 factors are overly broad. "Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." (*Sánchez*, *supra*, 63 Cal.4th at p. 487.) "Section 190.3 sufficiently narrows the class of murderers eligible for capital punishment." (*People v. Harris* (2008) 43 Cal.4th 1269, 1322.)

Alvarez contends that California's death penalty law is unconstitutional because it denies him intercase and intracase proportionality review. The absence of intercase proportionality review does not render the statute unconstitutional. (*People v. Suarez* (2020) 10 Cal.5th 116, 191 (*Suarez*).) We do provide intracase proportionality review, but Alvarez has not specifically requested such review. (*People v. Valencia* (2008) 43 Cal.4th 268, 310–311.) However, given the nature of the offenses, his sentence is not disproportionate to his personal culpability. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

Alvarez argues that California's death penalty law unconstitutionally precludes consideration of mitigating evidence by precluding reliance on mental or emotional disturbance or the dominating influence of another unless such factors are "extreme" or "substantial." However, we have repeatedly held that potentially mitigating factors are not "unconstitutionally limited by the adjectives 'extreme' and 'substantial'. . . ." (*People v. Schmeck* (2005) 37 Cal.4th 240, 305; see *People v. Brooks* (2017) 3 Cal.5th 1, 115; *People v. Adcox* (1988) 47 Cal.3d 207, 270.)

Alvarez argues that California grants unlimited discretion to prosecutors to decide when to seek the death penalty resulting in different standards for each county and thereby violating his rights. "We also have rejected claims that the death penalty statute unconstitutionally grants unfettered discretion to prosecutors to decide whether to charge eligible defendants with a capital offense or seek the death penalty, resulting in disparate imposition of the death penalty throughout the state." (*People v. Salcido* (2008) 44 Cal.4th 93, 168 (*Salcido*).) The high court's decision in *Bush v. Gore* (2000) 531 U.S. 98 does not alter our conclusion.

Alvarez claims that the delay in carrying out his execution is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. "We repeatedly have concluded that delay, whether in the appointment of counsel on appeal or in processing the appeal, or both, does not inflict cruel or unusual punishment within the meaning of the state or federal Constitution." (*Salcido, supra*, 44 Cal.4th at p. 166; see *People v. Peoples* (2016) 62 Cal.4th 718, 805 ["Delay in carrying out a death sentence does not by itself constitute cruel and unusual punishment, nor does it prevent fulfillment of legitimate purposes of punishment"].) "Although we have acknowledged the possibility that '[i]n some circumstances, excessive delays in the appellate process may give rise to a denial of due process,' defendant fails to show 'any actual prejudice as a result of the delay, such as an impairment of grounds on appeal.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1230.)

Alvarez contends that the failure to provide a presumption in the favor of life violated his Fifth, Eighth, and Fourteenth Amendment rights to due process and reliable penalty determinations. " '[T]he trial court's failure to instruct the jury

on the presumption of life did not violate defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protections of the laws.'" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 292–293.)

Alvarez claims that this court is unduly influenced by political pressure in reviewing death penalty judgments in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. "Appellate review of death judgments is not impermissibly influenced by political considerations in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution." (*Prince*, *supra*, 40 Cal.4th at p. 1299.) Additionally, "'[t]his court's review process is not impermissibly influenced by political considerations.'" (*Johnsen*, *supra*, 10 Cal.5th at p. 1182.)

Alvarez claims that each of the mitigating factors introduced by the phrase "whether or not" invited the jury to aggravate the sentence upon the basis of nonexistent and irrational aggravating factors. "CALJIC No. 8.85's instruction to the jury to consider 'whether or not' certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors was aggravating." (*People v. Lee* (2011) 51 Cal.4th 620, 653.) "'"[T]he statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors.'"'" (*People v. Carrasco* (2014) 59 Cal.4th 924, 971.)

Alvarez contends that California's use of the death penalty violates international law, particularly, the International Covenant on Civil and Political Rights and the American

Declaration of the Rights and Duties of Man. However, we have repeatedly held that " 'California's use of the death penalty does not violate international law.' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1038 see *People v. Hoyt* (2020) 8 Cal.5th 892, 955; *Rhoades, supra*, 8 Cal.5th at p. 456.)

"Finally, these asserted flaws, considered together, do not render the statute unconstitutional." (*Suarez, supra*, 10 Cal.5th at p. 191; see also *People v. Pearson* (2013) 56 Cal.4th 393, 479.)

### L. Restitution Fines

In supplemental briefing, Alvarez argues that due process mandates that an ability to pay finding must be made before a section 1202.4, subdivision (b) restitution fine may be imposed. Because no ability to pay finding was made here, Alvarez argues that the restitution fines in his case were improperly imposed. Alvarez requests that we remand the case to allow him to "request a hearing and present evidence demonstrating his inability to pay." (*People v. Castellanos* (2019) 33 Cal.App.5th 485, 491; see also *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1170–1172 (*Dueñas*).) We disagree.

At the sentencing hearing, the trial court imposed and suspended a $200 restitution fine under section 1202.4, subdivision (b) and a $200 parole revocation fine under section 1202.45. Alvarez's ability to pay was not discussed and Alvarez offered no objection. We discuss below each of these two fines, in turn.

As for the restitution fine, in *Dueñas*, the Court of Appeal concluded "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and

Government Code section 70373." (*Dueñas, supra,* 30 Cal.App.5th at p. 1164.) In also considering a due process challenge to a restitution fine imposed under section 1202.4 based upon the statute's preclusion of considering a defendant's inability to pay the minimum restitution fine amount, the Court of Appeal relied upon that "[w]e interpret statutes to avoid serious constitutional questions when such interpretations are fairly possible." (*Id.* at p. 1172.) The Court of Appeal consequently concluded that "although the trial court is required by Penal Code section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Ibid.*)

In this case, however, the trial court set the restitution fine at the statutory minimum and so the court was not required by the terms of section 1202.4 to consider defendant's inability to pay. (See §1202.4, subd. (d) ["[i]n setting the amount of the fine pursuant to subdivision (b) *in excess of the minimum fine* pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay" (italics added)].) In any event, the trial court suspended Alvarez's obligation to pay it. Alvarez argues that for the two restitution fines imposed, the court ordered that payment be suspended, but did not specify when or how that suspension would end and therefore the restitution fines should stand suspended indefinitely. The Attorney General agrees that, absent reversal or some subsequent act that makes Alvarez's judgment no longer final, the trial court's order suspending his payment obligation would be permanent. The Attorney General argues that the trial court's order in this case suspending his obligation to pay is a functional

determination regarding his ability to pay and complies with the statutory duty to impose the fine.

However, we do not need to reach the due process argument in this case because the court suspended imposition of the fine and the parties agree that, absent reversal or some subsequent act that makes Alvarez's judgment no longer final, the trial court's order suspending Alvarez's payment obligation is permanent. In this opinion, we affirm Alvarez's death sentence and so the restitution fine is suspended indefinitely, thereby making it unnecessary to reach the due process question. As noted above, in *Dueñas*, when confronted with a due process challenge to a minimum restitution fine, the Court of Appeal relied upon the premise that "[w]e interpret statutes to avoid serious constitutional questions when such interpretations are fairly possible." (*Dueñas, supra*, 30 Cal.App.5th at p. 1172.) The Court of Appeal consequently held that "although the trial court is required by Penal Code section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Ibid.*) Thus, even if we accept defendant's contention that *Dueñas* applies to this case, the result imposed in *Dueñas* when an ability to pay finding has not been made is effectively the same as that already imposed in this case: suspension or staying the execution of the restitution fine. We therefore decline Alvarez's request to remand the matter for a hearing on his inability to pay.

Alvarez also argues that since no parole is possible in connection with a sentence of death, the parole revocation fine (as distinct from the restitution fine discussed above) must be stricken. Specifically, Alvarez argues that the parole revocation

fine imposed under section 1202.45 applies only to a person " 'whose sentence includes a period of parole.' " (*People v. Isaac* (2014) 224 Cal.App.4th 143, 146, fn. 3.) Section 1202.45, subdivision (a), provides that the court "shall" assess a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole." We have held that the parole revocation fine is applicable despite a death sentence when the "defendant was also sentenced to a determinate term." (*People v. Baker* (2021) 10 Cal.5th 1044, 1108.) However, we have also drawn a distinction between indeterminate sentences with the possibility of parole and determinate terms. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*) [parole revocation fine proper where defendant, in addition to being sentenced to death, also sentenced to determinate term].)

We have drawn this distinction because an indeterminate sentence only establishes a defendant's *eligibility for parole consideration at a later date*, but a determinate sentence *includes a parole period "by law* and carried with it, also by law, a suspended parole revocation restitution fine." (*Brasure*, *supra*, 42 Cal.4th at p. 1075, italics added.) The concurring and dissenting opinion nonetheless dismisses our reliance on *Brasure* and concludes that "[t]he fact that we are dealing here with an indeterminate term rather than a determinate term does not make a material difference." (Conc. & dis. opn., *post*, at p. 3.) We read *Brasure* differently. As the concurring and dissenting opinion acknowledges, *Brasure* expressly distinguished an analogous fact pattern to the one presented here — a sentence of life without the possibility of parole for first degree special-circumstance murder plus an *indeterminate* term (see *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1184–

1186 (*Oganesyan*)) — and then concluded that a sentence of death plus a *determinate* term was subject to a parole revocation fine. (*Brasure, supra,* 42 Cal.4th at p. 1075.) Our language in *Brasure* is clear in drawing this distinction: "*People v. Oganeysan* (1999) 70 Cal.App.4th 1178, upon which defendant relies, is distinguishable as involving *no determinate term of imprisonment* imposed under section 1170, but rather a sentence of life without the possibility of parole for first degree special-circumstance murder and an indeterminate life sentence for second degree murder. (*Oganeysan,* at p. 1181.) As in *Oganeysan,* to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence. Nonetheless, *such a period was included in his determinate sentence by law* and carried with it, also by law, a suspended parole revocation restitution fine." (*Brasure, supra,* 42 Cal.4th at p. 1075, italics added.) *Oganeysan,* in turn, further highlights the import of the difference between a determinate and indeterminate term. The opinion details defendant's indeterminate sentence of 15 years to life for second degree murder and explains that defendant "could conceivably be eligible for parole" and that "[t]he Attorney General argues with some justification then that this is a 'case' where a sentence has been imposed which includes a 'period of parole.' " (*Oganeysan,* at p. 1184.) The opinion nonetheless concludes that "the language of section 1202.45 indicates that the overall sentence is the indicator of whether the additional restitution fine is to be imposed. Section 1202.45 indicates that it is applicable to a 'person . . . whose sentence includes a period of parole.' *At present,* defendant's 'sentence' does not allow for parole." (*Id.* at p. 1185, italics added.) We simply cannot read *Brasure*'s clear differentiation of the facts of *Oganeysan* as a conclusion that a

determinate versus indeterminate term "does not make a material difference." (Conc. & dis. opn., *post*, at p. 3.) To the contrary, our holding in *Brasure* makes clear that this distinction matters.

As *Oganesyan* explains, the distinction between an indeterminate and determinate term is crucial because "[s]ection 1202.45 indicates that it is applicable to a 'person . . . whose *sentence* includes a period of parole.' " (*Oganesyan*, *supra*, 70 Cal.App.4th at p. 1185, italics added.) A determinate sentence normally includes a period of parole at the time of sentencing, while an indeterminate sentence only establishes at the time of sentencing a defendant's eligibility for parole consideration after a specified period of incarceration. (See, e.g., § 3041, subds. (a)(2) ["One year before the inmate's minimum eligible parole date . . . a panel shall [] meet . . . and shall normally grant parole . . ."], (b)(1) [parole shall be denied if the Parole Board determines that "consideration of the public safety requires a more lengthy period of incarceration"].) This is why Courts of Appeal analyzing the issue — even after *Brasure* was decided — have consistently found that the parole revocation fine statute does not apply in cases where the defendant is sentenced to life without the possibility of parole and indeterminate terms. (See *Oganesyan*, at pp. 1184–1186 [trial court properly declined to impose parole revocation fine where the defendant was sentenced to an indeterminate term on one count and life without the possibility for parole for another count]; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 (*Jenkins*) [error to impose parole revocation fine where the defendant was sentenced to 35 years to life and also life without the possibility for parole]; *People v. Battle* (2011) 198 Cal.App.4th 50, 63 (*Battle*) [improper to impose parole

revocation fine where the defendant received an indeterminate term of 25 years to life and also life without the possibility for parole]; *People v. McInnis* (2021) 63 Cal.App.5th 853, 867 (*McInnis*) ["We think the reasoning in *Oganesyan, Battle*, and *Jenkins* is sound, and we conclude section 1202.45 is inapplicable to defendant"]; see also *People v. Montes* (2021) 70 Cal.App.5th 35, 48 (*Montes*) [improper to impose parole revocation fine where the defendant was sentenced to life without the possibility of parole]; *McInnis, supra,* 63 Cal.App.5th at pp. 866–867 [improper to impose parole revocation fine where the defendant was sentenced to three terms of life without the possibility of parole].)[26]

Here, in addition to the death sentence, Alvarez was sentenced to a stayed indeterminate term of 25 years to life term for assault on a child causing death. We therefore strike the $200 parole revocation fine imposed under section 1202.45.

---

[26] Despite the concurring and dissenting opinion's effort to distinguish these five cases, *Oganesyan* expressly grappled with the same question we have here, namely how to treat an indeterminate sentence for purposes of the parole revocation statute (*Oganesyan, supra,* 70 Cal.App.4th at pp. 1184–1186); and *Jenkins* and *McInnis* explicitly agreed with reasoning from *Oganesyan* (*Jenkins, supra,* 140 Cal.App.4th at p. 819; *McInnis, supra,* 63 Cal.App.5th at p. 867); and *Battle,* too, cited *Oganesyan* (*Battle, supra,* 198 Cal.App.4th at p. 63); and *Montes* cited to a series of cases that, in turn, relied on *Oganesyan* (*Montes, supra,* 70 Cal.App.5th at pp. 48–49, citing *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184; *People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1097).

## III. CONCLUSION

We strike the $200 parole revocation fine imposed under section 1202.45 and in all other respects affirm the judgment.

**GROBAN, J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

PEOPLE v. ALVAREZ

S089619


Concurring Opinion by Justice Liu


I write to make two observations.  First, I find it a close issue whether the trial court erred by admitting Dr. Dean Haddock's testimony without holding a *Kelly* hearing to evaluate whether the Child Abuse Potential Inventory (CAPI-6) has gained " 'general acceptance . . . in the relevant scientific community.' "  (Maj. opn., *ante*, at p. 66; see *People v. Kelly* (1976) 17 Cal.3d 24.)  We require a *Kelly* hearing before admitting testimony based on a new scientific technique in order to "protect against the risk of credulous juries attributing to evidence cloaked in scientific terminology an aura of infallibility." (*People v. Peterson* (2020) 10 Cal.5th 409, 444.)

On cross examination, Dr. Haddock described his test as "empirical" rather than "subjective," without qualification.  He then affirmed the accuracy of his test:  "Q. And if, in other words, I'm taking the test and I describe myself one way, then I can come out to be, in your opinion, a potential for physical abuse to a child?  A. Yes.  Q. And if I describe myself another way, then I can come out with a test result showing that I don't have a potential for abuse to a child, correct? A. Yes."  The jury could have reasonably understood this testimony as suggesting that Dr. Haddock could definitively rule out an individual's potential for abuse — i.e., that Dr. Haddock could show, through the CAPI-6 test, that Shari Ransom did not have the potential to abuse a child and thus could not have abused a child.

Defense counsel also asked Dr. Haddock if he had "ever been wrong." Dr. Haddock answered: "Not that I'm aware of." Dr. Haddock did not elaborate on whether he thought this was because the test had

total predictive accuracy or because he had few occasions to receive timely feedback on the validity of his predictions.  Taken at face value, his statement could reasonably have been understood to mean his opinions reflect scientific certainty.

In my view, the risk arising from Dr. Haddock's characterization of CAPI-6 is not mitigated by the fact that the test's results were one among "myriad other data" and "used as 'a springboard for a far more normative and subjective diagnostic process.'" (Maj. opn., *ante*, at p. 68.)  If the jury understands an expert as testifying that the results from one test can definitively rule out an individual's capacity to abuse a child, I do not see how that aura of infallibility would be cured by the expert's additional reliance on other sources of data.  True, we have previously relied on this one-among-many-tools reasoning to find that a *Kelly* hearing was not needed — but only where the expert made crystal clear that the test was actuarial.  (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1148 [the expert stressed that "an 'admitted' child molester . . . had tested 'within normal limits' on the" Minnesota Multiphasic Personality Inventory, which is used to assess psychopathology]; see also *People v. Therrian* (2003) 113 Cal.App.4th 609, 615–616 [the expert testified that she was unaware "of any study indicating that" the Static-99 test, which computes a risk of reoffending, "has been tested and found to be accurate"].)

There is more, however.  As today's opinion observes, Dr. Haddock also testified that he could not definitively predict that an individual "will not, under any circumstances, go out and abuse another individual."  Rather, he clarified:  "What I'm saying is that at statistically significant relevance, my best prediction is that this person is not likely to abuse children in their care."  I agree that "[t]his phrasing emphasizes probability, the expert's fallibility, and a finding that, itself, is premised on likelihood — not certainty" (maj. opn., *ante*,

at p. 70) and thus mitigated the aura of infallibility otherwise created by his testimony about CAPI-6. But this case strikes me as close to the line.

My second observation has to do with a comment made by the trial court that, although not evidently prejudicial to Alvarez nor raised here by the parties, is prejudicial to the administration of justice. In apologizing for a delay during the jury selection process, the trial court remarked to a panel of prospective jurors: "I apologize for the confusion that we've experienced here this afternoon, but I guess, as I've often said, if this was an easy job, they'd have six hundred million Chinamen over here doing it." After requesting a sidebar, defense counsel said: "With all due respect, defense counsel does have a concern regarding [that] comment . . . . I don't think you meant it to be derogatory in any way, but some people may consider that to be racist and derogatory." Defense counsel expressed concerned that prospective jurors who were of Asian descent or had relatives of Asian descent "may harbor ill feelings about serving as a juror in this case now." Defense counsel requested that the entire panel of prospective jurors be excused. The prosecution opposed the motion on the basis that the comment could not have been prejudicial.

The trial court responded: "I think it's a ridiculous request. I hope that you would be more professional in handling your function here in this case and this Court obviously meant nothing of a derogatory nature by this comment and certainly it doesn't reach to any stretch that it would in any way create a problem for your client, who's the alleged defendant in this case, and so I'm going to deny your request and I'll give you an assurance that I will attempt to not create this kind of an anxiety for you any further, but I think the request is completely out of line."

The term "Chinaman" is widely recognized as derogatory. (See Merriam-Webster Dict. Online (2025) <http://www.merriam-webster.com/dictionary/Chinaman> [as of August 18, 2025] ["Chinaman" is an "often offensive" term for "a native of China"]; all Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>; Croom, *Asian Slurs and Stereotypes in the USA* (2018) 9 Pragmatics & Society 495, 498 ["*chinaman . . .* is 'a slur, often applied to anyone of Asian heritage' "].) It harkens back to the days when the "fears of the 'heathen Chinaman' " were used to justify an epidemic of anti-Chinese violence, "consign[] Chinese migrants to permanent alienage without a path to citizenship," "restrict their entry[,] and curtail their rights." (Lew-Williams, The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America (2018), excerpted in Gorden-Reed, Racism in America: A Reader (2020) pp. 219, 225.)

More specifically, the implication that millions of Chinese natives would be assigned the task of serving as a juror "if this was an easy job" trades on a stereotype that people of Chinese descent are especially suited for menial work. The stereotype evokes a history of racist and xenophobic "[h]ostility toward Chinese labor" that "prompted the California Legislature to enact a raft of laws designed to disadvantage Chinese immigrants," many of which "were upheld by this court" well into the twentieth century. (*In re Chang* (2015) 60 Cal.4th 1169, 1172; see *ibid.* [citing legislation and case law]; Saxton, The Indispensable Enemy: Labor and the Anti-Chinese Movement in California (1971).) "Anti-Chinese sentiment was a major impetus for the California Constitutional Convention of 1879" (*In re Chang*, at p. 1172), which culminated in former Article XIX of the California Constitution, titled "Chinese." In order to discourage "Asiatic coolieism" and "protect[] . . . the State . . . from the burdens and evils arising from the presence of aliens . . . dangerous or detrimental to the

well-being or peace of the State," former Article XIX banned private and public employment of Chinese persons, prohibited "the introduction into this State of Chinese," and "delegate[d] all necessary power to the incorporated cities and towns of this State for the removal of Chinese." (Cal. Const. of 1879, art. XIX, §§ 1–4; see *In re Chang*, at pp. 1172–1173.) California's adoption of former Article XIX helped spur Congress to pass the Chinese Exclusion Act, which banned Chinese laborers from entering the United States for ten years and rendered all Chinese immigrants ineligible for citizenship. (*In re Chang*, at p. 1173; see *Chae Chan Ping* (1889) 130 U.S. 581, 595–596; Luo, Strangers in the Land: Exclusion, Belonging, and the Epic Story of the Chinese in America (2025).)

The trial court may have been unaware of the invidiousness of the term "Chinamen" and the particular usage of the term here ("if this was an easy job"). It is therefore worth reiterating the problems with the slur and its connotations, which are well documented in California case law and the annals of California history. Avoiding such demeaning language and rejecting the pernicious stereotype it expresses are essential to sustaining public confidence in our system of justice.

**LIU, J.**

PEOPLE v. ALVAREZ

S089619


Concurring Opinion by Justice Evans


I join the majority opinion in full. I write separately, however, to highlight the substantial potential for prejudice in seating jurors aware of a prior verdict, particularly in high-profile capital cases.

Francisco Jay Alvarez argues that the trial court prejudicially erred in denying his motion for a change of venue. The majority properly holds that Alvarez forfeited his complaint that the denial of this motion was error. (Maj. opn., *ante*, at pp. 42–45.) The trial court specifically informed Alvarez that it was not precluding him from renewing his motion if "there are other matters that should surface during the voir dire process." I therefore concur in the ultimate disposition of this claim because, as Alvarez himself concedes, failing to renew the motion after voir dire forfeited any reliance on information that came to light during voir dire.

Although Alvarez forfeited his claim challenging the denial of his change of venue motion, substantial evidence regarding the propriety of trying this case in Kern County existed. Critical components of this evidence, however, arose specifically in the voir dire proceedings which this court cannot consider. These proceedings revealed many members of the jury pool in Kern County were sufficiently familiar with extraordinarily negative media coverage of the case such that they were disqualified. More importantly, several seated jurors

1

were aware that Alvarez had been previously tried for the same crimes.

As the majority opinion accurately reflects, this case was shocking, horrific, and highly publicized. As the trial court noted, the media coverage was both unusually extensive and extremely negative, including comparisons of Alvarez to the "Antichrist." The prosecutor himself acknowledged that, because of the prior trial, verdicts, and subsequent mistrial, the case had "already drawn substantially more attention from the media than is ordinarily the case" even compared to other sensational crimes.

As the majority notes, Alvarez "calculates and emphasizes the percentage of jurors who admitted disqualifying bias because of their knowledge of the case." (Maj. opn., *ante*, at p. 44.) Alvarez asserts that, of the 167 prospective jurors who were asked about their knowledge of the case, 114 said they had some familiarity of the facts of the case and only 28.9 percent affirmatively indicated having no recollection of learning about this case from the media. Alvarez also highlights that, of those who expressly stated they were familiar with the prior verdicts, nearly 75 percent admitted they could not disregard that knowledge and/or could not decide the case based solely on the evidence. Importantly, a substantial number of the jurors actually seated were familiar with media accounts of the case. Much of this information, however, arose during the very voir dire proceedings upon which Alvarez disclaims any reliance.

A significant degree of notoriety is, of course, not unusual in capital cases. Jurors are not required to be wholly ignorant of the facts of a case in order to fairly adjudicate it. (*Irvin v. Dowd* (1961) 366 U.S. 717, 722.) Capital jurors inevitably will

be exposed to the terrible facts of the alleged crime(s) regardless of their prior exposure to media accounts. This is why complaints of sensationalized, negative coverage are, in themselves, frequently insufficient to support a claim of presumed juror bias necessitating a change of venue.

The relatively unusual feature of this case is that a great deal of the extremely negative press coverage centered around the prior mistrial due to jury misconduct (after jury verdicts in favor of both guilt and death). This coverage included a media narrative about how the defendant, generally referred to as a "convicted child killer," was granted a new trial. As the trial court noted, the successful motion for a new trial "generated widespread media coverage which noted that Defendant was not granted a new trial because of any question as to his guilt or innocence, but because of a technical requirement of the law." The necessity for an impartial jury not engaged in misconduct is hardly a "technical" requirement, as no doubt the trial court was aware. Yet there existed a significant threat that prospective jurors who were familiar with the media coverage of the case would not only prejudge Alvarez's guilt and worthiness of the death penalty but would also harbor the belief that the defendant "got off on a technicality" and was somehow manipulating the legal system. As one prospective juror who was not ultimately seated remarked: "[W]asn't he found guilty on the first time, and now it's back because of a technicality?" Though several seated jurors stated that they were aware of a prior trial, the record is unclear as to whether they were aware of a prior guilty verdict, death sentence, or both.

Even in the less emotionally charged context of civil proceedings, the dangers of jurors' knowledge of a prior verdict are obvious. "A jury is likely to give a prior verdict against the

same defendant more weight than it warrants. The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it." (*Coleman Motor Co. v. Chrysler Corp.* (3d Cir. 1975) 525 F.2d 1338, 1351.) In a capital case, in which the stakes and the emotional valence are considerably higher, prior knowledge of a conviction and death sentence may, understandably, be viewed as significantly prejudicial to the jury's ability to impartially adjudicate the defendant's guilt and sentence without prejudgment. (See *Crawford v. Georgia* (1989) 489 U.S. 1040, 1042 (dis. opn. of Marshall, J.) [denial of motion to change venue must satisfy standards of due process which had "been flagrantly violated in this case by the seating of a jury a majority of which knew of Crawford's past trial and a quarter of which knew of his prior death sentence"]; *People v. Woolley* (2002) 205 Ill.2d 296, 305 [informing jury of defendant's prior death sentence was both "prejudicial and inflammatory" and required reversal]; *Hammond v. State* (Ala.Crim.App. 1998) 776 So.2d 884, 892 [reversing due to prosecutor's questioning revealing prior death sentence: "If a juror was uncertain as to whether aggravating circumstances existed, or, if found to exist, whether they outweighed the mitigating circumstances, the knowledge that 12 other people had determined that it did could have swayed the juror's verdict in favor of death"]; *Francis v. State* (Fla. 1982) 413 So.2d 1175, 1179 [expressing concern "about the jurors' knowledge through pretrial publicity of [defendant's] prior conviction and sentence of death" and directing trial court to account for this prejudicial information if motion for change of venue was renewed after reversal and remand on separate issue]; *Hitchcock v. State* (Fla. 1996) 673 So.2d 859, 863 ["[m]aking the present jury aware that a prior

jury recommended death . . . could have the effect of preconditioning the present jury to a death recommendation"]; *Fullwood v. Lee* (4th Cir. 2002) 290 F.3d 663, 682 [despite constraints of the Anti-terrorism and Effective Death Penalty Act, ordering evidentiary hearing on jury bias claim where jury " 'became aware that [defendant's] original death sentence had been reversed because of some technicality involving a mistake the trial judge had made' "]; see also *Berryhill v. Zant* (11th Cir. 1988) 858 F.2d 633, 640–643 (conc. opn. of Clark, J.) [discussing the need for additional voir dire protections where significant percentages of prospective jurors knew defendant had previously been found guilty and had received the death penalty].)

The trial court conducted the majority of voir dire in this case. It frequently interposed generic questions inquiring whether the prospective jurors were aware of Alvarez's case and/or his prior guilty verdict and death sentence and would be able to set that information aside and fairly adjudicate the matter. After receiving affirmative responses, the court routinely accepted such responses at face value. There are reasons to be cautious concerning such bare assertions of impartiality. The high court has instructed that prospective jurors' self-estimation of their own fairness is insufficient to satisfy the due process concerns underpinning a defendant's request for a change of venue. (*Murphy v. Florida* (1975) 421 U.S. 794, 800 (*Murphy*) ["the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights"].)

In light of the substantial potential for prejudice in seating jurors who may be aware of a prior verdict, particularly in notorious capital cases, trial courts should exercise great care in questioning jurors regarding their ability to maintain

impartiality notwithstanding this knowledge.[1]  Regardless of any attestations of impartiality by individual jurors, trial courts should also pay significant attention to the percentage of prospective jurors who admit to disqualifying bias.  And counsel for both defendants and the prosecution should not hesitate to call to the attention of the trial court evidence uncovered in voir dire demonstrating widespread juror bias.  (*Murphy, supra*, 421 U.S. at p. 803 ["[i]n a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it"]; *Harris v. Pulley* (9th Cir. 1989) 885 F.2d 1354, 1364 ["a key factor in gauging the reliability of juror assurances of impartiality is the percentage of veniremen who 'will admit to a disqualifying prejudice.' "].)  Why defense counsel here did not do so is unclear from the record.  Were more information to come to light tending to show that seated jurors were aware of the prior guilty verdict and/or death sentence, that information

---

[1]     Defense counsel in a situation in which pretrial publicity has potentially tainted the jury may be "faced with a Hobson's choice." (*Berryhill v. Zant, supra*, 858 F.2d at p. 642.)  To ensure a fair jury, they must "question each prospective juror individually about what the juror knew about the case from the media or other exposure.  By being forced to ask such pointed questions in front of the *entire* jury venire, however, . . . counsel risk[s] contaminating those prospective jurors who had not read or heard about the case with the responses of those who had." (*Ibid*.)  Here, the trial court wisely adopted an individual and sequestered voir dire, which serves to greatly reduce such concerns.  (See *People v. Hoyt* (2020) 8 Cal.5th 892, 914 [noting trial court has discretion to allow individual and sequestered voir dire to address concerns about potential juror bias].)

would be important in assessing the venue issue.   Final determination of any such concerns, however, must await habeas corpus, in which the record does not limit our view.

**EVANS, J.**

PEOPLE v. ALVAREZ

S089619


Concurring and Dissenting Opinion by Chief Justice Guerrero


I concur in the majority opinion, with one exception. The majority concludes the trial court erred in imposing a $200 parole revocation restitution fine under Penal Code section 1202.45 (section 1202.45) and orders it stricken. I disagree and would hold that the trial court properly imposed the fine.

Section 1202.45, subdivision (a) mandates the imposition of a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and his or her *sentence includes a period of parole.*" (Italics added.) Pursuant to section 1202.45, subdivision (c), this additional parole revocation restitution fine must be suspended and becomes payable only if the defendant is released on parole and parole is later revoked. (§ 1202.45, subd. (c) [parole revocation restitution fine "shall be suspended unless the person's parole . . . is revoked"].)

Here, as the majority notes, the trial court sentenced defendant Francisco Jay Alvarez to a judgment of death for the first degree murder convictions. No period of parole attaches to these counts. But the trial court also imposed an indeterminate term of 25 years to life on the assault on a child resulting in death count. Although not discussed by the majority, an indeterminate term *includes* a period of parole. (See Pen. Code, §§ 1168, subd. (b) [describing indeterminate terms], 3000, subd. (a)(1) [prison sentence pursuant to Pen. Code § 1168 "shall include a period of parole supervision"]; accord, *In re Lira* (2014)

1

58 Cal.4th 573, 579.) The trial court therefore properly imposed a parole revocation restitution fine. (§ 1202.45 [mandating that such a fine be imposed "[i]n every case where a . . . sentence includes a period of parole"]; see *People v. Smith* (2001) 24 Cal.4th 849, 853 ["Under section 1202.45, a trial court has *no* choice and *must* impose a parole revocation fine equal to the restitution fine whenever the 'sentence includes a period of parole' "].)

Contrary to the majority's assertion (maj. opn., *ante*, at pp. 135–137), our decision in *People v. Brasure* (2008) 42 Cal.4th 1037 (*Brasure*) supports the trial court's imposition of a parole revocation restitution fine. In *Brasure*, this court rejected a defendant's claim that a trial court improperly imposed a parole revocation restitution fine under section 1202.45, subdivision (a) where the defendant was sentenced to death and to a determinate prison term under Penal Code section 1170. (*Brasure*, at p. 1075.) Citing Penal Code section 3000, subdivision (a)(1), we reasoned that "such a term 'shall include a period of parole.' " (*Brasure*, at p. 1075.) The same reasoning applies here. Since the trial court's imposition of an indeterminate term included a period of parole, just like the determinate term at issue in *Brasure*, the trial court properly imposed a parole revocation restitution fine. (*Ibid*.; see *People v. Baker* (2021) 10 Cal.5th 1044, 1108–1109 [following *Brasure* and concluding trial court properly imposed § 1202.45 fine where the defendant was sentenced to death and a determinate term].)

The majority notes that "we have . . . drawn a distinction between *indeterminate* sentences with the possibility of parole and *determinate* terms" in this context. (Maj. opn., *ante*, at p. 135, italics added.) It is true that the *Brasure* court

distinguished *People v. Oganesyan* (1999) 70 Cal.App.4th 1178 on the ground that *Oganesyan* "involv[ed] no determinate term of imprisonment imposed under [Penal Code] section 1170, but rather a sentence of life without the possibility of parole for first degree special circumstance murder and an indeterminate life sentence for second degree murder." (*Brasure, supra*, 42 Cal.4th at p. 1075.) However, by distinguishing *Oganesyan* in *Brasure*, we did not thereby approve all aspects of its reasoning. We had no occasion to consider whether *Oganesyan* was correct because we were not faced with an indeterminate sentence. (*Id.* at p. 1049.)

I disagree with the majority's application of *Brasure* here because it appears to rely on the faulty premise that an indeterminate term of imprisonment does *not* truly include a period of parole. As explained, the trial court here imposed an indeterminate sentence pursuant to Penal Code section 1168, subdivision (b). This Penal Code section 1168 indeterminate term carries with it a period of parole under Penal Code section 3000, subdivision (a)(1) — the same statute mentioned in *Brasure*. (*Brasure, supra*, 42 Cal.4th at p. 1075; Pen. Code, § 3000, subd. (a)(1) [prison sentence pursuant to Pen. Code § 1168 "shall include a period of parole supervision"].) Thus, our reasoning in *Brasure* applies equally here and supports the trial court's imposition of a parole revocation restitution fine under section 1202.45. The fact that we are dealing here with an indeterminate term rather than a determinate term does not make a material difference.

Relying on Penal Code section 3041, the majority reasons that an indeterminate term only establishes "a defendant's *eligibility* for parole consideration *after a specified period of incarceration*." (Maj. opn., *ante*, at p. 137, italics added.) The

majority further claims this is why certain courts have found that section 1202.45 does not apply in cases where the defendant is sentenced to life without the possibility of parole and an indeterminate term. (Maj. opn., *ante*, at p. 137.)[1] This type of focus on future events — including the passage of a "specified period of incarceration" (maj. opn., *ante*, at p. 137) or the likelihood of a defendant actually being released on parole by the Parole Board — is misplaced for purposes of determining section 1202.45's application. The trial court must impose a parole revocation restitution fine under section 1202.45 if, at the time of sentencing, a period of parole attaches to the sentence; and, as explained, a period of parole *does* attach to an indeterminate sentence.

Moreover, defendant "is in no way prejudiced by assessment of the [parole revocation restitution] fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Brasure, supra,* 42 Cal.4th at p. 1075.) Although the trial court was mandated to impose the parole revocation restitution fine, absent commutation or

---

[1]     Only one of the five Court of Appeal decisions cited by the majority to support this argument (maj. opn., *ante*, at pp. 137–138) even mentions Penal Code section 3041. (See *Oganesyan, supra,* 70 Cal.App.4th at pp. 1184–1185 [citing Pen. Code § 3041 to support the court's observation that "[i]f granted parole eligibility by reason of executive clemency, then the prisoner would have to secure a parole release date from the Board of Prison Terms"].) The *Oganesyan* court's single reference to Penal Code section 3041 does not support the majority's analysis here. In addition, two of the cases cited by the majority (*People v. McInnis* (2021) 63 Cal.App.5th 853 and *People v. Montes* (2021) 70 Cal.App.5th 35) involved a sentence of life without the possibility of parole, without any additional indeterminate term. These cases also do not support the majority's conclusion.

overturning of his judgment of death in future litigation, it is unlikely that the parole revocation restitution fine will impact defendant in any way.

In sum, while I concur in the remainder of the majority opinion, I respectfully dissent from the striking of the parole revocation restitution fine. Defendant was sentenced to a judgment of death, but also to 25 years to life for assault on a child resulting in death. That latter indeterminate sentence includes a possibility of parole — however unlikely to actually occur — and therefore is subject to a parole revocation restitution fine under section 1202.45.

**GUERRERO, C. J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Alvarez

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S089619
**Date Filed:** August 18, 2025

_____

**Court:** Superior
**County:** Kern
**Judge:** John I. Kelly

_____

**Counsel:**

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell and James William Bilderback II, Assistant Attorneys General, Kathleen A. McKenna, Ross K. Naughton, Sean M. McCoy and Sarah J. Jacobs, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark E. Cutler
Attorney at Law
P.O. Box 501
Lincoln, CA 95648
(530) 305-5575

Sean M. McCoy
Deputy Attorney General
1300 I Street, 14th Floor
Sacramento, CA 95814
(916) 210-7752